## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                        )
**MICHAEL D. HURD, JR.,**                              )
                                                        )
      **Plaintiff,**                                      )
                                                        )
         **v.**                                        )    **Civil Action No. 15-666 (ESH)**
                                                        )
**DISTRICT OF COLUMBIA,**                              )
                                                        )
      **Defendant.**                                    )
_____ )

## MEMORANDUM OPINION

Plaintiff brings this suit under 42 U.S.C. § 1983 to redress alleged due process violations by the District of Columbia ("the District"). He claims the District suddenly and unjustly re-incarcerated him without a hearing, four years after he was mistakenly released from a federal prison. (Am. Compl., July 10, 2015 [ECF No. 7].) The District has moved to dismiss, arguing that plaintiff's substantive due process claim is barred by the doctrine of *res judicata* and that the District did not violate plaintiff's substantive or procedural due process rights. (Def.'s Mot. to Dismiss [ECF No. 9].)[1] For the reasons set forth below, the District's motion to dismiss is granted.

## BACKGROUND

In January 2006, plaintiff Michael Hurd pled guilty in D.C. Superior Court to five counts: (1) carrying a pistol without a license; (2) possession of a prohibited weapon; (3)-(4) two counts

---

[1] The District filed an earlier Motion to Dismiss that was rendered moot by plaintiff's filing of his Amended Complaint. (*See* Minute Order, July 13, 2015.) In support of that earlier motion, the District submitted exhibits to which the Court will refer throughout this opinion. (*See* Exs. 1-12 to Def.'s Mot. to Dismiss [ECF Nos. 5-1 – 5-12].)

of possession of unregistered firearms; and (5) possession of cocaine. (Am. Compl. ¶¶ 10-11.)
He was sentenced to forty-two months in prison with all but forty-five days suspended, a $1,000
fine, and one year of supervised probation. (*Id.* ¶ 11) After violating the terms of his probation,
Hurd was required to serve the previously suspended portion of his sentence, as well as a three-
year term of supervised release. (*Id.* ¶ 12.) On September 21, 2006, he began serving his forty-
two-month sentence at the Federal Correctional Institution in Beckley, West Virginia. (*Id.* ¶ 14.)
Less than a year later, however, Hurd was inexplicably released to a halfway house in D.C.,
which in turn released him a month later to begin serving his three-year term of supervised
release. (*See id.* ¶¶ 15, 17.) It is undisputed that he served only thirteen months of his forty-two-
month prison sentence. (*See* Ex. 3 to Def.'s Mot. to Dismiss [ECF No. 5-3] at 2 n.1 ("Habeas
Motion").)[2] At the time of his release, he apparently believed that his motion for a sentence
reduction had been successful, but he now acknowledges that no reduction had been granted, and
there is no other valid explanation for his early release. (*See id.*)

On July 18, 2010, the U.S. Parole Commission determined that Hurd had successfully
completed his three-year term of supervised release, and it no longer had jurisdiction over him.
(*See* Am. Compl. ¶¶ 19, 22.) During this time, Hurd avers that he successfully completed a sheet
metal apprenticeship program; maintained employment as a sheet metal journeyman;
consistently tested negative for drugs; successfully completed an anger management course; kept

---

[2] The Court will take judicial notice of facts in the public record, *e.g.*, documents filed in D.C.
Superior Court as part of Hurd's criminal case. *See Felder v. Johanns*, 595 F. Supp. 2d 46, 58
(D.D.C. 2009). Moreover, many of these same documents are properly considered at this stage
because they are (1) attached to the District's motion to dismiss, (2) not subject to a dispute
regarding their authenticity, and (3) referred to by, and integral to, Hurd's complaint, *e.g.*,
Habeas Motion. *See U.S. ex rel. Folliard v. CDW Tech. Servs., Inc.,* 722 F. Supp. 2d 20, 24-25
(D.D.C. 2010).

all appointments with officers monitoring his supervised release at the Court Services and

Offender Supervision Agency ("CSOSA"); and re-established ties with his wife and children.

(*See* Habeas Motion at 2, 5.)  By the same token, however, he acknowledges that he failed more

than fifty drug tests and was arrested three times while under supervision.  (*See* Pl.'s Opp'n Br.

[ECF No. 10] at 11; *see also* Ex. 5 to Def.'s Mot. to Dismiss [ECF No. 5-5] at 2.)  First, Hurd

was arrested for simple assault in September 2007 and found not guilty at trial.  (Ex. 5 to Def.'s

Mot. to Dismiss at 2.)  A year later, he was arrested for possession with intent to distribute

cocaine while armed, possession of drug paraphernalia, possession of an unregistered firearm,

and unlawful possession of ammunition, but the charges were later dismissed.  (*Id.* at 2, 21.)  The

arrest report indicates that 108.7 grams of crack cocaine were found in false-bottomed containers

in Hurd's girlfriend's apartment, along with $8,426 in cash, a Ruger firearm, and nineteen rounds

of ammunition.  (*Id.* at 22-23.)  In August 2009, he was again arrested for simple assault, a

charge that was dismissed without prejudice when the victim failed to appear to testify against

him.  (*Id.* at 34, 37.)

Finally, almost a year after his supervision had terminated, Hurd was arrested for

possession of marijuana, to which he eventually pled guilty.  (Am. Comp. ¶¶ 24-25.)  This time

he was sentenced to nine days in prison, to be served over three weekends.  (*See id.* ¶ 25.)  While

serving his second weekend at D.C. Jail, Hurd was informed that he had twenty-seven months

remaining on his 2006 sentence, so he would not be released that evening as he had expected.

