UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL D. HURD, JR., | ) |
| | ) |
| Plaintiff, | ) Civil No. 15-CV-666 (ESH) |
| | ) |
| v. | ) |
| | ) |
| DISTRICT OF COLUMBIA, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF MICHAEL D. HURD'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Michael D. Hurd, Jr. ("Mr. Hurd), by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56 and this Court's Local Rule 7(a) and (h), submits the following Memorandum of Points and Authorities in Support of his Cross-Motion for Summary Judgment:

**I.   INTRODUCTION**

For decades the District of Columbia ("the District") has run a prison system that holds people past their release dates and gives no weight to their constitutional rights. Mr. Hurd is one of these people. On September 20, 2011, Mr. Hurd pled guilty to a misdemeanor charge, surrendered to the D.C. Department of Corrections (the "DOC") for a weekend sentence, and was kept in prison for two years without prior notice or a hearing. The undisputed facts show that DOC employees blindly followed ineffective and unconstitutional policies and procedures, implemented ineffective practices, and falsified prison records in their successful attempt to keep Mr. Hurd behind bars for as long as possible, and that the District itself was deliberately indifferent to the plight of over-detained individuals. What is perhaps most shocking about this

case is that the sentence on which Mr. Hurd was allegedly held had, by any measure, expired years before his incarceration.

Mr. Hurd seeks in this lawsuit to vindicate his Fifth Amendment rights to procedural and substantive due process. The undisputed evidence in this case clearly shows that DOC's longstanding practices exhibited a deliberate indifference to Mr. Hurd's right to be free from illegal over-detention. As such, Mr. Hurd is entitled to summary judgment in his favor.

## II.   FACTUAL BACKGROUND

Mr. Hurd has been a long-time resident of the Washington, D.C. area. Statement of Undisputed Material Facts ("SUMF") ¶ 1; however after completing high school, Mr. Hurd enlisted in the United States Marine Corps and served honorably on active duty from 1997 to 2001. SUMF ¶ 2. During his time in the Marine Corps, Mr. Hurd was stationed at Camp Lejeune, North Carolina. SUMF ¶ 3. After completing his obligated service, Mr. Hurd remained a member of the Marine Corps Reserves until February 9, 2005. SUMF ¶ 4. During this time, Mr. Hurd continued living in North Carolina, where he obtained a concealed carry permit for his handgun. SUMF ¶ 5.

In 2005, Mr. Hurd moved back to the Washington, D.C. area. SUMF ¶ 6. Shortly after his return to the D.C. area, Mr. Hurd was stopped in his vehicle by the Metropolitan Police Department. SUMF ¶ 7. Mr. Hurd informed the officer that he was legally carrying a concealed handgun, that his handgun was in the glove compartment of his vehicle, and that he had a carry permit for it from North Carolina. SUMF ¶ 8. Unknown to Mr. Hurd at the time, the District of Columbia had some of the strictest gun laws in the country, making it illegal for him to carry his weapon despite his unexpired concealed carry permit. (D.C.'s strict gun control law would be struck down by the U.S. Supreme Court three years later. *D.C. v. Heller*, 554 U.S. 570 (2008)).

The officer informed Mr. Hurd that private citizens were prohibited from carrying firearms inside the District, SUMF ¶ 9, and Mr. Hurd was arrested and charged with one count of carrying a pistol without a license, along with four misdemeanor charges. SUMF ¶ 10.  Mr. Hurd did not fight his charges but, instead, owned up to his conduct, and pled guilty to all five counts. SUMF ¶ 11.  On September 21, 2006, he was committed to the custody of the United States Attorney General and sentenced to a 42-month term of incarceration followed by three (3) years of supervised release. SUMF ¶ 12.  The following day, Mr. Hurd filed a motion *pro se* in which he requested a sentencing reduction. SUMF ¶ 13.

