# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| **MICHAEL D. HURD, JR.** | ) |
| | ) |
| **Plaintiff,** | )     **Civil No. 15-CV-666 (ESH)** |
| | ) |
| **v.** | ) |
| | ) |
| **DISTRICT OF COLUMBIA** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

_____)

## PLAINTIFF MICHAEL D. HURD'S REPLY IN SUPPORT OF HIS CROSS-MOTION FOR SUMMARY JUDGMENT [ECF 41]

Plaintiff Michael Hurd submits this Reply in support of his Cross-Motion for Summary Judgment [ECF No. 41].  Because the material facts, when viewed in the light most favorable to the District of Columbia ("D.C." or "the District") demonstrate that Mr. Hurd is entitled to judgment as a matter of law, the Court should grant Defendants' Cross-Motion for Summary Judgment.

## ARGUMENT

The District's Opposition to Mr. Hurd's Motion for Summary Judgment [ECF Nos. 43 and 44] is filled with irrelevant facts, inapplicable law, and inapposite arguments—all put forward to cloud the undisputed facts and law in this case: the D.C. Department of Corrections (DOC) ignored a lawful order to release Mr. Hurd and, instead, without providing notice or a hearing, illegally imprisoned Mr. Hurd for two years, violating his procedural and substantive due process rights.  Mr. Hurd's case is not unique; it is part of a consistent pattern of behavior by DOC employees to illegally imprison and detain people in direct contravention of lawful release

orders. D.C. has twice settled class action lawsuits because of this practice and is currently

facing at least one additional class action and one individual action based on the very same

conduct. Indeed, testimony here, even when read in the best light for D.C., shows consistent

training failures that point to deliberate indifference by D.C. and its agents to the highest

constitutional freedom—to be let alone by government and not illegally detained. For the

reasons stated in Mr. Hurd's Cross-Motion for Summary Judgment and in this Reply, Mr. Hurd

is entitled to Summary Judgment on all counts.

### A.     The Undisputed Material Facts.

Mr. Hurd is a veteran and was honorably discharged from the United States Marine

Corps and served four years in the Marine Corps reserves until 2005, when he moved back to

Washington, D.C. Def's Resp. to PSMF, ECF No. 43-1 at PSMF ¶¶ 1–4, 6. While stationed in

North Carolina, Mr. Hurd obtained a concealed carry gun permit from the state. *Id.* at PSMF ¶ 5.

In August 2005, while in the District of Columbia, Mr. Hurd was arrested and charged, *inter*

*alia*, with illegal possession of firearms, based on D.C. laws that would later be struck down as

unconstitutional in 2008. *Id.* at PSMF ¶ 7.

On January 23, 2006, Mr. Hurd pleaded guilty to five counts in his indictment—including

four charges relating to possession of firearms—and was committed to the custody of the United

States Attorney General to serve a 42-month sentence, followed by three years of supervised

release. Def's Resp. to PSMF, ECF No. 43-1 at PSMF ¶¶ 11–12. Mr. Hurd's sentence began on

January 23, 2006, and he was incarcerated at FCI in Beckley, West Virginia ("FCI Beckley").

*Id.* at ¶ 14. "If Hurd had served the entirety of that [42-month] term, he would have been

released from prison in March of 2010." *Hurd v. D.C.*, 864 F.3d 671, 675 (D.C. Cir. 2017).

On June 18, 2007, Mr. Hurd was released from federal prison and transferred to a

halfway house in Washington, D.C.  ECF No. 43-1 at PSMF ¶ 15.  One month later, on July 18,

2007, the halfway house released Mr. Hurd, at which time he began his three-year term of

supervised release.  ECF No. 43-1 at PSMF ¶ 16.  At the time of his original incarceration, Mr.

Hurd had made a *pro se* filing for a sentence reduction.  *Id.* at PSMF ¶ 13.  Under the

circumstances, Mr. Hurd "reasonably believed [his early release] reflected a deliberate sentence

reduction."  *Hurd*, 864 F.3d at 674.

Over the next 36 months, Mr. Hurd completed his term of supervised release, maintaining

regular contact with the U.S. Parole Commission and the D.C. Court Services and Offender

Supervision Agency ("CSOSA") officers who were monitoring him.  ECF No. 43-1 at PSMF ¶

17.  Mr. Hurd complied with his supervised release conditions, including "not leav[ing] the

Washington, D.C. metropolitan area," submitting to regular drug testing, participating in a court-

approved drug treatment program, and make diligent efforts to work regularly.  Pl's Resp. to

DSMF, ECF No. 40 at DSMF No. 8.  During his supervised release Mr. Hurd was charged with

simple assault on September 12, 2007 (he was found *not guilty* following trial); charged with a

number of drug and weapons offense, including possession with intent to distribute cocaine

while armed (this case was *dismissed*); and on June 12, 2010, Mr. Hurd was arrested for simple

assault, but that case was "no-papered."[1]  *Id.* at DSMF No. 9–12.

---

[1] Upon arrest, an assistant U.S. Attorney or Assistant Attorney General will review the
evidence to determine whether there is sufficient proof to charge the arrestee.  Pretrial Services
Agency for the District of Columbia, PROCESSING ARRESTEES IN THE DISTRICT OF
COLUMBIA: A BRIEF OVERVIEW, at 3 (June 2013), *available at*
https://www.psa.gov/sites/default/files/Processing%20Arrestees%20in%20the%20District%20of
%20Columbia-full%20page%20format.pdf.  "Some factors that go into the decision-making
process include the cooperation of victims and witnesses, whether physical evidence is present or
may be suppressed, and whether all of the elements of the offense charged have been met."  *Id.*
Prosecutors then, make the decision whether there is sufficient evidence to "paper" the case or to
"no paper" the case (i.e. not bring charges for lack of evidence, etc.).  *See id*.