(*See id.* ¶¶ 27-29.)  His interrupted prison sentence thus restarted nearly fifty-one months after he

was erroneously released.  (*See id.* ¶¶ 17, 28.)  He was not given any prior notice or a hearing to

contest his re-incarceration.  (*Id.* ¶ 30.)

On November 16, 2011, Hurd filed a motion for habeas corpus in his closed criminal case in D.C. Superior Court.  (*See* Habeas Motion at 1.)  In it, Hurd argued that his re-incarceration "without notice; a hearing, or any sort of warning, is 'so unfair that it must be deemed inconsistent with fundamental notions of fairness embodied in the Due Process Clause.'"  (*Id.* at 4 (quoting *DeWitt v. Ventetoulo*, 6 F.3d 32, 35 (1st Cir. 1993).)  Five days later, the Superior Court issued a show cause order to the United States, which prosecuted Hurd on the 2006 charge, and the District, which was holding him at the jail.  (*See* Ex. 4 to Def.'s Mot. to Dismiss [ECF No. 5-4].)  Although the United States and the District filed timely oppositions, no further action was taken on Hurd's motion by the Superior Court.  (*See* Am. Compl. ¶¶ 31-33.)  Therefore, in June 2012, he filed a second, emergency petition.  (*See id.*)  This time, a Superior Court judge scheduled a motions hearing for more than a month later, at which he denied Hurd's petition from the bench.  (*Id.* ¶¶ 34-35.)  The court then issued a one-sentence order committing Hurd back to prison, but no written opinion.  (*See* Ex. 8 to Def.'s Mot. to Dismiss [ECF No. 5-8].)  Hurd filed an appeal to the D.C. Court of Appeals, which took no action for seventeen months. (Am. Compl. ¶ 36.)

By the time the Court of Appeals issued a ruling, Hurd had already been released from prison on September 30, 2013, so his appeal was denied as moot.  (Am. Compl. ¶¶ 37-39.)  In total, his habeas motion and appeal had been pending before the local courts for more than twenty-five months.  (*See id.* ¶¶ 31, 39.)

## ANALYSIS

### I.   LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" such that a court may "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  Thus, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations omitted).  In ruling on a 12(b)(6) motion, a court may consider facts alleged in the complaint, documents attached to or incorporated in the complaint, matters of which courts may take judicial notice, and documents appended to a motion to dismiss whose authenticity is not disputed, if they are referred to in the complaint and integral to a claim.  *U.S. ex rel. Folliard v. CDW Tech. Servs., Inc.*, 722 F.Supp.2d 20, 24-25 (D.D.C. 2010).

### II.   RES JUDICATA

Before the Court can reach the substance of plaintiff's constitutional claims, it is necessary to address the District's contention that they are barred by the doctrine of *res judicata*. (*See* Def.'s Mot. to Dismiss at 9-17.)  The District first argues that plaintiff's claims were fully adjudicated in a previous class action against it, *Barnes v. District of Columbia*, No. 06-cv-315 (RCL) (D.D.C.), and that plaintiff is bound by the terms of the class settlement in that case.  (*See* Def.'s Mot. to Dismiss at 10-14.)  It also contends that plaintiff's substantive due process claim

5

was rejected by the D.C. Superior Court when it denied his motion for a writ of habeas corpus, in which he advanced substantially similar arguments.  (*Id.* at 14-17.)

### A.  *Barnes v. District of Columbia*

In 2013, the District agreed to settle a class action in which it was alleged, in relevant part, that the District over-detained prisoners beyond their court-ordered release dates.  (*See* Ex. 10 to Def.'s Mot. to Dismiss [ECF No. 5-10] ¶ 15.)  Latching onto the fact that Mr. Hurd's re-incarceration came about when he was not released from a weekend detention on an unrelated marijuana conviction, the District asserts that the allegations are also based on a claim of "over-detention."  (*See* Def.'s Mot. to Dismiss at 10-14.)  It further argues that, because plaintiff's alleged over-detention occurred during the period covered by the *Barnes* Settlement Agreement (September 1, 2005 to July 31, 2013), these claims were settled and dismissed pursuant to the settlement.  (*See id.*)

To succeed on this defense, the District must show that (1) Hurd was a member of the *Barnes* class; (2) class members received the best notice practicable under the circumstances; (3) Hurd did not opt out of the *Barnes* class; and (4) the claims resolved in *Barnes* included those Hurd seeks to assert here.  *See Brown v. Wells Fargo Bank, N.A.*, 25 F. Supp. 3d 144, 148 (D.D.C. 2014); *see also Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984) ("There is of course no dispute that under elementary principles of prior adjudication a judgment in a properly entertained class action is binding on class members in any subsequent litigation."). The second and third elements are plainly satisfied—Judge Lamberth found that the notice provided to *Barnes* class members was the best practicable, and Hurd's name does not appear on the final list of *Barnes* opt-outs.  (*See* Ex. 11 to Def.'s Mot. to Dismiss [ECF No. 5-11] ¶ 15; Ex.

12 to Def.'s Mot. to Dismiss [ECF No. 5-12].)  However, because plaintiff's allegations are

materially different from those in *Barnes*, he is not precluded by the *Barnes* settlement from

pursuing relief here.