Mr. Hurd's 42-month sentence began immediately, and he was transferred from D.C.'s jail to the Federal Correctional Institution ("FCI") in Beckley, West Virginia, where he served the balance of his sentence. SUMF ¶ 14.  On June 11, 2007, Mr. Hurd was informed that he had no detainers or warrants that would keep him in custody and he was released from federal prison. SUMF ¶ 15.  Mr. Hurd was then transferred to the Hope Village Halfway House in Washington, D.C. *Ibid*.  On July 18, 2007, Mr. Hurd was released from the halfway house, and he began his three year term of supervised release. SUMF ¶ 16.  During this time, Mr. Hurd had regular contact with the U.S. Parole Commission and D.C. Court Services and Offender Supervision Agency ("CSOSA") officers monitoring his supervised release. SUMF ¶ 17.

Very soon after his release from FCI Beckley, Mr. Hurd began a sheet metal apprenticeship, moving forward with his life in an attempt to return to being a productive member of society. SUMF ¶ 18.  On July 18, 2010, after having successfully completed the three year term of supervised release, Mr. Hurd's supervision was terminated. SUMF ¶ 19.  With his sentence now complete, Mr. Hurd continued working towards his Journeyman certification with the union. SUMF ¶ 20.

On May 29, 2011, almost four years *after* his release from custody, Mr. Hurd was arrested on a misdemeanor charge of possession of less than two ounces of marijuana. SUMF ¶ 21.  Possession of this quantity of marijuana is now legal in D.C.  D.C. Code Ann. § 48-904.01(a)(1)(A) (West).  Once again, he chose to take ownership of his actions and plead guilty on September 20, 2011. SUMF ¶ 22.  In order to prevent his very minor charge from interfering with Mr. Hurd's progress towards his Journeyman's certification, Mr. Hurd was sentenced to nine days of incarceration *to be served on consecutive weekends.  Ibid*.

Mr. Hurd surrendered to the DOC for his first weekend on September 23, 2011 and he was released on September 25, 2011, without incident. SUMF ¶ 23.  On September 30, 2011, Mr. Hurd surrendered again to serve the second weekend.  SUMF ¶ 24.  On October 2, 2011, however, instead of releasing Mr. Hurd as the court order required, DOC employees held him beyond the sentence that had been imposed for his misdemeanor marijuana charge. SUMF ¶ 25.

Generally, personnel in the Records Division of the DOC (also referred to as the "Records Office") known as Legal Instrument Examiners ("LIEs") are supposed to review court orders coming back from court to determine whether a detainee is subject to release. SUMF ¶ 30. If an inmate is a potential discharge, the Records Office conducts the review of that inmate's file to look for other pending charges and other matters to determine whether he is eligible for release and also runs a check for any outstanding warrants, detainers or other holds. SUMF ¶ 31. If it is determined through that process that there are no other reasons to hold the individual, the process of releasing that individual from the jail is initiated.  SUMF ¶ 32.  However, this did not happen in Mr. Hurd's case.

As happens in a large organization like the DOC, mistakes are frequently made. Although it is not clear from the record, it does appear as though an LIE failed to include all of

Mr. Hurd's sentence on documents that accompanied him to the U.S. Bureau of Prisons in 2006. As a result, a detainer was never lodged for Mr. Hurd's misdemeanor time.  When his felony sentence was completed, he was released and he successfully completed his time in a halfway house and his court-imposed supervised release. SUMF ¶¶ 15, 16, 19.

According to a designated representative from the U.S. Bureau of Prisons, Mr. Hurd was properly released in 2007. SUMF ¶ 15.

When he was re-incarcerated on a minor, unrelated charge, an LIE made the decision to "hold" him without notice or a hearing.  SUMF ¶¶ 33, 36.  Although the regulations of the DOC allow for the incarceration of an individual without a hearing, the "face sheet" requires a hearing date be filled in. SUMF ¶ 35.  The LIE who decided to incarcerate Mr. Hurd on the expired sentence noted that these issues arose "[m]ore times than we would like to remember," but that there were no consistent policies of how the issue was to be handled. SUMF ¶ 47.  In the end, he decided to keep Mr. Hurd and made up a "hearing date" that Mr. Hurd never had. SUMF ¶ 35.