While on supervised release, Mr. Hurd began a sheet metal apprenticeship. ECF No. 43-1 at PSMF ¶ 18 (district objects that this is not material). Mr. Hurd continued working towards his Journeyman certification with the union. *Id.* at PSMF ¶ 20 (district objects that this is not material).

During some of the drug testing, Mr. Hurd's tested positive for marijuana and cocaine. *See, e.g., id.* at DSMF No. 13. However, the positive tests all occurred in a single seven month span between January 6 and July 28, 2009, with only four tests coming up positive for cocaine. *Id.* During this time Mr. Hurd was under the jurisdiction of the Parole Commission, which had the sole authority to return Mr. Hurd to prison if he violated the terms of his supervised release. No official from the District of Columbia had any authority (then or now) to overrule the decision of the Parole Commission. The Parole Commission determined not revoke his supervised release or take any action greater than a letter of reprimand. *Id.* at DSMF No. 15. Mr. Hurd completed his three years of Supervised Release on July 18, 2010, at which time he was completely free of any government review or restraint. ECF No. 43-1 at PSMF ¶ 19.

More than a year after his sentence would have expired and almost a year after his supervised release did expire, on May 29, 2011, Mr. Hurd was arrested for possessing less than two ounces of marijuana. *Id.* at ¶ 21.[2] Just as he did with his initial gun charge, on September 20, 2011, Mr. Hurd pleaded guilty, accepting responsibility and punishment for his violation of the law, and was sentenced to nine days jail, to be served on three consecutive weekends. ECF No. 40 at DSMF No. 16. Superior Court Judge Marisa Demeo, in sentencing Mr. Hurd on the

---

[2] Possession and the recreational use of that amount of marijuana was legalized by the D.C. government in 2015 and is no longer a crime. *See Hurd*, 864 F.3d at 676 (citing D.C. Code Ann. § 48-904.01(a)(1)(A) (2015)).

misdemeanor Marijuana charge, specifically allowed him to serve his sentence on three consecutive weekends so as *not* to disturb his job progress. The Court's sentencing order specifically directed the DOC to release Mr. Hurd from custody at 7:00 p.m. on each of the three Sundays, September 23, 2011, October 2, 2011, and October 9, 2011. Judgment, ECF No. 41-9.

Mr. Hurd served his first weekend in DOC custody and was released without incident or interference from DOC. At the end of his second weekend, Mark Sibert, the Legal Instrument Examiner ("LIE") responsible for processing Mr. Hurd's release, "discovered" that Mr. Hurd had an "outstanding" sentence from his 2006 conviction. ECF No. 40 at DSMF No. 21–23. In direct violation of the court order directing Mr. Hurd's release, the DOC did not release him. Instead, Mr. Sibert "notified his supervisor and sought advice, and ultimately, denied plaintiff's release based on the outstanding charge." *Id.* at DSMF No. 23. The only subsequent investigation Mr. Sibert or DOC staff conducted was to a single email BOP to "ascertain 'how [plaintiff] could have been released without being returned [to DOC].'" *Id.* at DSMF No. 24. No D.C. statute or regulation permitted the DOC to defy the court order. BOP's response indicated that Mr. Hurd was appropriately released as DC had not requested him held for return. *See* BOP Email (10/25/11), ECF No. 40-10. BOP testified that Mr. Hurd was properly released. Peterson Dep., ECF No. 41-8 at 33:6–9.

After Mr. Hurd complained, and prior to the hearing on the Mr. Hurd's petition for habeas corpus, someone at DOC created a new "Face Sheet" for Mr. Hurd, which document purported to show that Mr. Hurd had actually been given a detention hearing on October 3, 2011, but no such hearing ever occurred. ECF No. 43-1 at PSMF ¶ 35; Face Sheet, ECF No. 39-12. In fact, Mr. Hurd would not come before a court for nearly 10 months, and only after he filed a habeas petition. ECF No. 40 at DSMF No. 19–20. Mr. Hurd appealed, but that appeal was not

taken up by the D.C. Court of Appeals until after Mr. Hurd's release from DOC custody on

September 30, 2013. *See id.* at DSMF No. 26. During the course of the appeal, another false

version of the face sheet was prepared. The false face sheets show consciousness of

wrongdoing.

**B.  Mr. Hurd's Procedural and Substantive Due Process Rights Were Violated By His Over-Detention and Reincarceration.**

To succeed on his claim, Mr. Hurd must show that D.C. violated his procedural and

substantive due process rights and that D.C. is liable. Given the undisputed facts, read in the

light most favorable to the District, the Court cannot come to any conclusion but that Mr. Hurd's

procedural and substantive constitutional rights were violated and that D.C. was responsible for

such violations.

**1.  The District Argument That It Provided Mr. Hurd With Procedural Due Process is Meritless.**

The District does not dispute that it failed to provide Mr. Hurd with pre-deprivation

notice or an opportunity to be heard, or that Mr. Hurd completed three years of supervised

release, which was never revoked. *Hurd*, 864 F.3d at 682 (internal quotation marks and citation

omitted). The "only question is whether he had a protected liberty interest that would entitle him

to some procedure before re-incarceration." *Id.* The D.C. Circuit found that

> [T]he character of supervised release as a follow-on to a sentence of imprisonment, together with Hurd's fulfillment of his entire term of supervised release, reinforces the reasonableness of his expectation that he had completed his sentence, and strengthens his liberty interest. When a person lives in society at large for years, goes through a transition that, by all appearances, marks the formal end of the last stage of his sentence, and only then faces re-incarceration on the ground that he was prematurely released, the prospect of re-incarceration has implications both for him and the other individuals in his life as substantial as those of the parolee in *Morrissey*.