The *Barnes* class is defined as all persons who "were (a) incarcerated in any DOC

facility; and (b) who were not released by midnight on the date on which the person was entitled

to be released by court order or the date on which the basis for his or her detention ha[d]

otherwise expired."  (*See* Ex. 10 to Def.'s Mot. to Dismiss [ECF No. 5-10] ¶ 15.)  Although the

District tries to construe this as "encompass[ing] every fact pattern that resulted in a person being

detained in a DOC facility too long" (Def.'s Reply Br. [ECF No. 11] at 6), the allegations in

*Barnes* involved garden-variety administrative failures that resulted in prisoners' delayed

releases.  (*See, e.g.*, Second Am. Compl., 1:06-cv-00315-RCL, ¶ 37 (D.D.C. June 6, 2006) (over-

detention problem exacerbated by problems with "computerized inmate population accounting

system"); *id*. ¶ 42 (one cause of over-detention alleged to be the "resignation of competent

managers from [the DOC's] Records Office").)  In other words, the *Barnes* plaintiffs alleged that

they had satisfied their sentences and yet were inadvertently held over for an additional period.

*See id*. ¶ 11 (whether District is liable to over-detained class members "can be determined by

ministerial inspection of the Department of Corrections' records").  Here, plaintiff alleges that he

was released early from prison, satisfied the conditions of his supervised release, and then four

years after his release was improperly *re-incarcerated* to continue serving that same sentence.

(*See* Def.'s Mot. to Dismiss at 16 ("Plaintiff assert[s] . . . that his re-incarceration after only

serving part of his original sentence was improper and violated his rights under the

Constitution.").)

More fundamentally, the fact that Mr. Hurd was held over by the District after an unrelated detention is only happenstance.  The District asserts that plaintiff had no "liberty interest in his freedom after mistaken release" (Def.'s Reply Br. at 8), so according to that logic, it would have been entitled to arrest him at his home and re-incarcerate him without any due process.  It is thus clear that the earlier, unrelated detention has no legal relevance to plaintiff's claim.  Rather, this is a case of an alleged improper re-incarceration, not over-detention.

In short, without any evidence that plaintiff was *actually* a member of the class—that he filed a claim, or was mailed notice, or was included on the list of potential class members— defendant's *post hoc* attempt to shoehorn him into the *Barnes* class cannot succeed.

**B.  Habeas Motion**

The District next argues that plaintiff's substantive due process claim is barred because it was asserted in his habeas motion, which the D.C. Superior Court ultimately denied, eight months after it was first filed.  (*See* Def.'s Mot. to Dismiss at 15 ("Plaintiff previously asserted, in his *habeas* proceeding, that his substantive due process rights were being violated . . . .").) The Court must therefore determine "(1) whether the claim was adjudicated finally in the first action; (2) whether the present claim is the same as the claim which was raised or which might have been raised in the prior proceeding; and (3) whether the party against whom the plea is asserted was a party or in privity with a party in the prior case."  *Patton v. Klein*, 746 A.2d 866, 870 (D.C. 1999).

As to the second element, the District correctly notes that it is immaterial whether plaintiff has repackaged or relabeled his claims in this Court, because they involve the same nucleus of facts as his habeas motion.  *See id.*  It is also correct that the third element is satisfied, because Hurd was a party to the habeas motion.  (*See* Habeas Motion at 1.)  The only real

question here is whether the Superior Court denied the habeas motion on the merits. *See* D.C. R. Civ. P. 41(b) ("Unless the Court in its order for dismissal otherwise specifies, a[n involuntary] dismissal . . . other than a dismissal for lack of jurisdiction, or for failure to join a party under Rule 19, operates as an adjudication upon the merits.").

In attempting to determine the grounds relied upon in denying habeas, this Court is challenged by the fact that the Superior Court judge did not issue a written opinion. The District asserts that the lack of a written opinion should not matter, because there is no indication that the court failed to consider Hurd's constitutional arguments when it denied his motion. (*See* Def.'s Mot. to Dismiss at 17.) The difficulty is that the District's habeas opposition also raised a dispositive jurisdictional challenge. (*See* Ex. 6 to Def.'s Mot. to Dismiss [ECF No. 5-6] at 1-2; *see also* D.C. R. Civ. P. 41(b) (dismissal for lack of jurisdiction is not an adjudication on the merits).) In light of this uncertainty, the Court reviewed the audio recording of the July 2012 hearing at which Mr. Hurd was denied habeas, and it is clear that the Superior Court resolved the merits of his substantive due process claim, finding that the District committed no due process violation when it re-incarcerated him. (*See* July 27, 2012 Hearing Recording at 3:57:35 PM.)[3]

---

[3] The same cannot be said for Hurd's procedural due process claim, nor does the District meaningfully contend otherwise. The District correctly asserts that claims that "were or *could have been* raised in the Superior Court action" are precluded (*see* Def.'s Mot. to Dismiss at 17), but Hurd could not have raised a procedural due process claim in his habeas motion. *See* D.C. Code § 16-1906. By its nature, a habeas petition attacks the lawfulness of the prisoner's detention, to which procedural due process is largely irrelevant—even if Hurd established that he should have received a prior hearing, it would not have affected the lawfulness of his detention. *See id.* On the other hand, a successful *substantive* due process claim would have meant that his re-incarceration was unconstitutional, and he would have been entitled to release. *See id.* To be sure, Hurd's habeas motion did raise the lack of prior notice and a hearing, but only insofar as it buttressed his substantive claim. (*See* Habeas Motion at 4 ("To snatch Mr. Hurd away from all of that without notice; a hearing, or any sort of warning, is 'so unfair that it must be deemed inconsistent with fundamental notions of fairness embodied in the Due Process Clause.'").)