The practice of the DOC with regard to the release of detainees is to have LIEs review and calculate release orders. SUMF ¶ 31.  Upon conclusion of this first level review, the Lead Supervisory LIE serves as a second level check on release orders and approves or denies the release. *Ibid*.  The LIEs and Lead Supervisory LIEs were not trained or were trained improperly, and were unable to adequately make determinations with regard to releases. SUMF ¶¶ 46, 47. They were "throw[n]…in there" and expected to perform the very important task of releasing people from detention, without training or adequate knowledge of relevant policies and procedures. SUMF ¶¶ 44, 45, 46.

The District has been sued repeatedly regarding the issue of over-detentions, yet, has done nothing to correct the problem or consider reasonable alternatives, but has more so further

complicated the policies and procedures. SUMF ¶ 52.  As a consequence of the numerous lawsuits, the District made it even more difficult to release people by adding another layer of signatures to the release process. *Ibid.*  At first, it took two people to review a folder for release, then it took three, and "the higher up the rank you went, the more you had to sign for releases." *Ibid.*

On November 16, 2011, Mr. Hurd filed a Motion with the D.C. Superior Court requesting to be released due to his illegal imprisonment. SUMF ¶ 37.  However, the court did not schedule a hearing on the motion for nine months. SUMF ¶ 38.  The hearing on Mr. Hurd's motion finally took place in July 2012, but the court ordered that Mr. Hurd remain incarcerated. SUMF ¶ 39.  The court did not enter a written order to explain its ruling. SUMF ¶ 40.  Mr. Hurd appealed to the D.C. Court of Appeals, but the court did not act on his appeal until after Mr. Hurd's release in September 2013. SUMF ¶ 41.  At that point, the court dismissed Mr. Hurd's appeal as moot. *Ibid*.

Mr. Hurd was released from prison on September 30, 2013 – over two years after DOC employees refused to release him. SUMF ¶ 42.

## III. ARGUMENT

### A. Standard of Review

Under Rule 56(c), summary judgment is proper "if the pleadings, deposition, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986); *Holcomb v. Powell,* 433 F.3d 889, 895 (D.C. Cir. 2006).  Although

summary judgment is not the occasion for the court to weigh credibility or evidence, *see Anderson*, 477 U.S. at 255; *Holcomb*, 433 F.3d at 895, summary judgment is appropriate "if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Holcomb*, 433 F.3d at 895 (*quoting Celotex Corp.*, 477 U.S. at 322). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [reasonable] jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

In this case, the evidence, viewed in the light most favorable to the District, demonstrates that there are no triable issues of material fact and that Mr. Hurd is entitled to judgement in his favor as a matter of law.

### B. Michael D. Hurd, Jr. Served His Sentence in Full and His Sentence Had Expired as a Matter of Law

In this case, there would appear to be two competing possibilities that would explain Mr. Hurd's release. The first possibility, and the one the government argues, is that Mr. Hurd was mistakenly released from custody prior to serving his entire sentence. This argument finds support in the DOC's Sentence Monitoring Computation Data which indicated that an LIE at the DOC may have failed to include Mr. Hurd's misdemeanor sentences in documents sent to the U.S. Bureau of Prisons resulting in this premature release. The other possibility is that Mr. Hurd was properly released from the Bureau of Prisons. The argument finds support in the testimony of the Bureau of Prison's representative, Angelicia Peterson, who testified that Mr. Hurd was properly released. SUMF ¶ 15. Either way, it is clear that under either scenario, Mr. Hurd would have served his sentence before he was detained by the DOC on September 23, 2011.

In *United States v. Merritt*, 478 F.Supp. 804 (D.D.C. 1979), on facts quite similar to this case, the defendant was sentenced by the D.C. court to a prison term to run consecutively to a

7

sentence then being served in Maryland. At the conclusion of the Maryland sentence, the defendant was paroled to a halfway house and ultimately released. During this time and, for the next three years, no effort was made to execute the detainer to require the defendant to serve his D.C. sentence.