*Id.* at 683. The allegations of fact found sufficient by the D.C. Circuit have been proven and are

not disputed.  Because of the court order requiring him to be released at 7:00 p.m. on Sunday, October 2, 2011, Mr. Hurd had a protected liberty interest in being released at that time.  Under the Fifth Amendment, Mr. Hurd's liberty interest required the government, before re-incarcerating Mr. Hurd for any significant length of time, to provide him notice, an opportunity to be heard and present evidence before a neutral decision maker, and written findings.  *Cf. Morrissey v. Brewer*, 408 U.S. 471, 486–489 (1972).[3]

Instead, DOC "unilaterally re-incarcerated Hurd without a warrant or a detainer despite the fact that the authority to detain him was statutorily committed to the Federal Bureau of Prisons."  *Hurd*, 864 F.3d at 684 (citing D.C. Code § 24-201.26)[4].  Indeed, DOC had *no right* to incarcerate Mr. Hurd, whatsoever.  Yet, the District asserts that it had the right to detain him and that Mr. Hurd received notice when a low ranking DOC official told Mr. Hurd that he had 27 months from his 2006 sentence to serve, ECF No. 40 at DSMF No. 17, and that he received a hearing when his habeas petition was decided by the Superior Court ten months later.  Opp. ECF Nos. 43 & 44 at 23–25.  However, the notice and hearing were required to occur <u>before</u> Mr. Hurd was deprived of his liberty, not weeks and months after the fact.  As the D.C. Circuit noted, "If Hurd had received notice and a hearing before his re-incarceration, he might have raised an ultra vires challenge to the District's authority to detain him."  *Hurd*, 864 F.3d at 684.

The hearing itself violated Mr. Hurd's due process.  The habeas petition was decided by the same judge who had imposed the original 42-month sentence.  In denying Mr. Hurd's habeas request, the "Superior Court. . . express[ed] its desire to conclude the matter that day . . . stating

---

[3] For this reason, the sentencing judge should not have heard the habeas petition.

[4] D.C. Code § 24-201.26 states that prisoners convicted in the District of Columbia "shall be committed, for their terms of imprisonment . . . to the custody of the Attorney General of the United States or his authorized representative".

that there was 'no foundation' for the documents and 'no witness here to address' them, but that 'the Court is not going to delay this ruling in order to bring [witnesses] into court'." *Hurd*, 864 F.3d at 677 (citation omitted).  The judge did not even bother to enter a written order explaining the basis for his ruling.

Even for parolees, who have less interest in their liberty than a man who is totally free, the Supreme Court made clear that the minimum requirements of due process include,

> (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

*Morrissey*, 408 U.S.at 488–89.  In normal criminal proceedings, a probable cause hearing must take place within 48 hours after arrest.  *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 56  (1991).  Given these minimum requirements, it is difficult to see how Mr. Hurd's procedural due process rights were *not* violated.

The District argues that Mr. Hurd was not "a regular citizen who was unjustly seized off the street" because he was already incarcerated, and his only recourse was a habeas hearing. Opp., ECF Nos. 43 & 44 at 25.  The District ignores the fact that the Superior Court had issued an order commanding Mr. Hurd's release.  At 7:01 p.m., on Sunday, October 2, 2011, Mr. Hurd was entitled to his freedom.  *See Barnes*, 242 F.R.D. at 118 ("In cases such as this one, the issue is the prisoner's *absolute* right to freedom.").  Moreover, Mr. Hurd had been placed in the custody of the Attorney General, not DOC.  *Hurd*, 864 F.3d at 684 (citing D.C. Code § 24-201.26).  Therefore, Mr. Hurd was exactly a "regular citizen who was unjustly seized off the street." The District had neither the legal authority to hold him nor was he rightfully held after

his term of imprisonment expired.

At the same time, Mr. Hurd could not have been recommitted without a hearing, even if DOC had the power to do so. When the time of the original sentence expires, so does the right of the government to recommit the prisoner without a hearing. *See White v. Pearlman*, 42 F.2d 788, 789 (10th Cir. 1930) ("There is no doubt of the power of the government to recommit a prisoner who is released or discharged by mistake, where his sentence would not have expired if he had remained in confinement."); *Green v. Christiansen*, 732 F.2d 1397, 1400 (9th Cir. 1984) ("The federal authorities therefore had the power to reincarcerate Green so long as his sentence would not have expired had he never been released."); *United States v. Merritt*, 478 F.Supp. 804, 806 note 5 (D.D.C. 1979) (noting sentence had expired under *White v. Pearlman* line of cases).

As the law makes clear, Mr. Hurd's sentence continued to run while he was at liberty regardless of whether the Parole Commission intentionally released Mr. Hurd through its statutory authority, or mistakenly released Mr. Hurd, in both instances. In the former instance, the sentence continued to run by statutory rule. *See* D.C. Code § 24-406(c)(1) (mandating that parolees be given credit toward completion of the sentence "for all time served on parole." ). In the latter instance, his sentence continued to run by common law rule. *White v. Pearlman*, 42 F.2d 788, 789 (10th Cir. 1930).[5]

In *United States v. Liddy*, the D.C. Circuit recognized that, "At common law a prisoner has a right to serve his sentence continuously, and cannot be required to serve it in installments."

---

[5] Citing *Wells v. United States*, 802 A.2d 352-354-55 (D.C. 2002), the District Court stated that the District of Columbia Court of Appeals does not follow federal common law. *Wells* contains no such statement. Further, *Wells* involved a claims by a prisoner who had violated parole on one sentence and had not yet started to serve two others. In Mr. Hurd's case, the time period of his original sentence had long passed when he was re-incarcerated.

510 F.2d 669, 674 (D.C. Cir. 1974). In *Dunne v. Keohane*, the Seventh Circuit explained:

> The government is not permitted to delay the expiration of the sentence either by postponing the commencement of the sentence or by releasing the prisoner for a time and then reimprisoning him. So, for example, if the sentence is five years and the defendant begins to serve it on July 1, 1990, the government cannot, by releasing him between January 1, 1992, and December 31, 1992, postpone the expiration of his sentence from June 30, 1995, to June 30, 1996-cannot in fact postpone it a day beyond June 30, 1995. The sentence expires on schedule even though the defendant will have served four years rather than five. The government is not permitted to play cat and mouse with the prisoner, delaying indefinitely the expiation of his debt to society and his reintegration into the free community. Punishment on the installment plan is forbidden.