Ordinarily, a finding that a plaintiff's claim has already been adjudicated would end the analysis, but Hurd also argues that the D.C. Court of Appeals held that his unsuccessful habeas motion would not preclude the instant action.  (Pl.'s Opp'n Br. at 3-5.)  Specifically, in finding Hurd's habeas appeal moot, the Court of Appeals stated:

> Appellant argues that the appeal is not moot because our failure to decide the merits of it would lead to the "collateral consequence" that he cannot pursue a contemplated action under 42 U.S.C. § 1983 for damages caused by the putatively unjust re-incarceration. That argument has no merit. *See Spencer v. Kemna*, 523 U.S. 1, 17 (1998); *id* at 20-21 (Souter, J. concurring). *See also Heck v. Humphrey*, 512 U.S. 477, 487 (1994).

(Ex. 9 to Def.'s Mot. to Dismiss [ECF No. 5-9] at 2.)  This statement might be read in a few different ways, depending on which part of Hurd's argument "ha[d] no merit."  One could read it, as plaintiff does, to mean that he *can* still "pursue a contemplated action under 42 U.S.C. § 1983" regardless of whether the Court of Appeals overturned the lower court's habeas denial. (*See* Pl.'s Opp'n Br. at 5.)  However, one can also read it to mean that Hurd's inability to later bring suit has no impact on the mootness analysis, since his appeal is moot *regardless of whether it later precludes him from bringing suit*.  The cases cited by the Court of Appeals, which do not concern *res judicata* at all, make clear that the latter reading is correct.  *See Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (released prisoner's habeas petition is moot regardless of whether his contemplated § 1983 action is foreclosed as a result).  As such, the Court of Appeals' ruling has no impact on the preclusive effect of the habeas denial.  But, even assuming *arguendo* that plaintiff's substantive claim is not barred, the Court would reject that claim on the merits.

## III.  SUBSTANTIVE DUE PROCESS

Mr. Hurd asserts that his re-incarceration more than fifty months after he was erroneously released, during which time he successfully completed a three-year term of supervised release

and pursued a trade, was so fundamentally unfair that it violated substantive due process. (*See* Am. Compl. ¶ 66.)

The D.C. Circuit has not had occasion to squarely address mistaken-release due process claims like those asserted here. The closest it came was in *United States v. Blakney*, 1997 WL 702372, at *1 (D.C. Cir. Oct. 23, 1997), which involved a defendant's claim that imposing a greater sentence after the government's successful appeal would violate Due Process, because she had already served the sentence originally imposed. *Id.* at *1. Defendant relied upon a mistaken-release due process case from the First Circuit, *DeWitt v. Ventetoulo*, 6 F.3d 32 (1st Cir. 1993), but the Court declined to decide whether it "would accept *DeWitt* as the law of this Circuit," for unlike DeWitt, Blakney had always known that the legality of her sentence was in dispute. *Blakney*, 1997 WL 702372, at *1. Similarly, in *United States v. Campbell*, the district court stated in *dicta* that "in a most unusual case it might well be fundamentally unfair and violative of the Due Process Clause for the Court to resentence a defendant after he has served a statutorily invalid sentence," because the defendant's expectations of finality had crystallized. *See* 985 F. Supp. 158, 160-61 (D.D.C. 1997). However, the court held that the defendant did not present such an unusual case, because he was aware from the moment he was sentenced that the downward departure he received was "most unusual and would be immediately challenged by the United States." *Id.* at 160. The D.C. Circuit summarily affirmed this holding for substantially the same reasons stated by the district court. *United States v. Harrison*, 1998 WL 704522, at *1 (D.C. Cir. Aug. 19, 1998).

Finally, although the decision was apparently not appealed, one of the early, leading cases finding that a released prisoner could not be re-incarcerated came out of this jurisdiction. *See United States v. Merritt*, 478 F. Supp. 804, 808 (D.D.C. 1979). In *Merritt*, the defendant

11

received a federal sentence to run consecutively with a sentence he was already serving in Maryland, but after he inquired three times with U.S. Marshals about the detainer they had lodged with Maryland officials, the Marshals Office stated that it would take no action until it was notified of his release from the Maryland prison. *Id.* at 805-06. Since the U.S. Marshals did not receive any notification, it did not execute on the detainer and Merritt was released from Maryland prison. Thereafter, he married, adopted a handicapped child, became active in his church, and became part owner and vice president of a construction company. *Id.* at 806. U.S. Marshals later arrested him nearly three years after his release, but the court held that it would be inconsistent with fundamental principles of liberty and justice to require him to serve his federal sentence. *See id.* at 806, 808. Looking to the totality of the circumstances, the court found that the U.S. Marshals were "affirmatively wrong" to allow his release, Merritt played no part in effecting his release (to the contrary, he inquired three times about the detainer), and executing the sentence after three years would "needlessly jeopardize his [exceptional] long-term adjustment to society . . . for no purpose other than blind obedience to the 1973 sentence." *Id.* at 807-08.