In that case, this Court stated that "[i]t is well settled that when a prisoner is released prior to service or expiration of his sentence through no fault or connivance of his own, and the authorities make no attempt over a prolonged period of time to reacquire custody over him, he may be given credit for the time involved, and he will not be required at some later time to serve the remainder of his sentence." *Id*., at 806; *see also White v. Pearlman*, 42 F.2d 788 (10th Cir. 1930); *Bailey v. Ciccone*, 420 F.Supp. 344, 347 (W.D. Mo. 1976); *Albori v. United States*, 67 F.2d 4 (9th Cir. 1933). In *Pearlman*, the 10th Circuit concluded that "where a prisoner is discharged from a penal institution, without any contributing fault on his part, and without violation of conditions of parole, … his sentence continues to run while he is at liberty." *Pearlman*, 42 F.2d at 789.

The mere fact that Mr. Hurd was released from federal prison before he had served all 42 months of his sentence does not mean that his release from federal prison was mistaken or erroneous. His original sentence did not impose a mandatory minimum, and the United States Parole Commission had full authority to release him at a time of its choosing once the mandatory minimum (in Mr. Hurd's case zero) had been served. D.C. Code § 24-404(a); *Cartel-El v. Isaac Fulwood*, 819 F.Supp.2d 38, 40 (D.D.C. 2011) (Parole Commission had authority to release prisoner prior to service of maximum sentence). In fact, the representative from the Bureau of Prisons, Angelicia Peterson, testified that, based upon her review of the records, Mr. Hurd's release was proper. SUMF ¶ 15.

It does not matter whether Mr. Hurd was released intentionally by the Parole Commission or unintentionally by the U.S. Bureau of Prisons. Either way, Mr. Hurd's sentence continued to run while he was at liberty, and he would have finished his sentence by March 21, 2010. *See Merritt*, 478 F.Supp. 804. Furthermore, the D.C. Circuit found that Mr. Hurd had a reasonable belief that he had been deliberately released and had fully served his sentence in 2006, which was reinforced by the conduct of the federal prison that released him, the halfway house where he lived during his first few weeks out of prison, the Parole Commission, and the CSOSA that regularly monitored him. *Hurd v. D.C.,* 864 F.3d 671, 676 (D.C. Cir. 2017).

For the foregoing reasons, Mr. Hurd had a protectable liberty interest because (1) he was not a mistakenly-released prisoner and his prior sentence had been served in full or (2) if he was a mistakenly-released prisoner, his sentence continued to run, and the government could not recommit him after the time period of his original confinement expired. Under the circumstances of this case, where Mr. Hurd had been released by the Parole Commission and then spent three years of supervised release under the auspices of the Parole Commission, when the supervised release was up, his sentence was served in full. Because he a had a liberty interest in being set free when his sentence was done, he had a liberty interest in staying free two years later. When the D.C. Superior Court ordered him to be released at 7:00 p.m. on October 2, 2011, Mr. Hurd had a liberty interest in being released at that time in accordance with the court's order. The DOC had no authority to hold him to serve the expired sentence.

### C.   The D.C. Department of Corrections' Deliberate Indifference Violated Michael D. Hurd, Jr.'s Procedural Due Process Rights

Of course, if Mr. Hurd had been given a hearing, it would have quickly been determined that his prior sentence had expired. He was not. In this case, Mr. Hurd reported to the DOC for a weekend of incarceration (2 days); instead, he was kept for 27 months. Moreover, the decision

to deprive Mr. Hurd of more than two years of his freedom was made without any type of prior notice or any opportunity to be heard. In fact, the procedures of the DOC allow for this type of incarceration without a hearing. The Due Process Clause means that, at a minimum, no citizen can be deprived of his liberty without due process of law. Mr. Hurd should be entitled to judgment in his favor on his procedural due process claim.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty'…within the meaning of the Due Process Clause…." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "[F]reedom from bodily restraint" is at the very core of that protected interest. *Bd. of Regents v. Roth*, 408 U.S. 564, 572 (1972); *see also Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). The freedom of a person to conduct his life physically unconfined by the government is among the most fundamental of constitutional liberty interests. *Hurd,* 864 F.3d at 683. The Supreme Court has repeatedly held that in at least some circumstances, a person who is in fact free of physical confinement – even if that freedom is lawfully revocable – has a liberty interest that entitles him to constitutional due process before he is re-incarcerated. *See Young v. Harper*, 520 U.S. 143, 152 (1997); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972).