14 F.3d 335, 336 (7th Cir. 1994) (citations omitted). In *Smith v. Swope* the Ninth Circuit said:

> The least to which a prisoner is entitled is the execution of the sentence of the court to whose judgment he is duly subject. If a ministerial officer, such as a marshal, charged with the duty to execute the court's orders, fails to carry out such orders, that failure cannot be charged up against the prisoner. The prisoner is entitled to serve his time promptly if such is the judgment imposed, and he must be deemed to be serving it from the date he is ordered to serve it and is in the custody of the marshal under the commitment, if, without his fault, the marshal neglects to place him in the proper custody. Any other holding would give the marshal, a ministerial officer, power more arbitrary and capricious than any known in the law. A prisoner sentenced for one year might thus be required to wait forty under the shadow of his unserved sentence before it pleases the marshal to incarcerate him. Such authority is not even granted to courts of justice, let alone their ministerial officers.

91 F.2d 260, 262 (9th Cir. 1937). Because the sentence continues to run, the mistakenly released

prisoner is entitled to credit against his sentence for the time spent at liberty.

> It is well settled that when a prisoner is released prior to service or expiration of his sentence through no fault or connivance of his own, and the authorities make no attempt over a prolonged period of time to reacquire custody over him, he may be given credit for the time involved, and he will not be required at some later time to serve the remainder of his sentence.

*Merritt*, 478 F. Supp. at 806; *see also Vega v. United States,* 493 F.3d 310, 323 (3rd Cir. 2007)

(holding that a prisoner was entitled to credit for time spent at liberty unless government could

show that prisoner affirmatively effectuated his release or that government was not negligent,

and remanding for such determination); *Johnson v. Mathieson*, 2015 WL 3772776 (E.D. Va.

2015) (granting habeas corpus petition because prisoner was entitled to credit for time spent at liberty following his release from custody). It is clear then that even the mistakenly released prisoner has a liberty interest in the credit. *Thompson v. Cockrell*, 263 F.3d 423, 427 (5th Cir. 2001) ("Thompson has a liberty interest in the calendar time following his erroneous release").

In the cases cited by the District Court, the asserted lack of a liberty interest was premised on the fact that the time period of the original sentence had not yet expired. In the cases relied upon by the District Court, the prisoner was reincarcerated before the time period expired on the original sentence. *Henderson v. Simms*, 223 F.3d 267, 269 (4th Cir. 2000) (original earliest release date was in 2018); *Jenkins v. Currier*, 514 F.3d 1030, 1030 (10th Cir. 2008) (sentence would not expire for at least 10 years).

In this case, Mr. Hurd's original sentence of imprisonment expired at the latest on March 21, 2010—a year and a half before the District decided unilaterally to usurp the authority of the U.S. Attorney General and the Parole Commission and decide the Mr. Hurd need to be imprisoned for a longer time. Because Mr. Hurd's term of imprisonment had been served in full, he was not a mistakenly released prisoner with time left to serve on his sentence. Thus, Mr. Hurd's procedural due process rights were violated when D.C. arbitrarily, and without authority, notice, an opportunity to be heard and present evidence, and without a written opinion by the court, over-detained and re-incarcerated Mr. Hurd. Therefore, Mr. Hurd is entitled to summary judgment on his procedural due process claim.

## 2. Under the Merritt Standard, The District Violated Mr. Hurd's Substantive Due Process Rights.

At 7:00 p.m. on October 2, 2011, the date upon which his weekend term of imprisonment expired, Mr. Hurd had a vested liberty interest and was, *de jure*, a free man. *See* Sentence of the Court, ECF No. 41-9. Judge Lamberth's words in *Barnes* must be repeated here: "In cases such

as this one [where a prisoner is not timely released despite a judicial order to do so], the issue is the prisoner's *absolute* right to freedom." 242 F.R.D. at 118 (emphasis in original).

This Court previously applied *United States v. Merritt* to determine whether the District violated Mr. Hurd's procedural due process rights. Mem. Op. on Mot. to Dismiss, ECF No. 12, at 14–22. In *Merritt*, this Court noted,

> It is well settled that when a prisoner is released prior to service or expiration of his sentence through no fault or connivance of his own, and the authorities make no attempt over a prolonged period of time to reacquire custody over him, he may be given credit for the time involved, and he will not be required at some later time to serve the remainder of his sentence.
> . . .
>
> A convicted person will not be excused from serving his sentence merely because someone in a ministerial capacity makes a mistake with respect to its execution. Several additional factors must be present before relief will be granted[:] the result must not be attributable to the defendant himself; the action of the authorities must amount to more than simple neglect; and the situation brought about by defendant's release and his reincarceration must be "unequivocally inconsistent with 'fundamental principles of liberty and justice.'"

*Merritt*, 478 F. Supp. at 806–07 (citations omitted).