Therefore, the question here is whether this is "a most unusual case." *See Campbell*, 985 F. Supp. at 161. Historically, the general rule at common law was that "[n]either the honest mistake nor the willful disregard of duty on the part of the officers whose duty it is to enforce the judgment can release the convicted party from its consequences." *See Ex parte Bugg*, 145 S.W. 831, 832 (Mo. App. 1912). Exceptional circumstances, however, in which a prisoner had long since been successfully reintegrated into society would create an outer temporal limit, after which "society can no longer have any interest in [the judgment's] enforcement." *See id.* at 833 (after state permitted prisoner with tuberculosis to be free for three years, it could no longer insist

on his re-incarceration); *see also Shields v. Beto*, 370 F.2d 1003, 1006 (5th Cir. 1967) (violation

of due process to re-incarcerate prisoner on a Texas sentence 28 years after Texas released him

to Louisiana authorities and failed to take any action in the interim).

When this "outer limit" is deemed to have been breached, it is not always clear whether

courts are relying on equitable or constitutional grounds to find for the prisoner.  *See, e.g.*, *White

v. Pearlman*, 42 F.2d 788, 789 (10th Cir. 1930); *Merritt*, 478 F. Supp. at 808 (using phrases like

"shock the conscience" and "fundamental principles of liberty and justice" despite the fact that

the prisoner did not bring a constitutional claim).  This is especially true given that many cases

analyze constitutional claims under the common law doctrines of waiver and estoppel.  *See, e.g.*,

*Shields*, 370 F.2d at 1005 (finding Texas's lack of interest in prisoner to constitute a waiver of

jurisdiction); *Johnson v. Williford*, 682 F.2d 868, 872-73 (9th Cir. 1982) (finding that the same

facts created a due process violation and equitably estopped government from re-incarcerating

prisoner).  The appropriate remedy is also an issue—would the prisoner be entitled only to have

his street time credited towards his sentence or to be relieved from that sentence altogether?

Courts are generally in agreement that "credit for time spent at liberty" is a common law

doctrine, and that if due process is implicated, the prisoner cannot be re-incarcerated at all.  *See,

e.g.*, *United States v. Martinez*, 837 F.2d 861, 865 (9th Cir. 1988) (after determining that prisoner

could not prove a due process violation, court went on to consider whether he was entitled to

credit for time at liberty under federal common law); *Vega v. United States*, 493 F.3d 310, 317

(3d Cir. 2007).  In contrast, the D.C. Court of Appeals does not follow federal common law and

has disavowed any "broad [common law] 'doctrine of credit for time at liberty,'" except where

"extreme circumstances" implicate due process concerns.  *See Wells v. United States*, 802 A.2d

352, 354-55 (D.C. 2002).

13

In determining whether re-incarceration is so unfair as to implicate due process concerns, modern cases apply the totality of the circumstances test adopted in *Merritt*. *See* 478 F. Supp. at 807 ("A convicted person will not be excused from serving his sentence merely because someone in a ministerial capacity makes a mistake with respect to its execution. Several additional factors must be present before relief will be granted . . . ."); *Martinez*, 837 F.2d at 864 (noting that more recent cases apply *Merritt*'s totality of circumstances test). Although certain factors tend to blend together—for instance, a very long period of mistaken release might indicate more than mere negligence on the government's part—they have generally been applied by courts with some consistency. They include: (1) the length of mistaken release; (2) the government's level of culpability; (3) the prisoner's knowledge of, or contribution to, the mistake; and (4) the prejudice caused by re-incarceration, *i.e.*, how well the prisoner has re-adjusted to society. *See Merritt* 478 F. Supp. at 807-08.

### A.  Amount of Time at Liberty

Hurd spent more than four years out of prison before being re-incarcerated (three of which were on supervised release), which is greater than the durations typically deemed insufficient to violate due process. *See Hawkins v. Freeman*, 195 F.3d 732, 737 (4th Cir. 1999) (twenty months); *Hughes v. Oliver*, 596 F. App'x 597, 598 (10th Cir. 2014) (one year); *Piper v. Estelle*, 485 F.2d 245, 246 (5th Cir. 1973) (twenty-two months); *Sterling v. Maggio*, 505 F. Supp. 1111, 1113 (M.D. La. 1981) (less than eighteen months); *Campbell v. Williamson*, 783 F. Supp. 1161, 1162 (C.D. Ill. 1992) (nineteen months); *Graham v. DeBoo*, 2009 WL 224491, at *4 (N.D.W. Va. Jan. 23, 2009) (twenty-nine months). That said, courts have declined to find a violation where the prisoner was at liberty for far longer than Hurd. *E.g.*, *McPhearson v. Benov*,

2014 WL 1794561, at *9 (E.D. Cal. May 6, 2014) (nearly ten "exemplary" years spent at liberty).  Compared to cases finding a violation, Hurd's four years do not approach the extreme cases like *Shields*, 370 F.2d at 1006 (twenty-eight years), but they do fall comfortably within the range found troubling to courts.  *See Merritt*, 478 F. Supp. at 806 (thirty-three months); *Johnson*, 682 F.2d at 869 (fifteen months); *Bugg*, 145 S.W. at 832 (three years); *DeWitt*, 6 F.3d at 33 (eight months).

As such, this factor weighs slightly in Hurd's favor.  However, the time-at-liberty factor tends to merge with a consideration of *how* the prisoner spent his time at liberty—he should certainly not be credited for ten years at liberty if they were spent on a crime spree.  *See, e.g., In re Messerschmidt*, 104 Cal. App. 3d 514, 517 (Ct. App. 1980) (placing significant emphasis on the fact that the prisoner spent his time at liberty committing various crimes).  As explained more fully herein (*see infra* Part III.D), Hurd's repeated run-ins with police tend to negate any benefit he might have otherwise enjoyed for the amount of time he spent at liberty.