In *Morrissey*, the Court ruled that because parole revocations deprive the defendant of liberty, due process demands that the defendant be provided with notice, as well as a preliminary and final hearing. Due process requires that after the arrest, the determination that reasonable ground exists for revocation of parole should be made by someone not directly involved in the case. *Id* at 486. The parolee must be given written notice of a hearing and the purpose of the hearing. *Id*. at 486-487. Then, at a final hearing, "[t]he parolee must have an opportunity to be heard and to show, if he can, that he did not violate the conditions, or, if he did, that

circumstances in mitigation suggest that the violation does not warrant revocation." *Id*. at 488. *See also Nixon v. Quick*, 781 A.2d 754, 760 (D.C. 2001) ("A person on parole who is subject to revocation must have an effective opportunity to rebut the allegations against him."). Similarly, probation cannot be revoked without notice and hearing. *Gagnon*, 411 U.S. at 782 ("a probationer, like a parolee, is entitled to a preliminary and final revocation hearing, under the conditions specified in *Morrissey v. Brewer*[.]").

The following three factors must be considered in determining whether an individual's due process rights were violated: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

Here, all three factors weigh in favor of Mr. Hurd. First, the private interest at stake – the "[f]reedom from arbitrary … detention" – is "among our most cherished liberties." *Apton v. Wilson*, 506 F.2d 83, 93 (D.C. Cir. 1974). There can be no serious dispute that this factor weighs heavily in favor of Mr. Hurd. In this case, unlike the conditional liberty held by the parolee in *Morrissey* and the probationer in *Gagnon*, Mr. Hurd had been released from prison entirely and had completed his period of supervised release in full. SUMF ¶¶ 15, 19. Even though Mr. Hurd was on supervised release, and was not a parolee when he was released in 2007, the "distinction between parole and supervised release is not dispositive of Hurd's procedural due process claim." *Hurd,* 864 F.3d at 683. The D.C. Circuit stated:

> [T]he character of supervised release as a follow-on to a sentence of imprisonment, together with Hurd's fulfillment of his entire term of

> supervised release, reinforces the reasonableness of his expectation that he had completed his sentence, and strengthens his liberty interest. When a person lives in society at large for years, goes through a transition that, by all appearances, marks the formal end of the last stage of his sentence, and only then faces re-incarceration on the ground that he was prematurely released, the prospect of re-incarceration has implications both for him and the other individuals in his life as substantial as those of the parolee in *Morrissey*…. If [Mr. Hurd] had believed [his release] was an error that might be discovered and corrected, it is hard to see why he would have remained in the District of Columbia, successfully…serving out his prescribed term of supervised release.

*Ibid*. Accordingly, he was entitled to no less due process than that guaranteed to the parolee and the probationer. By regulation, once Mr. Hurd's term of supervision was complete, it was no longer subject to revocation. 28 C.F.R. § 2.211(d). When the District determined that Mr. Hurd was required to serve an expired sentence, due process required the District to notify Mr. Hurd of that intent to do so and to provide him with both a preliminary and final hearing on the issue before it could deprive him of his liberty. The District did neither. SUMF ¶ 36 ("I haven't spoken to a Judge…I didn't even get notice from the jail. Nobody explained."). The facts in this case "support a liberty interest crystallized sufficiently by the close of the period of supervision to entitle him to some kind of process before re-incarceration." *Hurd,* 864 F.3d at 683. Instead, without notice and without a hearing, the District refused to release him when it happened to have him in custody on another unrelated matter. SUMF ¶ 25.