This Court recognized that the *Merritt* test is a "totality of the circumstances" test. Mem. Op., ECF No. 12 at 14. In doing so, this Court found that Mr. Hurd was not culpable in his release, *id.* at 19, and the D.C. Circuit concluded that Mr. Hurd "reasonably believed [his early release] reflected a deliberate sentence reduction," *Hurd*, 864 F.3d at 674. The Court also found that D.C. improperly imprisoned Mr. Hurd without authority which, among other factors, showed that D.C.'s actions amounted to government culpability in Mr. Hurd's release. *See* Mem. Op., ECF No. 12 at 15–19. The only factor the Court took issue—and the only factor that the District focuses on in its Opposition—is Mr. Hurd's reintegration into society or the "Prejudice/Readjustment to Society" prong. *Id.* at 13–14 (listing *Merritt* factors but omitting "fundamental principles of liberty and justice" and adding "the prejudice caused by re-

incarceration, *i.e.* how well the prisoner re-adjusted to society.").[6]

The District incorrectly relies on the "readjustment to society" prong as all but dispositive to Mr. Hurd's case. But, that prong does not appear in *Merritt*. To the contrary, *Merritt* warned that reincarceration "would needlessly jeopardize [][the plaintiff's] long-term adjustment to society, disrupt both his family and his family life, and destroy his economic base, all for no purpose other than to secure blind obedience to the 1973 sentence as it was then imposed." *Merritt*, 478 F. Supp. at 808. Instead of heeding this warning, the District now argues, that Mr. Hurd's positive drug tests over a six-to-seven month period in 2009, and his three arrests (and no conivctions), all while on supervised release, show that he failed to become a law abiding citizen. Mem. Op., ECF No. 14 at 20–21; Opp., ECF Nos. 43 & 44 at 19–20.

In our system, a "person accused by the United States of committing a crime is presumed innocent until proven guilty beyond a reasonable doubt." *Kaley v. United States*, 571 U.S. 320, 357 (2014). The District's position, and this Court's prior ruing, would eviscerate that basic and fundamental due process right by holding Mr. Hurd accountable for actions that (1) were never brought as charges, (2) charges of which he was acquitted, and (3) drug tests that the Parole Commission did not merit Mr. Hurd's re-incarceration.

In the same breath in which the District contends that the *Merritt* test includes a "reintergration" prong, the District also demands that the Court ignore the facts surrounding Mr. Hurd's employment, contending that such facts are not material. Opp., ECF Nos. 43 & 44 at 19.

---

[6] The Court also said that the "time-at-liberty factor tends to merge with a consideration of *how* the prisoner spend his time at liberty—he should certainly no be credited for ten years at liberty if they were spent on a crime spree," citing only a single California state Appellate court case for this proposition. *Id.* at 15 (citing *In re Messerschmidt*, 104 Cal. App. 3d 514, 517 *Ct. App. 1980)). This standard does not appear in *Merritt* and should not have been relied on by the Court.

Indeed, the District argues that Mr. Hurd "should not be credited for the steps toward reintegration that he was required to take, upon threat of reincarceration." *Id.* Under the District's view, a former prisoner in Mr. Hurd's situation can never assert positive facts regarding conduct during supervised release or parole because the threat of reincarceration will always exist for as long as the parole or supervised release remains in force.

This ignores the fact that the process of reintegration is just that, a process. It is lifelong. The District prefers to measure Mr. Hurd's reintegration simply by his actions over a small period of his life. Instead, it should look at the totality of his life. He was a United States Marine, willing to be at tip of the spear to fight America's enemies. He is a man who, in good faith, believed he was legally carrying a firearm—one which he had a registered conceal carry permit for and which his military training had taught him how to safely use. Mr. Hurd voluntarily revealed to his arresting officer that he had a weapon; he did not try to hide the fact. Mr. Hurd pleaded guilty to his crimes—four of which would likely not have been crimes had he been stopped in late 2008, after the *Heller* decision. When Mr. Hurd was re-arrested for possession of marijuana, he pleaded guilty. Today, his transgression would not even be a violation of the law in D.C. Mr. Hurd was never a threat or a menace to society and he certainly cannot be categorized as a person living a "life of crime." He was a fully employed union man, on his way to earning his Journeyman certificate and becoming a well-paid blue collar tradesperson when D.C. illegally detained him.

In sum, The District's argument, that Mr. Hurd's substantive due process claim fails under *Merritt* because Mr. Hurd was not sufficiently "rehabilitated," is meritless. The District bases its argument on the facts that Mr. Hurd tested positive for drugs, almost exclusively cannabis, and that he was rearrested three times while on supervised release. Opp., ECF Nos. 43

14

& 44 at 18–19. During this time, any decision to return Mr. Hurd for drug use was within the exclusive jurisdiction of the Parole Commission, and neither then or anytime thereafter did DOC have the legal authority to countermand or overrule the Parole Commission.

Moreover, the Court in *Merritt* cautioned about reincarcerating individuals who were adjusting to society. What happened to Mr. Hurd is precisely what the Court in *Merritt* found so troubling: needlessly jeopardize Mr. Hurd's long-term adjustment to society, disrupting his family and his family life, and destroying his economic base, all for no purpose other than to secure blind obedience to the 2006 sentence as it was then imposed. *Merritt*, 478 F. Supp. at 80.

Moreover, the *Merritt* test is not mechanical or strictly logical, where a plaintiff who fails any single prong therefore is ineligible under the test. To the contrary, it is an equitable standard based on a plaintiff's fundamental right to liberty that should be viewed in light of the interest at issue. What is that interest? That which our servicemen and women fought for 75 years ago on D-Day and that which Mr. Hurd took an oath to defend as a United States marine: freedom. As the D.C. Circuit put it, "The freedom of a person to conduct his life physically unconfined by the government is among the most fundamental of constitutional liberty interests." *Hurd*, 864 F.3d at 683.

In light of the facts and law, the Court must not focus on the Prejudice/Readjustment to Society prong, which is not part of the test at all, but, instead, must focus on whether Mr. Hurd's reincarceration was "unequivocally inconsistent with 'fundamental principles of liberty and justice.'" There can be no question on these facts then that it was.

At the outset of course, it must be considered that the Fifth Amendment contains provides an explicit guarantee that the government may not deprive a person of his liberty without due process of law. By virtue of being mentioned in the Bill of Rights itself, the right not to be

deprived of liberty without due process of law is, by definition, "a deeply rooted, historically protected liberty interest." In *Abdelfattah v. U.S. Dep't of Homeland Security*, the Court of Appeals explained that

> Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing a claim.