### B.  Government Culpability

Another factor considered by courts is how culpable the government was in releasing the prisoner, for mere negligence is not enough to implicate due process.  *See Merritt*, 478 F. Supp. at 807 (U.S. Marshal was "affirmatively wrong . . . [to] act beyond his legal authority" in refusing to execute detainer); *Shelton v. Ciccone*, 578 F.2d 1241, 1245-46 (8th Cir. 1978) (U.S. Marshals failed to act on warrant for seven years, which constituted "extreme neglect," if not purposeful dereliction).  Significantly, the culpability for Hurd's mistaken release belongs to federal authorities, not the District, so those errors do not impact the analysis.  *See Leggett v. Fleming*, 380 F.3d 232, 235-36 (5th Cir. 2004) (errors of state officials do not impact whether a

prisoner must serve the remainder of his federal sentence); *Vega*, 493 F.3d at 321 (same). As a result, the Court cannot attribute to the District plaintiff's mistaken release from the Federal Correctional Institution at Beckley (Am. Compl. ¶ 15), the failure of the U.S. Parole Commission to detect the error during the three years he spent under its jurisdiction (*id.* ¶ 19), or the related failure of CSOSA to detect the error while it monitored his supervised release. (*Id.* ¶ 20; *see also* D.C. Code § 24-133(a) (CSOSA is a federal agency).) Standing alone, then, the District's failure to detect the error during the few instances when Hurd was later incarcerated amounts, at best, to contributory negligence.

Although many opinions look only to the government's culpability in *releasing* the prisoner, the Court will also consider whether the District acted arbitrarily or vindictively in its *re-incarceration* of Mr. Hurd. *See DeWitt*, 6 F.3d at 35-36 (where state claimed re-incarceration was required by change in state law but failed to re-arrest similarly situated parolees, court inferred that its motivation was to sidestep parolee's entitlement to revocation hearing on unrelated incident). After all, as the Fourth Circuit has persuasively noted, it is the re-incarceration that Hurd is challenging as unconstitutional, not the previous mistakes. *See Hawkins*, 195 F.3d at 746 (previous mistakes have "no real bearing upon the question of whether the later revocation . . . was conscience-shocking"); *see also Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 883 (1st Cir. 2010) (government's valid interest in re-incarceration precludes a finding of conscience-shocking vindictiveness).

Plaintiff suggests that the District re-incarcerated him for improper reasons, stemming from its repeated conflict with the Parole Commission over whether to revoke Hurd's supervised release. (*See* Pl.'s Opp'n Br. at 10-11.) There is support for the proposition that an improperly motivated re-incarceration can violate substantive due process. *See DeWitt*, 6 F.3d at 35-36. It is

also plausible that supervisors at CSOSA would have been frustrated by the Parole

Commission's lenient responses to Hurd's alleged misconduct, offering Hurd only reprimands

rather than the revocation that CSOSA repeatedly recommended.  (*See* Ex. 5 to Def.'s Mot. to

Dismiss at 12-15, 30-35.)  However, there is nothing in the record to suggest that CSOSA was

involved in the decision to re-incarcerate Hurd, and as noted, plaintiff is wrong to impute

CSOSA's alleged motives to the District, because CSOSA is a federal agency.  *See* D.C. Code §

24-133(a).

   The more concerning aspect of Hurd's re-incarceration is the questionable authority of

the DOC to unilaterally take that action, without a warrant, a detainer, or any apparent effort to

subsequently transfer Hurd back to federal custody.  From the earliest stages of Hurd's

prosecution and imprisonment, the District's authority over Hurd was statutorily committed to

the federal government, and the Court is unaware of what the legal basis would be for permitting

the District to assume that authority.  First, responsibility for Hurd's prosecution was committed

to the United States.  *See* D.C. Code § 23-101(c) (felony prosecutions "shall be conducted in the

name of the United States by the United States attorney for the District of Columbia or his

assistants").  Next, upon conviction, Hurd was committed "for [his] term[] of imprisonment . . .

to the custody of the Attorney General of the United States," who designated Hurd's place of

confinement.  *See id.* § 24-201.26.  The only way the District would then be "vested with

jurisdiction over" Hurd is if the Attorney General had designated him for incarceration at a

District facility, which did not occur.  *See id.* § 24-201.02.  Finally, upon release from prison,

authority over Hurd's supervised release was vested in the U.S. Parole Commission, with day-to-

day supervision by CSOSA.  *See* D.C. Code § 24-133(c)(2).  If Hurd had been re-taken during

his period of supervised release, there is little question that the Parole Commission would have

had jurisdiction over him.  *See Boykins v. United States*, 856 A.2d 606, 608-09 (D.C. 2004) (by ordering supervised release rather than probation, superior court gave up jurisdiction over revocation to the Parole Commission).

Instead, the more logical inference is that Hurd should have been returned to federal custody.  In fact, the District itself seems to have acknowledged its lack of authority in its habeas opposition, where it argued that Hurd's request for a sentence reduction must be addressed by the U.S. government, not the DOC.  (Ex. 6 to Def.'s Mot. to Dismiss at 2.)