Furthermore, as the D.C. Circuit noted in this very case, "[a]dditional features of this case underscore the value of pre-deprivation before re-incarcerating someone in Hurd's situation:"

> As the district court acknowledged, the D.C. Department of Corrections unilaterally re-incarcerated Hurd without a warrant or a detainer despite the fact that the authority to detain him was statutorily committed to the Federal Bureau of Prisons. *Hurd*, 146 F. Supp. 3d at 68; see D.C. Code § 24-201.26 (prisoners convicted in the District of Columbia "shall be committed, for their terms of imprisonment…to the custody of the Attorney General of the United States or his authorized representative"). If Hurd had received

> notice and a hearing before his re-incarceration, he might have raised an ultra vires challenge to the District's authority to detain him. *See* 146 F. Supp. 3d at 68-69. A timely hearing could also have allowed Hurd to present his substantive claims against re-incarceration. It is difficult to imagine how the highly fact-specific nature of the analysis the district court and the parties deemed applicable, hinging substantially on whether Hurd had successfully "turned his life around," *id*. at 70, could have been fairly assessed without Hurd having had any chance to present his own case.

*Hurd,* 864 F.3d at 684.

Second, the DOC's policies and procedures allow for arbitrary detention without a hearing. As the LIE who made the decision to keep Mr. Hurd detained noted, policies and procedures at the DOC change frequently without notice or confirmation. SUMF ¶ 43. Administrators would change policies "by word of mouth" and neglect to put down anything in writing. *Ibid*. At times, administrators would even "chang[e] the whole manual, but no one []ever signed off on it," and no one would "even know it's been changed." *Ibid.* Conversely, DOC's policies and procedures that were believed to have been replaced years ago are still in circulation, showing that policies and procedures "were done on the fly." SUMF ¶ 44.

Furthermore, DOC employees are inadequately trained or not trained at all, and plainly "throw[n] in there" to complete their assigned tasks as LIEs. SUMF ¶ 45. The undisputed evidence shows that DOC employees who have been employed by the District for decades "don't know what they're doing, and they don't care." *Ibid*. This deliberate indifference is particularly prevalent when determining the release of inmates. In essence, it was the DOC's policy and procedure to simply "hold the inmate to serve his sentence" when they believed that somebody had not served a sentence from a prior conviction. SUMF ¶ 47.

Without clear policy or procedure in place, it became the District's practice to falsify documents and add sentence computations to finalized and time-stamped documents, in order to justify over-detentions. SUMF ¶¶ 34, 35, 49. In this case, the DOC decided to deny Mr. Hurd's

13

release authorization, continue to detain him and merely send an e-mail to the Bureau of Prisons more than one week later to ask for an explanation on Mr. Hurd's release status. SUMF ¶ 49. And even after the Bureau of Prisons responded two weeks later and confirmed that there were no outstanding warrants or detainers, the DOC inexplicably, but seemingly in line with its "policies and procedures," continued to hold Mr. Hurd in prison for an additional two years. SUMF ¶ 50.

Lastly, the District would not be burdened with additional fiscal and administrative measures. Indeed, the District already has policies in place for the processing of inmate releases. However, "the existence of written policies…are of no moment in the face of evidence that such policies are neither followed nor enforced." *See also Ware v. Jackson Cty., Mo*., 150 F.3d 873, 882 (8th Cir. 1998). The District is aware that the DOC is essentially doing what it wants under the guise of acting pursuant to policy and procedure. As testified by former DOC LIE, Michelle Waddy:

> I brought [the issues regarding ineffective policies and procedures] up to the [administrator]. I brought it up to the warden. I even tried to bring it to the director, but I had to go through the warden in order to get to the director. I put it [on] paper …, about ten different things that I disagreed with that were happening at the facility…I asked everyone that worked with me in the office so we would get everything on paper that we disagreed [with].

SUMF ¶ 51. However, they "didn't know the operations and they really didn't care." SUMF ¶ 52. The District has created an atmosphere of chaos in which DOC employees are improperly trained and implement practices within their own discretion. SUMF ¶¶ 43, 45, 46, 48. The District is merely asked to implement effective discharge procedures and adequately train its employees to avoid the arbitrary detention of people, such as Mr. Hurd.