787 F.3d 524, 541 (D.C. Cir. 2015) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (internal quotation marks omitted). Thus, for example, "Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Arbitrary action by the government not within an explicit textual source of constitutional protection violates "substantive due process" when it "shocks the conscience." *Lewis*, 523 U.S. at 846. Thus, there are potentially two different bases upon which to consider a non-procedural due process claim, one of which employs the "shock the conscience" test and one that does not.

Many cases, including the *en banc* decision of the Fourth Circuit in *Hawkins v. Freeman*, 195 F.3d 732, 738-750 (4th Cir. 1999) relied upon by the Court's earlier opinion, improperly conflate these concepts. To illustrate the point, under our Constitution, unreasonable searches or seizures always violate the Constitution, whether or not a particular search or seizure is so egregious as to "shock the conscience," because the Constitution explicitly prohibits unreasonable searches and seizures. So it must be with the other explicit textual sources of constitutional protection set out in the Constitution and the Bill of Rights. Under the Fifth Amendment, the government may not deprive a person of his liberty by imprisonment without

due process of law. That means it is always wrong for the government to deprive a person of his liberty by imprisonment without due process of law. It does not mean that it is wrong for the government to deprive a person of his liberty by imprisonment without due process of law only when it "shocks the conscience."

Even if, however, Mr. Hurd was required to show that the District's actions shocked the conscience, Mr. Hurd has done that. In *Lewis*, the Court explained that "conscience shocking" means different things in different contexts. 523 U.S. at 851-854. In the context of prisoners in the custody of the government, the Supreme Court said this:

> [L]iability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking."

523 U.S. at 853. Moreover, the D.C. Circuit's ruling in Mr. Hurd's case quoted this passage in *Lewis* and warned:

> We close by emphasizing again that this court has not yet had occasion to set forth a framework for analyzing a prematurely released prisoner's re-incarceration, and we merely assume without deciding here that Merritt applies. . . . But Since *Merritt* was decided, the Supreme Court has emphasized that "only the most egregious official conduct"—that which "shocks the conscience"—"can be said to be arbitrary in the constitutional sense," *Cty. of Sacramento v. Lewis* 523 U.S. 833, 846 (1998). . . . Still, *Lewis* recognized that when officials have "the luxury" of "time to make unhurried judgments," and "such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." 523 U.S. at 854, 118 S.Ct. 1708. If this case were to return to this court, we trust that the parties would focus on whether *Merritt* should become the law of this circuit, factoring in the Lewis "shocks the conscience" threshold while accounting for the arguably non-exigent circumstances involved in deciding whether or not a prisoner who was released early should be re-incarcerated years later.

*Hurd*, 864 F.3d at 687–88.

As demonstrated in section B(1), *supra*, Mr. Hurd's full prison term expired not later than March 21, 2010, after which time he was a free man. As described at length above, DOC had *no*

*authority whatsoever* to detain Mr. Hurd. At best, DOC should have informed the U.S. Attorney's office and/or the D.C. Attorney General about Mr. Hurd's sentence, releasing him per the Court's order while Mr. Hurd's case was researched and a decision was made by the appropriate criminal and judicial authorities. Instead, years after his original release by BOP, and despite the fact that Mr. Hurd lived in D.C. and had regular contact with CSOSA and the Parole Commission, DOC never issued a detainer nor sought, at any time prior to October 2, 2011, to arrest or reincarcerate Mr. Hurd. In fact, Mr. Hurd served his first weekend of his three-weekend sentence without incident, and was timely released at the proscribed hour on the first Sunday of his court-ordered incarceration. Indeed, DOC did nothing more than inquire with BOP a single time to determine whether why Mr. Hurd was released and did not even follow up once BOP responded by direction DOC to contact FCI Beckley. *See* ECF No. 40-10. Given the circumstances here—that a free man was held in prison without notification or an opportunity for a pre-detention hearing, that he was imprisoned for two years even though he had no valid sentence pending, that those responsible for imprisoning him had no legal authority to do so, that the District did not even seem to know or care that Mr. Hurd had been released in 2007 prior to his *second* weekend in jail on the marijuana charge—would shock the conscience of any reasonable person. It is compounded by the fact that D.C. had *years* to act on Mr. Hurd's case, but instead did nothing, not even lodge a detainer with BOP or recognize that Mr. Hurd *might* have time left to serve while being prosecuted, pleading guilty, being sentenced, and serving his first weekend in jail. Moreover, DOC staff went so far as to create a false Face Sheet showing that Mr. Hurd had a hearing on October 3, 2011, to help justify his incarceration, an action which demonstrates that DOC staff *knew* they could not hold Mr. Hurd absent a court order to do so. *See* ECF No. 43-1 at PSMF ¶ 35; Face Sheet, ECF No. 39-12.

The very idea that the District can refuse to release a prisoner serving a weekend sentence for two additional years without allowing the prisoner a hearing to challenge the basis his confinement is by itself an outrage. But when coupled with the facts that the District has knowingly long allowed the violation of its prisoners' constitutional rights, and has not taken steps to prevent it (even failing to comply with court ordered settlements), it is clear that what happened to Mr. Hurd was not an accident—the District condoned and created a policy of permitting egregious and outrageous conduct that can be fairly said to shock the conscience and to violate the universal sense of justice.

C.    **D.C. Policy Demonstrates A Patter of Municipal Behavior Resulting In The Same or Similar Constitutional Violations—Over-Detention and Reimprisonment Without Due Process of Law.**

Municipal liability in this case is based on D.C. longstanding policy of over-detaining and imprisoning individuals past their release dates and D.C.'s clear and longstanding pattern of behavior, which demonstrates an indifference to the constitutional rights of individuals in its custody. *See Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997) (municipal liability under § 1983 may be founded on "inaction giving rise to or endorsing a custom"). Municipal liability for constitutional injuries attaches when a "policy or custom . . . inflicts the injury." *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978).