In the somewhat analogous context of escape, *United States v. Bradley*, 566 F. Supp. 1392, 1394 (D.D.C. 1983), is instructive.  There, a D.C. prisoner was committed to the custody of the Attorney General following his Superior Court conviction, and he escaped from a federally-operated halfway house in the District.  *Id.*  He thus became "an escapee from the Attorney General's custody," and once he was located, the U.S. Marshals filed a detainer with corrections officials at the D.C. Jail, where the prisoner had been locked up on an unrelated charge.  *See id.*  The District did not assert any authority over the prisoner, nor is there any indication that such authority existed; having been initially committed to federal custody, the escaped prisoner was properly returned to federal officials.  *See id.*  Similarly, although not dealing with a due process claim, the New York Court of Appeals found that a prisoner mistakenly released by the state's Board of Parole could not be summarily arrested at his home by correctional officers, without their first seeking the Board's approval and getting the release order vacated.  *See People ex rel. Spinks v. Harris*, 53 N.Y.2d 784, 785 (1981).  Because the arrest and incarceration were without any lawful basis, the prisoner was ordered to be released immediately, subject to the Board's ability to then institute the proper revocation proceedings.

18

*See id.*  While not directly on point, these cases do suggest that the DOC acted without lawful authority in unilaterally detaining Hurd for the remainder of his unserved sentence.

With authority over Hurd's sentence having been fully committed to federal officials, the District was apparently bound to notify federal officials and return him to their custody. Although there are no allegations here that the District failed to do so maliciously, it is nonetheless arguable that Hurd's imprisonment was *ultra vires*.  *See also* D.C. Code § 24-211.02(a-1)(2) ("Nothing in this subsection shall be construed as . . . [g]ranting any arrest powers to any employee of the Department of Corrections performing any duty at the Central Cellblock . . ."); *id.* § 24-101(f) ("The District of Columbia Department of Corrections shall remain responsible for the custody . . . of any person convicted of a felony offense pursuant to the District of Columbia Official Code . . . *until December 31, 2001* . . . .") (emphasis added); *id.* § 24-101(g)(1)(A) ("Notwithstanding any other provision of law, to the extent the Bureau of Prisons assumes functions of the Department of Corrections under this subchapter, the Department is no longer responsible for such functions . . . .").  While this does not necessarily make the re-incarceration unconstitutional, it does weigh in plaintiff's favor in the due process analysis.

### C.  Prisoner's Culpability

A due process claim cannot succeed if the prisoner took some affirmative step to effect his release or continued freedom.  *See Merritt*, 478 F. Supp. at 806; *Sanchez v. Warden, New Hampshire State Prison*, 329 F. Supp. 2d 200, 209 (D.N.H. 2004) (after release, prisoner immediately assumed a false identity and later fought extradition from Massachusetts after being arrested on new charges).  Some courts extend this principle to a prisoner's silence or inaction

after realizing a mistake had been made. *Martinez*, 837 F.2d at 865; *Camper v. Norris*, 36 F.3d 782, 785 (8th Cir. 1994). This factor is not actually weighed against other factors, but rather, if present, it simply disqualifies the prisoner from any relief. *See Merritt*, 478 F. Supp. at 806. There is no need to spend long on this point, however, because there is no indication that Hurd was aware of the mistake until he was re-incarcerated. He represented to the Superior Court that he believed his motion for a sentence reduction had been granted, and for purposes of deciding this motion, the Court will accept that representation as true. (*See* Habeas Motion at 2 n.1.)

### D. Prejudice / Readjustment to Society

From the earliest mistaken-release cases onward, particular emphasis has been placed on this factor—re-incarceration is really only fundamentally unfair where the prisoner has successfully re-integrated himself into society for a substantial period of time. *See Bugg*, 145 S.W. at 832 (expressing concern that "after a man had reared a family and attained to a position of high standing in the community, he and his family might be humiliated and disgraced by the bringing to light of an *old judgment* long since forgotten") (emphasis added). Cases in which a due process violation is found invariably involve such a success story. *See, e.g.*, *DeWitt*, 6 F.3d at 33 (in addition to obtaining work, beginning a painting business, and resuming his familial relationships, prisoner had previously saved a prison guard from another inmate's attack); *Johnson*, 682 F.2d at 873 (prisoner had reunited with his family, left his job as a fruit packer to start his own fruit packing business, and hired five employees).[4] But, of course, where a prisoner

---

[4] By the same token, some courts have declined to find a violation even where such a success story exists. *See, e.g.*, *McPhearson*, 2014 WL 1794561, at *9 (prisoner "exhibited exemplary conduct, married the mother of his children, obtained steady employment and paid his taxes" for nearly ten years).

continued to break the law after being released, courts have not hesitated to dismiss his claim. *See, e.g.*, *Wells*, 802 A.2d at 355 ("[P]erhaps most importantly, the manner in which appellant re-entered the District of Columbia justice system is inconsistent with the notion that he had successfully readjusted to the community . . . .").

Plaintiff's substantive due process argument rests entirely on *Merritt*, which he claims "disposes of [the District's] argument" that his allegations do not shock the conscience. (Pl.'s Opp'n Br. at 13-14.) However, his allegations are readily distinguishable from the facts in *Merritt*. *See* 478 F. Supp. at 806 & n.12 (upon release, Merritt became an active member of his church, engaged in a prison ministry, became part owner and vice president of a construction company, and adopted a handicapped child with his wife). It is true that, during his release, Hurd successfully completed his three-year term of supervision, worked as a sheet metal journeyman, completed an anger management course, and re-established his ties to his wife and children. (*See* Habeas Motion at 5.) On the other hand, as plaintiff acknowledges (*see* Pl.'s Opp'n Br. at 11 & n.2), he also tested positive for cocaine and marijuana numerous times; was charged twice with simple assault; was arrested for possession of drug paraphernalia, possession with intent to distribute cocaine while armed, unlawful possession of ammunition, and possession of an unregistered firearm; and pled guilty to possession of marijuana and was sentenced to nine days in jail. (*See* Ex. 5 to Def.'s Mot. to Dismiss at 2-3, 12-23, 34-35, 41-42). Although the Court recognizes that only one of these arrests resulted in a conviction, this record negates any argument that plaintiff successfully turned his life around.