A pre-deprivation hearing, as the Court of Appeals noted in Mr. Hurd's prior appeal would have allowed Mr. Hurd the opportunity to prove that he should not have been re-

incarcerated, *Hurd* 864 F.3d at 684, but also allowed him to prove, as a matter of law, either that his release from the Bureau of Prisons was proper (as the Bureau of Prisons maintains) or that the sentence had expired. Leaving such an important decision to the discretion of an LIE without any administrative or judicial review invites over-detention and violates the procedural due process. Mr. Hurd should therefore be entitled to summary judgment in his favor as a matter of law.

### D. The D.C. Department of Corrections' Deliberate Indifference Violated Michael D. Hurd's Substantive Due Process Rights.

The over-detention of Mr. Hurd without a hearing, as explained above, violated his right to procedural due process. More importantly, however, the intentional incarceration of an individual for a sentence that was already completed violated Mr. Hurd's substantive due process rights as well. The substantive component of the Fifth Amendment's due process guarantee recognizes that the detention of an individual without legal authority may constitute a deprivation of liberty without due process of law. *See Scott v. Baldwin*, 720 F.3d 1034, 1036 (8th Cir. 2013) (treating the plaintiffs "alleged detention beyond the terms of their sentences as a substantive-due-process violation").[1]

Excessive detentions violate the substantive component of the Due Process Clause by infringing upon an individual's basic liberty interest in being free from incarceration absent a

---

[1] In Mr. Hurd's prior appeal, the Court of Appeals questioned the standard to be applied in re-incarceration cases suggesting that in some circumstances, the re-incarceration of an inmate who had not completed his sentence may not "shock the conscious." While that argument may have some validity where an individual is detained prior to the expiration of a previously imposed sentence, it has no application to the present case. First, the Bureau of Prisons maintains that Mr. Hurd was properly released. There was, therefore, no "mistake" from the perspective of the authority that had custody over Mr. Hurd. Secondly, even if there had been a "mistake," Mr. Hurd's sentence had expired before his subsequent incarceration. In either event, the District simply incarcerated someone with no sentence to serve, a fact that under any circumstances would "shock the conscious."

criminal conviction. *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992). In 2007, Mr. Hurd had been released from prison entirely and had completed his period of supervised release in full in 2010. SUMF ¶¶ 15, 19. In *Merritt*, a case in which the defendant challenged his incarceration after expiration of his time (less time than involved here) the court held:

> An order requiring service of defendant's sentence now would needlessly jeopardize his long-term adjustment to society, disrupt both his family and his family life, and destroy his economic base, all for no purpose other than to secure blind obedience to the 1973 sentence as it was then imposed….The U.S. Court of Appeals for the Fifth Circuit has stated that a sentence, though once entered, need not be served when such service would be inconsistent with fundamental principles of liberty and justice. In the judgment of this Court, a requirement that defendant serve his sentence here and now would be precisely in that category; indeed it would shock the conscience of the court.

478 F.Supp. at 806-808 (citations and footnotes omitted). Upon considering the lack of fault on Merritt's part, the responsibility of the government for the error, and the actual consequences of an order requiring him to serve his federal sentence, the court found that "[r]esponsibility for the defendant's release from prison and his subsequent at-large status rest[ed] entirely with the governmental authorities." *Id.* at 807-808.

Restating these relevant considerations, Mr. Hurd's case is "closely analogous to or perhaps stronger than *Merritt* in most respects," as previously stated by this Court. *Hurd,* 146 F. Supp. 3d at 66. This Court thought that the length of Mr. Hurd's time at large could support relief, *id.,* at 67; that federal authorities, not the District or Mr. Hurd, were at fault for the release, *id.*; and that the "questionable authority" of the District to take Mr. Hurd back into custody was "concerning," *id.* at 68.

The District's questionable authority with regard to over-detentions is even more concerning when considering the District's legal history and failed solutions to its problems. The District has been sued repeatedly in one form or another for the very issue of over-

detentions, yet, has done nothing to correct the problem or even consider reasonable alternatives. *See* SUMF ¶55 ("It's been a lot of [over-detentions] since I [had] been there, and I'm sure it's been more since I left…I know it's a whole lot more than you think."). In fact, subsequent to the numerous lawsuits, the District has even further complicated its policies and procedures surrounding the release of people. *Id.* (A. "…[T]here was another layer of signatures in the release process…[I]t took two people to review a folder for release, then it took three" Q."…That seems like it would make release more difficult, would it not?" A. "…[T]he higher up the rank you went, the more you had to sign for releases.").