The D.C. Circuit has made clear that proof of a single incident of unconstitutional behavior is sufficient to impose liability where the injury was caused by an existing, unconstitutional municipal policy. . . ." *Parker v. Dist. of Columbia*, 850 F.2d 708, 711–12 (D.C. Cir. 1988) (internal quotation marks and citation omitted). "The failure to train, supervise or discipline city employees can constitute such a policy or custom if it amounts to 'deliberate indifference' towards the constitutional rights of persons in its domain." *Daskalea v. Dist. of*

*Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000) (citation omitted). "Deliberate indifference is determined objectively, by analyzing whether the municipality knew or should have known of the risk of constitutional violations, and yet failed to respond *as necessary*." *Baker v. D.C.*, 326 F.3d 1302, 1307 (D.C. Cir. 2003) (citation and internal quotation marks omitted) (emphasis added). "To prevail, plaintiff must show more than simple or even heightened negligence; the District's indifference must be conscious, or at least reckless." *Byrd v. D.C.*, 297 F. Supp. 2d 136, 139 (D.D.C. 2003), *aff'd sub nom. Byrd v. Gainer*, No. 03-7196, 2004 WL 885228 (D.C. Cir. Apr. 26, 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). The facts here, even when read in a light most favorable to D.C., show D.C. knew about the over-detention problem and was reckless in not correcting it.

The over-detentions in the *Bynum* and *Barnes* class actions, and Mr. Hurd's unconstitutional over-imprisonment, along with more recently filed actions discussed below, are all species of the same genus: all involve a municipal policy of conscious indifference to the court orders required timely release of prisoners. The policies at work here, both written and unwritten, demonstrate that D.C. routinely violated court ordered release dates, did so knowingly, and took *inadequate* action to resolve the issues, which was the moving force behind Mr. Hurd's injury. *See Baker*, 326 F.3d at 1306.

In *Bynum*, prisoners were "detained by D.O.C. beyond the point at which their release had been ordered, for periods ranging from an extra day to many days or even months on end" for out-processing. *Barnes v. D.C.*, 242 F.R.D. 113, 115 (D.D.C. 2007) (describing *Bynum v. D.C.*). In *Barnes*, the District settled the class litigation stemming from inmates who "were not released by midnight of the day on which [the inmate] became entitled to release," again for out-processing. Class and Settlement Notice, *Barnes, et. al v. District of Columbia*, Case No. 06-

0315 ("Barns Class Settlement Notice")[7]; *see also Barnes*, 242 F.R.D. at 115.  In both cases, the out-processing delays included "ministerial tasks such as acquiring the release order, [and] checking a prisoner's record to make sure there was no other warrant or order that would justify continued detention. . . ." *Barnes*, 242 F.R.D. at 115; *see id.* ("Once there [D.C. Jail], they encountered the same dance with D.O.C. that arose in *Bynum*: inmates entitled to release were not released until the next day, or sometimes days or even weeks later. . . .").  Indeed, the *Barnes* class included individuals over-detained between September 1, 2005, and July 31, 2013, a period which encompasses Mr. Hurd's unconstitutional over-detention and reimprisonment.  *See Barnes* Class Settlement Notice, *supra.*

Although Mr. Hurd does not fall within the *Barnes* class definition because his over-detention was due to D.C. falsely and improperly re-imprisoning him after his scheduled release date, not merely holding him indefinitely pending some additional ministerial actions, *see* Mem. Op. on Mot to Dismiss, ECF No. 12, at 7, the same underlying behavior that lead to constitutional violations in *Barnes* and *Bynum* were again at play in this case.  That is, a paperwork system that is cumbersome and inaccurate, a training system that has repeatedly failed to teach DOC employees to abide by court orders, and procedures that err on the side of restricting a citizen's "absolute right to freedom."  *See Barnes*, 242 F.R.D. at 115, 118.

D.C. argues that its actions in response to the *Barnes* and *Bynum* cases insulate it from liability in this case.  Opp., ECF Nos. 43 & 44 at 10–11.   But that argument is defeated by the District's treatment of Mr. Hurd in this case.  Despite multiple court rulings taking the District to task for keeping prisoners in jail beyond the date of the court-ordered release, when the District

---

[7] Available at https://doc.dc.gov/sites/default/files/dc/sites/doc/release_content/
attachments/_v9_DCBR1_Notice_112713_FINAL.pdf

concluded that Mr. Hurd should serve more time, the District was under orders by the Superior Court to release Mr. Hurd. The District did not obey the order, release Mr. Hurd, and then take steps to re-incarcerate him for the prior sentence. Instead, they ignored and defied the court order, just as it done hundreds or thousands of times before. The custom of ignoring and defying court orders led directly to Mr. Hurd's wrongful re-incarceration and the denial of his liberty. Whatever changes the District says it made (and fact that it says it made changes to its release processes *demonstrates that D.C. knew of the problem at a policymaking level*) did not change the long-standing custom and policy, which operated directly to injure Mr. Hurd.

This should be no surprise. Judge Lamberth in a 2011 *Barnes* decision laid out the relevant history including D.C. abject failures to adequately take action to resolve its illegal imprisonment issues. As part of the *Bynum* settlement, the District, on January 25, 2006, agreed to "a number of components that were designed to remedy the overdetention and related strip search problems at the District's jails . . . [including] build[ing] a state of the art Inmate Processing Center (IPC) within the foot print of the DC Jail site. . . ." *Barnes v. D.C.*, 793 F. Supp. 2d 260, 267 (D.D.C. 2011) (quoting *Bynum v. D.C.*, 412 F.Supp. 2d 73, 83 (D.D.C. 2006). Judge Lamberth went on, "The purpose of the IPC was to create adequate processing facilities for both intake and release of inmates *and for the processing of associated records*." *Id.* (emphasis added). But wait, there was more: "This Court recognized that the settlement promised 'significant policy changes in the operation of the Department of Corrections[.]'" *Id.*

Consistent with the facts in this case, D.C. broke its promises, leading the court to conclude that "the DOC appears to have done nothing concrete in response to the overdetention problems at its jails until 2007." *Id.* at 267–68. Had D.C. made the promised changes by 2011,

it is likely Mr. Hurd would *never* have been over-detained and reimprisoned.[8]

This history of indifference is bolstered by the testimony of retired LIE Supervisor Mark Sibert and former LIE Michelle Waddy. While D.C. attempts to minimize their testimony as that of a witnesses who cannot bind DOC and a "disgruntled former employee," *see* Op., ECF Nos. 43 & 44 at 4–5, 11–14, their testimony, even when taken in the best light to D.C., is damning and demonstrates D.C. absolute indifference to constitutional violations.