**E. Conclusion**

Given the weight that courts have afforded the prejudice factor, and the lack of precedent finding a due process violation where the released prisoner continued to break the law, these

facts are fatal to plaintiff's substantive claim.  Although the District may indeed have lacked

legal authority to unilaterally re-incarcerate him—rather than returning him to federal custody—

that alone would not state a due process claim, *see Paul v. Davis*, 424 U.S. 693, 701 (1976)

(Fourteenth Amendment is not "a font of tort law"), for the totality of the circumstances do not

amount to a truly exceptional, conscience-shocking claim.

Furthermore, in its widely cited *Hawkins* decision, the Fourth Circuit has held that, in the

wake of the Supreme Court's decision in *County of Sacramento v. Lewis*, the "shocks the

conscience" analysis is only a threshold question—a substantive due process violation must also

infringe on a deeply rooted liberty interest that historically has been protected.  *See Hawkins*, 195

F.3d at 738 (citing 523 U.S. 833, 847 n.8 (1998)).  The court then identified this asserted liberty

interest as a prisoner's right "to remain free on erroneously granted parole so long as he did not

contribute to or know of the error and has for an appreciable time remained on good behavior to

the point that his expectations for continued freedom from incarceration have 'crystallized.'"

*Hawkins*, 195 F.3d at 747.  It concluded that "[t]his is not the traditional stuff of substantive due

process rights."  *Id.* at 748.  Following this rationale, one cannot conclude that the District

infringed on a deeply rooted, historically protected liberty interest, and for this reason as well,

Hurd's substantive due process claim must be rejected.

## IV.  PROCEDURAL DUE PROCESS

Plaintiff next asserts that the District's failure to provide him with any kind of notice or

hearing before re-incarcerating him violated procedural due process.  (Am. Compl. ¶ 65.)  A

procedural due process analysis proceeds in two steps: first, plaintiff must show a protected

liberty or property interest of which he has been deprived by the government, and second, he

must show that the procedures he was afforded prior to that deprivation were constitutionally

insufficient.  *See Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570 n.7 (1972).  Because it is undisputed that the District failed to provide Hurd with any prior notice or hearing, the only question is whether he had a protected liberty interest.

Protected liberty interests can be created by state law or the Due Process Clause itself. *See Kentucky Dep't of Corr.*, 490 U.S. at 460; *Thompson v. Cockrell*, 263 F.3d 423, 426-27 (5th Cir. 2001) (finding that then-existing Texas law created a liberty interest in receiving credit for time spent erroneously at liberty).  A protected liberty interest arising out of the Due Process Clause has been recognized, for instance, when the government seeks to revoke parole, *Morrissey v. Brewer*, 408 U.S. 471, 484 (1972), or to revoke supervised release.  *Hill v. Johnston*, 750 F. Supp. 2d 103, 105 (D.D.C. 2010).  But in cases of mistaken release followed by re-incarceration, courts have consistently refused to recognize a liberty interest under the Due Process Clause "because, unlike a parolee, [a mistakenly released prisoner] does not have a 'legitimate claim of entitlement' to freedom.'"  *Henderson v. Simms*, 223 F.3d 267, 274 (4th Cir. 2000); *Jenkins v. Currier*, 514 F.3d 1030, 1035 (10th Cir. 2008) (same); *Campbell*, 783 F. Supp. at 1164 (same); *Vega*, 493 F.3d at 317 (finding that no court has "satisfactorily identified a concrete interest upon which to anchor the right to procedural due process in interrupted detention cases").

The only remaining basis for finding a protected liberty interest is under state law.  *See Thompson*, 263 F.3d at 427.  In *Thompson*, the Fifth Circuit found that then-existing Texas common law conferred "a legal entitlement to calendar time during the period of [the prisoner's] premature release," which was sufficient to trigger procedural due process protections.  *See id.* As discussed, however, the D.C. Court of Appeals has declined to recognize a similarly broad,

unqualified common-law right to credit for time spent at liberty.  *See Wells*, 802 A.2d at 354.

Plaintiff also asserts a statutory right to such credit under D.C. Code § 24-406(c)(1), which states

that certain parolees shall receive credit for all time served on parole.  (Pl.'s Opp'n Br. at 11.)

He is correct that, "[f]or *most* purposes, supervised release is the functional equivalent of

parole."  *Anderson v. U.S. Parole Comm'n*, 2010 WL 5185832, at *2 (D.D.C. Dec. 22, 2010)

(emphasis added).  However, a significant difference between parole and supervised release is

that the former is served in lieu of prison time, while the latter is served only *after* the prison

term has ended.  *Compare* D.C. Code § 24-404(a) *with id.* § 24-403.01(b)(1).  As such, there is

no legal basis for crediting a period of supervised release towards an incomplete prison sentence.

Therefore, without a protected liberty interest in his continued freedom, plaintiff cannot state a

procedural due process claim.

## CONCLUSION

Accordingly, the Court concludes that plaintiff cannot, as a matter of law, state a

constitutional claim for damages based on a violation of his due process rights, and therefore, the

District's motion to dismiss will be **GRANTED**.  A separate order accompanies this

Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date: November 19, 2015