The undisputed facts clearly show, that the District has created an atmosphere of chaos and DOC employees change and implement new procedures on an ongoing basis, without signing off on them or properly train all employees. SUMF ¶ 43 ("[Changes to policies are] not even in writing, and then when you put it in writing, the director's supposed to sign off on it. He never signed off on anything, and I complained about that so much that [the administrator] started signing off on stuff, and she didn't have the authority to do that.")  These very actions led to Mr. Hurd's over-detention of more than two years and violated his substantive due process rights.

In addition, the undisputed facts in this case show that Mr. Hurd had successfully turned his life around during his supervised release. This Court previously recognized that Mr. Hurd "successfully completed his three-year term of supervision, worked as a sheet metal journeyman, and completed an anger management course." *Id.* at 70. The Court also acknowledged that Mr. Hurd's only conviction after his release in 2007 was for marijuana possession; his other arrests resulted either in acquittals or dismissals; and the Parole Commission had decided not to revoke

his supervised release, but determined after three years that he had successfully completed it. *Id.* at 60.

Upon release from prison in 2007, Mr. Hurd trained for and obtained a well-paid job as an apprentice to become a Journeyman sheet metal worker. SUMF ¶ 18 ("…I had a job…I did everything by the book that I thought I was supposed to be doing…I just got my life back together."). As noted above, during his time on supervised release, Mr. Hurd had regular contact with the U.S. Parole Commission and CSOSA officers monitoring his supervised release. SUMF ¶ 17 ("I went to every visit from supervised release. I took every urine. I never tried to hide.")

When he completed his apprenticeship and was about to commence working as a Journeyman – which would have entitled him to a higher rate of pay – Mr. Hurd pled guilty to a misdemeanor charge for possession of less than two ounces of marijuana. SUMF ¶¶ 22, 26, 27. And when he could not return to his job on Monday, October 3, 2011, after his second weekend sentence ended, Mr. Hurd lost his job, and the additional income he would have had if he had been able to work as a Journeyman. SUMF ¶ 26.

Mr. Hurd's criminal record may not have been flawless, but the undisputed facts show that Mr. Hurd has been diligent and responsible with regard to any task that was assigned to him, as evidenced by his honorable discharge from the Marine Corps, the fact that he owned up to his mistakes and immediately pled guilty to two offenses that are no longer penalized in the District of Columbia, his successful completion of supervised release, and the fact that he has been employed throughout his adult life and always paid taxes. SUMF ¶¶ 4, 11, 19, 22, 29. Even when he was over-detained, Mr. Hurd had been employed from the very next day after he was incarcerated. SUMF ¶ 28.

His over-detention had a severe mental and financial impact on Mr. Hurd. He lost his job, had to begin a new apprenticeship program which set him back an additional five years, he lost money from his retirement plan to pay for bills and legal fees while he was incarcerated, as well as contributions the union would have made to his retirement plan. However, above all else, Mr. Hurd lost two years of his life; two years during which he could have been a productive member of society, and enjoyed his freedom and time with his family and friends.

## IV.    CONCLUSION

For these reasons, Plaintiff Michael D. Hurd, Jr., respectfully requests that this Court enter summary judgment in his favor.

Dated: April 26, 2019                            Respectfully submitted,

/s/*Dennis E. Boyle*
Dennis E. Boyle (DC Bar No. 1017256)
C. Allen Foster (DC Bar No. 41662)
Erik D. Bolog (DC Bar No. 433614)
Eric C. Rowe (DC Bar No. 466182)
Whiteford, Taylor & Preston L.L.P.
1800 M Street, NW, Suite 450N
Washington, D.C. 20036
Telephone: (202) 659-6808
Facsimile:  (202) 327-6175
dboyle@wtplaw.com
cafoster@wtplaw.com
ebolog@wtplaw.com
erowe@wtplaw.com

*Co-Counsel for Plaintiff*