Mr. Sibert, a long-time DOC employee and supervisor who was responsible for denying Mr. Hurd's release, noted that situations like Mr. Hurd's—where DOC found that individuals in their custody *had not* completed prior sentences, was common. Siebert Dep., ECF No. 40-8, at 58:16–59:8. Mr. Siebert testified that these situations arose "often enough that we had to respond to it." *Id.* He testified that DOC provided *no training* for such situations; "I don't' think there was ever anything official when situations like this arised [sic]. These things were

---

[8] D.C.'s failure to put in place appropriate policies and procedures related to checking prisoner files, and the inadequate training provided to DOC staff, has led to several additional cases beyond Mr. Hurd's including another class action based on over-detentions. In the *Jones* case, D.C. is once again faced with a class action lawsuit alleged a pattern and practice of overdetaining inmates and deliberate indifference to their constitutional rights. *Jones v. D.C.*, 16-cv-2405-DLF, First Amended Complaint, ECF No. 12 (Apr. 5, 2017). The *Jones* complaint specifically accused D.C. Jail Records Office "enforces a policy of treating court return . . . as subject to their original commitment order of the court return returns to the Jail or other facility without a release order for each case on which they are being held." *Id.* at ¶ 24. The complaint goes on to discuss DOC's dysfunctional records and release system, databases (CourtView and JACCS) that cannot communicate with each other, paper records, and a D.C. long history of underreporting overdetentions, including being sanctioned by this court for doing so. *See id.* at ¶¶ 25–126 (citing *Smith v. D.C.*, 15-151 (DAR), ECF No. 56 (Dec. 6, 2016)).

And, just last October, a Carlton Harris brought suit claiming that D.C. held him on a for nearly three months after he was picked up on a warrant for a *traffic* violation in Maryland. *Carton Harris v. D.C.*, 18-cv-2390-ABJ, Complaint, ECF No. 1, at ¶¶ 12-14. He was held improperly and should have been released when the US Marshal's service failed to pick him up. *Id.* at ¶ 44. Because of DOC's illegally imprisoned him for more than two months without affording him a hearing, Mr. Harris lost his union job as a roofer. *Id.* at ¶ 45.

discovered, then we would just hold – hold the inmate to his sentence." *Id.* at 58:16–22. Whatever the stated official policy, the actual practice was to just "hold the inmate," completely disregarding the individuals due process rights. No hearing. No judges. Just DOC officials executing DOC policy and practice. Mr. Siebert further testified that it was not uncommon for DOC to be missing paper or have conflicting commitment and release orders. *Id.* at 45:1–4. "[I]t made us very nervous, ever single release . . . it was basically a black hole in our jurisdiction." *Id.* at 45:5–13. That is why the default was just to *hold* people, regardless whether the hold was correct or not.

Ms. Waddy, who worked at DOC from 1991 to 2017, the last 11 years as an LIE, Waddy Dep, ECF No. 41-14 at 7:20 –21, 12:1–3, corroborated Mr. Sibert's testimony. The Administrator would "change[] everything by word of mouth and didn't want to put nothing [policies] on paper." *Id.* at 8:6–9, 14–18. When policies in writing did change, appropriate senior officials would not sign off on the changes and staff were not always made aware of the new policies. *Id.* at 30:12–14.

Ms. Waddy attempted to notify superiors, including the Warden and DOC director, but her attempts were to no avail. *Id.* at 8:19–10:4. Ms. Waddy testified that DOC was "covering up a whole lot of different stuff, because the simple fact is the new people that came into the office . . . the people uptown really didn't know the operations, and they ***really didn't care***." *Id.* at 24:8–15 (emphasis added). Ms. Waddy left DOC partially because there were "a whole bunch of bad releases in that [the records] office." *Id.* at 24:4–6. Ms. Waddy described significant corruption in the office which affected the office's work and staff. *See id.* at 24:15–30:4. Ms. Waddy noted that the training was non-existent: "you got people in that [records] office been in there for 20 years don't even know what they're doing, ***and they don't care.*** *Id.* at 28:6–8 (emphasis added).

## <u>CONCLUSION</u>

Having demonstrated that the District violated Mr. Hurd's procedural and substantive due process rights, and that it knowingly, consistently, and with wanton disregard for the constitutional rights of citizens including Mr. Hurd, plaintiff is entitled to summary judgment.

Dated: June 7, 2019

Respectfully submitted,

_____/s/Adrian F. Snead_____
Dennis E. Boyle (DC Bar No. 1017256)
C. Allen Foster (DC Bar No. 41662)
Erik D. Bolog (DC Bar No. 433614)
Eric C. Rowe (DC Bar No. 466182)
Adrian F. Snead (DC Bar No. 1531946)
Whiteford, Taylor & Preston L.L.P.
1800 M Street, NW, Suite 450N
Washington, D.C. 20036
Telephone: (202) 659-6808
Facsimile:  (202) 327-6175
dboyle@wtplaw.com
cafoster@wtplaw.com
ebolog@wtplaw.com
erowe@wtplaw.com
asnead@wtplaw.com

Co-Counsel for Plaintiff
