# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **MICHAEL D. HURD, JR.,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 15-0666 (ESH)** |
| **DISTRICT OF COLUMBIA,** | |
| **Defendant.** | |

## MEMORANDUM OPINION

Plaintiff Michael D. Hurd, Jr. brings this action against the District of Columbia for damages under 42 U.S.C. § 1983 for "wrongful deprivation of liberty." (Am. Compl. at 9 [ECF 7].) Before the Court are Hurd's and the District's cross-motions for summary judgment. For the reasons stated herein, the District's motion for summary judgment will be granted, and Hurd's will be denied.

## BACKGROUND

### I.    FACTUAL BACKGROUND[1]

Plaintiff Michael Hurd was stopped by the Metropolitan Police Department in August 2005 (*id.* ¶ 9), and charged with five crimes to which he pled guilty in January 2006: "one count of carrying a pistol without a license[,] . . . one count of possession of a prohibited weapon, two counts of possession of unregistered firearms and one count of possession of a quantity of cocaine." (*Id.* ¶¶ 10–11.) He was sentenced to 42 months in prison and three years of supervised

---

[1] The facts relating to this case were set out in greater detail by this Court in *Hurd v. District of Columbia*, 146 F. Supp. 3d 57 (D.D.C. 2015), and in the reversal by the Court of Appeals in *Hurd v. District of Columbia*, 864 F.3d 671 (D.C. Cir. 2017).

release with the execution of all but 45 days suspended, as well as a $1,000 fine and one year of probation. (*Id.* ¶ 11.) The sentence consisted of 15 months of imprisonment and three years of supervised release for the felony gun charge, and several consecutive, shorter sentences adding up to an additional 27 months of imprisonment for the four misdemeanor charges. (*See* 2006 Superior Court Judgment [ECF 38-3].) Several months later Hurd violated the terms of his probation by testing positive for both cocaine and marijuana, and at a show cause hearing in September 2006, his parole was revoked. (*See* Pl.'s Resp. to D.C.'s Statement of Material Facts ("Pl.'s Resp.") at 1–2 [ECF 40].) He was ordered to serve his 42-month prison sentence, to be followed by three years of supervised release. (*See* Am. Compl. ¶ 12.)

On June 11, 2007—*i.e.*, less than a year after his parole was revoked and he was sent to serve his full sentence—Hurd was released from the federal facility at which he was being held in West Virginia and sent to Hope Village, a halfway house in the District. (*See id.* ¶ 15.) He was released from the halfway house in July 2007, and thereafter began his three-year term of supervised release. (*See id.* ¶ 17.) Hurd thus served only the felony part of his sentence. He should have served the remaining misdemeanor time at the jail that is run by the D.C. Department of Corrections ("DOC"), but instead BOP discharged him "under circumstances that he reasonably believed reflected a deliberate sentence reduction." *Hurd*, 864 F.3d at 674. "During this time, he had regular contact with the District of Columbia Court Services & Offender Supervision Agency officers who were monitoring his supervised release, and was never found to have violated the terms of his supervised release." (Am. Compl. ¶ 20.) Although he tested positive for marijuana and cocaine "on more than 50 separate occasions" throughout his term of supervised release, the Parole Commission never revoked his supervised release. (Pl.'s Resp. at 5–6.)

Hurd appeared in D.C. Superior Court several times during this period. (*See id.* at 4–5.) He was charged with simple assault in 2007, but found not guilty following a trial in 2008. (*See id.* at 4.) He was charged "with possession with intent to distribute cocaine while armed, possession of drug paraphernalia, possession of an unregistered firearm and possession of unregistered ammunition" in late 2008, but this case was dismissed, and all charges were dropped. (*Id.*) Hurd was again charged with simple assault in 2009, but the charge was dismissed; another assault charge in 2010 was not papered. (*See id.* at 5.)

In September 2011, Hurd pled guilty to possession of marijuana. (*See* Am. Compl. ¶ 25.) Because he had been participating in a sheet metal apprenticeship since his release from federal prison and was working towards his journeyman certification with the union (*see* Def.'s Resp. to Pl.'s Statement of Material Facts ("Def.'s Resp.") at 7–8 [ECF 43-1]), he was permitted to serve his 9-day sentence over three consecutive weekends. (*See* Am. Compl. ¶ 25.) Hurd surrendered to the DOC for his first weekend of incarceration on September 23, 2011, and was released on September 25. (*See id.* ¶ 26.) He surrendered to serve his second weekend on September 30; however, at the end of the weekend, on October 2, DOC did not release him as expected. (*See id.* ¶¶ 27–28.)

The DOC Records Office employs Legal Instruments Examiners ("LIEs") who, at the time of any inmate's potential discharge, "conduct the review of an inmate's file to look for other pending charges and other matters to determine whether he is eligible for release and also run[] a check for any outstanding warrants, detainers or other holds." (Def.'s Resp. at 10.) Mark Sibert was the LIE in charge of plaintiff's case, and the one who denied his release. (*See* Pl.'s Resp. at 9.) According to Sibert, he denied Hurd's release in reliance on Hurd's 2006 judgment and commitment, which showed that he had 27 months left to serve on his sentence. (*See* Sibert Dep.

at 65–66 [ECF 39-8].)  Hurd filed a complaint with the DOC Records Office after he was not released on October 2; on October 26, 2011, he received a response asserting that he was being held because he "was erroneously released from the Bureau of Prisons on July 18, 2007."  (Pl.'s Resp. at 7.)

Hurd filed a habeas petition on November 16, 2011, under his original case number in Superior Court.  (*See* Am. Compl. ¶ 31.)  Inexplicably, he did not receive a hearing until July 27, 2012, at which time Judge Holeman—who sentenced Hurd in 2006 to the original 42 months of imprisonment—orally denied the habeas petition.  (*See id.* ¶¶ 34–35.)  Judge Holeman concluded that Hurd had not stated a due process claim, because "a convicted person will not be excused from serving his sentence [merely] because someone in a ministerial capacity makes a mistake with respect to the execution of the sentence" (Habeas Hearing Transcript at 67 [ECF 38-12]), and Hurd's case was materially different from other cases in which relief had been granted.  (*See id.* at 69 ("Now, to the extent that when we hold up *United States v. Merritt* to be factually similar to this case, it is, in fact, factually distinguishable from this case.").)  Although Hurd appealed that denial, the D.C. Court of Appeals did not rule on the appeal prior to his release from DOC custody on September 30, 2013; following his release, the D.C. Court of Appeals dismissed Hurd's appeal as moot.  (*See* Am. Compl. ¶¶ 36–39.)

## II.    PROCEDURAL HISTORY

Hurd filed his complaint with this Court on May 1, 2015, and amended the complaint on July 10, 2015.  (*See* Compl. [ECF 1]; *see also* Am. Compl.)  His complaint consists of a single claim under 42 U.S.C. § 1983 for violation of his substantive and procedural due process rights, based on the District's choice to "suddenly and unjustly re-incarcerate[] him without a hearing, four years after he was mistakenly released from a federal prison."  *Hurd*, 146 F. Supp. 3d at 59.

The District moved to dismiss the amended complaint on July 27, 2015, and on November 19, 2015, this Court granted that motion. *See id.* at 72 ("[T]he Court concludes that plaintiff cannot, as a matter of law, state a constitutional claim for damages based on a violation of his due process rights, and therefore, the District's motion to dismiss will be [granted].").

Plaintiff appealed, and on July 28, 2017, the Court of Appeals for the District of Columbia Circuit vacated this Court's dismissal and remanded for further proceedings. *See Hurd v. District of Columbia*, 864 F.3d 671 (D.C. Cir. 2017). The Circuit concluded that Hurd's substantive due process claim was not precluded by the earlier habeas proceedings before Judge Holeman, *see id.* at 679–82, and that Hurd's amended complaint stated a claim for procedural due process because, under the particular facts of his case, he alleged "a liberty interest crystallized sufficiently by the close of the period of supervision to entitle him to some kind of process before re-incarceration." *Id.* at 683. The Court also revived Hurd's substantive due process claim based on its determination that this Court had considered materials outside the amended complaint. *See id.* at 686–87. On remand, the panel counseled this Court to consider whether *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), and its "shock the conscience" test should be employed along with, or instead of, the multi-factor test used in *United States v. Merritt*, 478 F. Supp. 804 (D.D.C. 1979), to determine whether the re-incarceration violated Hurd's substantive due process rights.

On remand, after attempting without success to negotiate a settlement, the parties began fact discovery, which was completed in early 2019. The District filed for summary judgment on April 5, 2019, and Hurd filed a cross-motion for summary judgment on April 26. Argument was held on the motions on November 18, 2019. (*See* November 18, 2019 Minute Entry.)

# ANALYSIS

The first issue is whether the District can be held liable under § 1983. This was not previously addressed by this Court or by the Circuit. This Court concludes that the District cannot be held liable under § 1983, and therefore it does not reach the issue of whether there was a procedural or substantive due process violation under the Fifth Amendment.[2]

## I.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment should be granted to the movant if it has shown that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The mere existence of some factual dispute will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

### B.    Municipal liability under 42 U.S.C. § 1983

Hurd's sole claim is against the District of Columbia under 42 U.S.C. § 1983. (*See* Am. Compl. ¶ 1.) This section provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a

---

[2] "Because D.C. is a political entity created by the federal government, it is subject to the restrictions of the Fifth Amendment, not the Fourteenth." *Propert v. District of Columbia*, 948 F.2d 1327, 1330 n.5 (D.C. Cir. 1991) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)).

declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983. In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), the Supreme Court held that "municipalities and other local government units" were included within the meaning of "persons" who could be sued for monetary damages for deprivation of an individual's constitutional rights. *Id.* at 690.

However, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. In other words, "a municipality cannot be held liable *solely* because it employs a tortfeasor." *Id.* (emphasis in original). Instead, a local government can be held liable "only for the results of unconstitutional governmental 'policies.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988). "There are a number of ways in which a 'policy' can be set by a municipality to cause it to be liable under § 1983: [1] the explicit setting of a policy by the government that violates the Constitution; [2] the action of a policy maker within the government; [3] the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom'; or [4] the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (internal citations omitted). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Once such a policy has been established, the plaintiff must next demonstrate that the municipality was the "moving force" behind her injury—in other words, "a plaintiff must show that the municipal

action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997) (internal quotation marks omitted).

A court must "separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). In numerous cases, the Supreme Court has "assumed that a constitutional violation had been adequately alleged or proved and focused its attention on the separate issue of municipal liability." *Id.* at 121. This follows from "the separate character" of inquiries into questions of constitutional violation and municipal responsibility for that violation. *Id.* at 122; *see also Doe v. District of Columbia*, 796 F.3d 96, 105 (D.C. Cir. 2015) (remanding a § 1983 claim based on "a serious constitutional question" because the district court had not yet determined whether any such violation was "pursuant to a custom or policy of the District"). The Court of Appeals for the District of Columbia has instructed that if "the constitutional question is a difficult one, and there is a question whether the District is liable under § 1983, the district court should address the question of municipal liability in the first instance." *Doe*, 796 F.3d at 106.

## II.     HURD'S § 1983 CLAIMS

Hurd argues that pursuant to 42 U.S.C. § 1983 the District should be liable for damages for the approximately two years he was incarcerated by the DOC between October 2011 and September 2013. He contends that his prior sentence had expired long before the DOC decided to hold him in October 2011, either because his sentence continued to run while he was at liberty (if he had been held continuously, his 42-month sentence would have been completed in full in

March 2010) or because his three years of supervised release had been completed. (*See* Pl.'s Opp. at 10 [ECF 39].)[3]  As explained by Hurd's attorney at the hearing, the passage of either milestone should mark the beginning of a bright-line rule at which point it is no longer constitutional to detain a prisoner with an ostensibly unfinished sentence. (*See, e.g.,* Transcript of November 18, 2019 Motion Hearing ("Tr.") at 5:16-18 ("The case law is relatively uniform on this, that until such time as his sentence is fully expired, the government can then recommit him."); *id.* at 6:18-21 (describing a "bright line test of some sort which says it is unconstitutional if time on the street [as] added to the time served exceeds the amount of prison that he would otherwise serve"); *see also id.* at 19:17-22 ("[T]he thing about *Hawkins* [*v. Freeman*, 195 F.3d 732 (4th Cir. 1999)], it involved a prisoner who had like 10 years to go on his sentence . . . at the time that he was taken back into custody. That's completely different than what happened here because the time had long passed. The time for incarceration had long passed when Mr. Hurd was rearrested.").)  Hurd further argues that his procedural due process rights were violated because any sort of pre-incarceration process would have revealed that he had passed these bright lines and thus was not subject to detention by the DOC. (*See* Pl.'s Opp. at 10 ("If Mr. Hurd had been given a hearing, it would have quickly been determined that his prior sentence had expired . . . .").)

---

[3] In his opposition to the District's motion for summary judgment, Hurd described his bright-line rule as such: "Mr. Hurd had a protectable liberty interest because (1) he was not a mistakenly-released prisoner and his prior sentence had been served in full or (2) if he was a mistakenly-released prisoner, his sentence continued to run, and the government could not recommit him after the time period of his original confinement expired." (Pl.'s Opp. at 10.) According to Hurd, either (1) completion of supervised release, or (2) the addition of street time to time served exceeding the total time of imprisonment that was imposed terminates the government's ability to re-incarcerate. (*See id.*)

Hurd's primary contention is that the District's liability for these constitutional violations is premised on its "long standing custom and practice of detaining prisoners for longer than their actual sentences, and . . . long-standing culture of deliberate indifference to the constitutional rights of prisoners under its control." (Am. Compl. ¶ 40.) He also claims the District "failed to adopt procedures and failed to train its employees regarding practices and procedures required when prisoners have served portions of their sentences elsewhere, and has failed to train its employees of the significance and effect of the division of authority between the District and the federal government." (*Id.* ¶ 50.) According to Hurd, his situation "was not an individual experience as asserted by the District" (Pl.'s Opp. at 25); to the contrary, Hurd argues the District has a "history of indifference" to court-ordered releases and the need to avoid overdetaining prisoners. (Pl.'s Reply at 23 [ECF 46].)

These arguments conflate the third and fourth prongs of municipal policy liability described in *Baker*—they invoke both the consistent adoption of subordinates' acts known as "custom," as well as policymakers' failure to act in the face of a known need, *i.e.*, "deliberate indifference." *See Baker*, 326 F.3d at 1306. The conflation of these two prongs is understandable, as they both focus on essentially the same three questions: (1) has there been a persistent pattern of similar constitutional violations; (2) was the District on notice of this pattern of violations; and (3) did the District nevertheless fail to act, thus displaying deliberate indifference to the possibility of further similar violations. While this has also been formulated as a two-step test—did the District have notice of constitutional violations and make a deliberate choice not to solve the problem (*see* Def.'s Mot. at 11–12 [ECF 38] (citing *Connick*, 563 U.S. at 61))—this two-step test is substantively no different since it combines similar constitutional violations and notice into one step. *See Connick*, 563 U.S. at 62 (requiring "[a] pattern of similar

constitutional violations"); *see also Egudu v. District of Columbia*, 72 F. Supp. 3d 34, 41 (D.D.C. 2014) (requiring evidence that "the municipality's employees engaged in a *persistent or regular pattern* of conduct that gave rise to the alleged constitutional violations" (emphasis added)); *Olaniyi v. District of Columbia*, 876 F. Supp. 2d 39, 49 (D.D.C. 2012) (concluding that there could be no notice when the only evidence presented was of a "history of general problems" with the District's medical care).

While Hurd's briefing focused on *Baker*'s third- and fourth-prong arguments,[4] Hurd's attorney suggested at oral argument that the District's written release policy caused the alleged constitutional violation. At the time of Hurd's re-incarceration, the DOC had in effect a "Program Statement" that addressed releases and that required all LIEs to check a variety of databases for "outstanding charges preventing release, prior to an inmate's release from the custody of the DOC." (DOC 2008 Program Statement at 9 [ECF 38-19].) Without this policy, Hurd argues, the LIEs would never have checked his record and hence never discovered that he had not served the 27 months required on his misdemeanor convictions from 2006. (*See* Tr. at 34:20-24 ("Because if . . . they had not looked into the old records, Mr. Hurd would have been let out at 7:00 on Sunday. Their policy of making—looking at all of these things and making sure that people are entitled to be released, that's what they do. That's their practice.").)

A.      **Existence of an explicit District policy**

Hurd's argument based on an explicit District policy must be rejected. Generally, in order for an explicit municipal policy to warrant liability under § 1983, that policy must *itself* violate the Constitution—it is not enough that the policy may in some attenuated fashion lead to

---

[4] This is with the exception of a passing reference to DOC's "practice to falsify documents." (*See* Pl.'s Opp. at 24 [ECF 39]). No evidence has been offered to support such a bald assertion. As a result, the Court will not consider this argument.

actions that result in constitutional violations.  *See Bryan Cty.*, 520 U.S. at 404 (concluding that a municipality could be held liable for explicit policies "[w]here a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so" (emphasis in original)).  The action taken by the municipality must demonstrate a "degree of culpability."  *Id.* *Monell*, for example, involved an explicit and unconstitutional official policy in New York, which "compelled pregnant employees to take unpaid leaves of absence before such leaves were required for medical reasons."  436 U.S. at 661.  An unconstitutional policy was also found in *Barnes*, where Judge Lamberth concluded that the DOC's policy of refusing to release inmates after 10 p.m. violated their constitutional rights, as it essentially mandated inmate overdetentions "when there exist[ed] no legal basis whatsoever for the continued deprivation of [inmates'] liberty."  *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 278 (D.D.C. 2011).

A DOC policy of checking records for outstanding charges prior to release of an inmate is not itself unconstitutional.  On the contrary, DOC's policy is sensible and reasonably supports society's interest in "preventing the release of an inmate when an alternative basis for his confinement exists."  *Id.* at 276.  In this particular case, DOC's policy triggered a chain of events that culminated in Sibert declining to release Hurd when he would have otherwise been sent home on his weekend sentence despite the absence of a federal detainer, which Hurd alleges was *ultra vires* and in violation of his due process rights.  However, even accepting his argument that the policy led to an alleged constitutional violation by Sibert, a single constitution violation by a low-level District employee is insufficient to make a case of municipal liability.  *See Bryan Cty.*, 520 U.S. at 404 ("The plaintiff must . . . demonstrate that, through its *deliberate* conduct, the *municipality* was the 'moving force' behind the injury alleged." (first emphasis in original)).  Indeed, Hurd is unable to cite to any deliberate actions by District policymakers that caused his

injuries. Hurd's explicit policy argument thus does not meet the "rigorous standards of culpability and causation" required to ensure a municipality is liable for only its own acts. *See id.* at 405.

### B. "Policy" based on a custom or deliberate indifference

Hurd claims that as of 2011 the District has a persistent custom of overdetaining prisoners and failed to train or supervise appropriately its employees who were in charge of the release process, thereby acting in deliberate indifference to potential violations of inmates' constitutional rights. As noted above, this argument melds the third and fourth prongs (custom and deliberate indifference) of *Baker*'s description of the "number of ways in which a 'policy' can be set by a municipality to cause it to be liable under § 1983." *Baker*, 326 F.3d at 1306. To succeed in demonstrating municipal liability based on these prongs, Hurd must show (1) a pattern of similar constitutional violations; (2) notice; and (3) failure to act or deliberate indifference by the District. The Court will consider each in turn.

### 1. Custom or pattern of similar constitutional violations

To support his assertion of a District custom or pattern resulting in similar constitutional violations, Hurd offers the following evidence: (1) the *Bynum* and *Barnes* class actions, as well as other, more recently filed actions concerning overdetentions at the D.C. Jail; (2) testimony of former supervisory LIE Mark Sibert, who was in charge of denying Hurd's release in October 2011 and worked at DOC for more than 15 years, between approximately 1997 and 2013 (*see* Sibert Dep. at 11–12); and (3) testimony of former LIE Michelle Waddy, who worked at DOC for more than 20 years, between 1991 and 2017 (*see* Waddy Dep. at 7 [ECF 39-13]).

### a. *Bynum* and *Barnes* class actions

The District has been the defendant in a series of cases, starting in 2002 with *Bynum v. District of Columbia*, which challenged DOC's release procedures and the ways in which they

may be generating unconstitutional overdetentions and strip searches. *See Barnes*, 793 F. Supp. 2d at 267. In January 2006, the *Bynum* class settled "pursuant to a settlement agreement that contained a number of components that were designed to remedy the overdetention and related strip search problems at the District's jails." *Id.* However, "instead of a swift change to the status quo at the DOC, there were years where little if any substantive change was instituted," *id.*, leading to the filing of the *Barnes* class action in 2006, which argued that "the DOC's overdetention and strip-search problems remain[ed] widespread post-*Bynum*." *Id.* at 271.

When Hurd first defended his suit against the District's motion to dismiss, he argued that although he was detained during the *Barnes* class period, his case should not be precluded by the settlement: "Mr. Hurd's overdetention did not come about because of the faulty administrative process of release at issue in *Barnes*, but from other factors entirely." (*See* Resp. to Def.'s Mot. to Dismiss at 10 [ECF 10].) The Court agreed with this distinction. *See Hurd*, 146 F. Supp. 3d at 62 ("[B]ecause plaintiff's allegations are materially different from those in *Barnes*, he is not precluded by the *Barnes* settlement from pursuing relief here."). Now, however, Hurd maintains that the issues causing his detention and those in the *Barnes* case are dissimilar, yet at the same time he argues that "the same underlying behavior that lead [sic] to constitutional violations in *Barnes* and *Bynum* [was] again at play in this case." (*See* Pl.'s Reply at 21.) The Court disagrees.

Hurd vacillates between calling what happened to him an "over-detention" and a "re-incarceration," at times suggesting that the difference between the two is purely semantic. (*See* Pl.'s Opp. at 23 n.8.) Although it advantages him to refer to his situation as an "over-detention," as this allows him to argue a closer alignment between his case and those in *Bynum* and *Barnes*, Judge Lamberth described overdetentions in *Barnes* as situations in which "the jail has every

reason to believe that the person's continued detention is unlawful and *no reason* to believe that some other basis for the detention" exists. *See Barnes*, 793 F. Supp. 2d at 276 (emphasis added). Hurd was not merely kept longer on his weekend sentence for administrative processing or because of some human error on the part of the DOC; instead, he was held due to an *intentional* decision to detain him pursuant to his unfinished 2006 sentence. This Court thus concluded that his situation is best described as a re-incarceration, *not* an overdetention. *See Hurd*, 146 F. Supp. 3d at 62 ("[T]his is a case of an alleged improper reincarceration, not over-detention); *see also Hurd*, 864 F.3d at 684 (repeatedly referring to Hurd's situation as a "re-incarceration".

Where there is no explicit, unconstitutional municipal policy, the Supreme Court requires "a pattern of similar violations that would establish that the policy of inaction was the functional equivalent of a decision by the [municipality] itself to violate the Constitution." *Connick*, 563 U.S. at 72 (internal quotation marks and brackets omitted). Furthermore, "a close link between the alleged pattern of constitutional violations and the alleged injury" is necessary. *Olanyi*, 876 F. Supp. 2d at 50. For example, in *Olanyi*, Judge Walton of this Court granted summary judgment to the District on a § 1983 claim because the plaintiff's evidence showed only a "history of *general* problems with medical care," rather than the specific, alleged constitutional injury, *i.e.*, forced medication, at issue in the plaintiff's case. *Id.* at 49 (emphasis added); *see Robinson v. Pezzat*, 818 F.3d 1, 46–47 (D.C. Cir. 2016) (agreeing with the district court that "seven years' worth of police reports of dog shootings were insufficient" to establish a pattern where it was unclear whether the majority of the shootings were unconstitutional).

Hurd's situation—a re-incarceration following an intentional DOC decision to hold him to finish an earlier, uncompleted sentence—is not like the "garden-variety" over-detentions due

to administrative processing or human error that occurred in *Bynum* and *Barnes*. *See Hurd*, 146 F. Supp. 3d at 62.[5] As a result, the *Bynum* and *Barnes* cases cannot be used to prove a pattern of similar constitutional violations.

### b.    Testimony of Mark Sibert

Hurd cites the testimony of Mark Sibert, who at the time of Hurd's re-incarceration in October 2011 was a lead supervisory LIE. (*See* Sibert Dep. at 53.) Sibert confirmed that he wrote "Denied" on Hurd's release form on October 2, 2011 (*see id.* at 53–54; *see also* Release Authorization Form [ECF 39-9]), and that he did so solely based on the judgment and commitment from Hurd's 2006 case, which showed Hurd still had 27 months to serve. (*See* Sibert Dep. at 66.) Sibert testified that "it's a rare case but, you know, some inmate can serve his time elsewhere on misdemeanor charges, or if he was released and not returned to us." (*Id.* at 58.) When asked how often such cases arise, Sibert said "[m]ore times than we would like to remember, but if I had to put a time frame on it, maybe every three months, maybe twice a year, not a whole lot but often enough that we had to respond to it." (*Id.* at 59.) Nevertheless, Sibert confirmed that there was no official policy in place to deal with such cases; instead, when these cases were discovered, the DOC "would just hold . . . the inmate to serve his sentence." (*See id.* at 58.) Sibert clarified that when he was describing these situations, he was referring both to situations where an inmate was released "from [the] Bureau of Prisons and not returned," as well

---

[5] Hurd also cites "several additional cases beyond Mr. Hurd's including another class action based on over-detentions." (Pl.'s Reply at 23 n.8 [ECF 46].) However, these cases, like *Bynum* and *Barnes*, are not factually similar to Hurd's re-incarceration. *See, e.g., Harris v. Gov't of District of Columbia*, 2019 WL 3605877, at *1 (D.D.C. Aug. 6, 2019) (plaintiff's "'in-transit' hold" was supposed to last a night or two but extended for more than two months because of missing paperwork). Moreover, both *Harris* and the other case Hurd cites, *Jones v. District of Columbia*, 2019 WL 5690341 (D.D.C. June 13, 2019), were at the motion to dismiss stage, and thus subject to a different standard of proof—the plaintiffs did not have to provide evidence to support a claim of municipal liability, they merely had to state a plausible claim.

as to situations where "an inmate could have gone to Maryland, served his time, was released and not returned to us." (*Id.* at 59–60.)

While Hurd argues that Sibert's testimony demonstrates that situations such as his were common, and that the District acted inappropriately when it provided no training for such specific situations (*see, e.g.,* Reply at 23), the case law demonstrates that Sibert's testimony does not support these conclusions. For example, in *Robinson*, the Court found that although the plaintiff's evidence of a record of prior animal shootings may have proven the existence of prior animal shootings generally, it was not sufficient to support municipal liability as "plaintiff has tendered no evidence suggesting that the majority of these shootings were unconstitutional." *Robinson v. Pezzat*, 83 F. Supp. 3d 258, 269 (D.D.C. 2015), *vacated on other grounds by Robinson*, 818 F.3d at 47. Here, although Sibert describes a situation facially similar to Hurd's (an inmate serves a sentence outside the District and is not returned to the District to serve a D.C. sentence afterwards), it is unclear if the situation is in fact similar to Hurd's. (*See* Sibert Dep. at 59–60 ("'[L]ike' is a big term.").) More significantly, the Court has no way to know whether any of these prior incidents cited by Sibert were unconstitutional. *See Egudu*, 72 F. Supp. 3d at 43 (rejecting evidence of number of arrests, "without more," as sufficient to "demonstrate a custom of constitutional violations," as "the Court will not simply assume that the recorded arrests were improper"). It is possible that in one or more of the "similar" situations about which Sibert testified, the individual was erroneously released following completion of a federal prison sentence, but picked up just one week later while still on supervised release, at which point her unfinished sentence was observed and she was returned to the DOC to serve the remainder of her sentence. Not only would this situation not meet the "bright line" test suggested by Hurd, as her time served added to her time on the street would not exceed the time she was required to serve

(see Tr. at 24:3-24 (Hurd's attorney agreeing that "society's interest in consecutive sentences would [not] outweigh having a potentially dangerous person out on the street that somebody mistakenly let out" when, for example, a sex offender is released with nine years left on his sentence)), but it would also go no further than what the Circuit called "unproblematic." *See Hurd*, 864 F.3d at 86 ("If [a] release were mistaken and quickly recognized as such, a prompt arrest and re-incarceration would seem unproblematic.").

Sibert's testimony also lacks any specification as to the timing of these incidents, which is necessary to establish a pattern of unconstitutional conduct. *See Moore v. District of Columbia*, 79 F. Supp. 3d 121, 140 (D.D.C. 2015) (rejecting the plaintiffs' attempts to use a 2003 report "to invite the jury to infer that because of warnings made in 2003[,] . . . the same problem continued unabated for the next five years"); *see also Egudu*, 72 F. Supp. 3d at 43 (rejecting various pieces of evidence analyzing data from 1996 to 2005, as "that information would not satisfy plaintiff's burden to show what was customary in the District in 2009"). Sibert testified that he worked for the DOC from approximately 1997 to 2013, and that these "like" situations occurred sometime between two and four times a year. (*See* Sibert Dep. at 59.) The Court cannot presume that any of these "like" situations occurred close in time to Hurd's re-incarceration in 2011, let alone a significant enough number of them to constitute a pattern or custom.

As a result, Sibert's testimony fails to present the "fully packed, precisely delineated scenarios" necessary to demonstrate a custom. *See Carter v. District of Columbia*, 795 F.2d 116, 125 (D.C. Cir. 1986); *see also Olaniyi*, 876 F. Supp. 2d at 49 (concluding that "evidence offered by [the plaintiff] concerning deficiencies at the D.C. Jail with respect to patient care *in general*"

was insufficient to support municipal liability for a claim stemming from the *specific* issue of forced medication (internal quotation marks omitted)).

### c. Testimony of Michelle Waddy

Hurd cites to the testimony of Michelle Waddy, an LIE who worked at the DOC at the time he was re-incarcerated. Waddy, whom the District described in its briefing as a "disgruntled employee" (*see* Def.'s Opp. & Reply at 13 [ECF 43]), cited a number of complaints that arose during her more-than-twenty-year tenure with the DOC. (*See generally* Waddy Dep.) For example, she testified that she quit the DOC in 2017 because her supervisor "changed everything by word of mouth and didn't want to put nothing [sic] on paper." (*Id.* at 8.) However, none of her complaints relate to a comparable situation to Hurd's, so they cannot support a pattern claim. *See Olaniyi*, 876 F. Supp. 2d at 50 (observing the "necessity of a close link between the alleged pattern of constitutional violations and the alleged injury"). She testified to the problem of DOC overdetentions (*see* Waddy Dep. at 31 ("It's been a lot of them since I been there, and I'm sure it's been more since I left . . . .")), but she described nothing akin to Hurd's experience of re-incarceration. She also testified to a number of "bad releases" that the DOC made during her tenure, but these involved inmates released directly to self-custody when in fact they were meant to go into drug programs. (*See id.* at 25.) As a result, her testimony cannot support "[a] pattern of similar constitutional violations." *Connick*, 563 U.S. at 62.

### 2. Evidence of notice by the District

Hurd has not adduced any evidence that policymakers were aware of problems such as his. Because municipalities cannot be held liable "solely on the basis of the existence of an employer-employee relationship with a tortfeasor," *see Monell*, 436 U.S. at 692, plaintiffs must demonstrate that a municipality was *aware* of constitutional violations taking place. A "policy

of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by [a municipality] itself to violate the Constitution." *Connick*, 563 U.S. at 61–62 (internal quotation marks omitted). However, as Hurd has provided no evidence to show that the District had notice of a custom or policy of re-incarcerating prisoners in violation of their constitutional rights, his § 1983 claim fails for this reason as well.

Hurd's notice argument relies heavily on the *Bynum* and *Barnes* cases. (*See, e.g.,* Pl.'s Opp. at 24 ("The District has been sued repeatedly in one form or another for the very issue of over-detentions . . . .").) According to Hurd, these cases put the District on notice of its overdetention problem. *See Barnes*, 793 F. Supp. 2d at 283 ("There is no dispute that the District was aware, or at least should have been aware, of overdetention problems at its jails beginning, at the latest, in 2002, when the *Bynum* lawsuit was filed.). As the Court explained above, however, Hurd was re-incarcerated, not over-detained. *Bynum* and *Barnes* thus did not put the District on notice of the problem of re-incarcerations like Hurd's because they do not represent a "pattern of *similar* constitutional violations." *Connick*, 563 U.S. at 62 (emphasis added).

Sibert and Waddy's testimony also fails to establish notice. Waddy testified that she brought complaints to her supervisor, one of the wardens, and even the director. (*See* Waddy Dep. at 8–9). But even if one could assume that one of those individuals is a policymaker for purposes of *Monell*, Waddy never specified what types of complaints she voiced. (*See id.* at 9 ("I put it in paper on the different things, about ten different things that I disagreed with that were happening at the facility.").) Even her release-related complaints do not involve any situations similar to Hurd's. (*See, e.g., id.* at 25 (describing "bad releases" as when an inmate was released to self-custody rather than a drug program).) Furthermore, Sibert never testified

that he passed along his information to *anyone*, let alone to a sufficiently senior individual who would be considered a District policymaker.  Hurd's evidence of notice by the District is therefore woefully deficient; rather, as far as can be adduced, Hurd-like situations were dealt with on an *ad hoc* basis by low-level employees on the rare occasions that they arose.

At the hearing on this motion, Hurd's attorney essentially acknowledged that he was not able to provide evidence of notice to the District of specific situations like Hurd's—instead, he suggests that the sort of general notice described above should be sufficient.  (*See* Tr. at 50:24–51:7 ("[I]f we're going to talk about notice, you have to have notice of a case that is exactly like this or actually you don't have notice, I think that's the wrong rule.  I think the rule here is that they had plenty of notice.  That there was a lot going on that was wrong in the District of Columbia Department of Corrections, that they were having serious problems with their management, their paperwork.").)  The Court simply cannot accept such generalized evidence of notice.  *See, e.g., Connick*, 563 U.S. at 62–63 (describing evidence of prior reversals due to *Brady* violations and determining they could not prove a pattern because "[n]one of those cases involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind,"  and thus "those incidents are not similar to the violation at issue here, [so] they could not have put Connick on notice that specific training was necessary to avoid this constitutional violation"); *see also Robinson*, 818 F.3d at 47 (concluding that "police reports of dog shootings provide no basis for a reasonable jury to conclude that the District had notice of a pattern of likely unconstitutional conduct adequate to prove deliberate indifference" because reports did not demonstrate that situations were similar to the one at issue).

### 3.    Failure to act or deliberate indifference

Hurd offers no evidence that the District knowingly failed to act or was otherwise deliberately indifferent to constitutional violations presented by situations like his.  As discussed above, he adduced no evidence that his situation recurred so frequently that District policymakers should have been aware of it.  And vague suggestions that the District could have improved the release policy and that such improvements would have avoided Hurd's situation are not enough.  *See Robinson*, 83 F. Supp. 3d at 270 ("Claims that 'better or more training' could have averted harm can be made 'about almost any encounter resulting in injury' and are a flimsy basis for liability." (quoting *City of Canton v. Harris*, 489 U.S. 378, 391 (1989))); *see also Smith v. District of Columbia*, 306 F. Supp. 3d 223, 255 (D.D.C. 2018) (rejecting a claim that the District was deliberately indifferent to the need for training when the plaintiff's expert "did not identify deficiencies in DOC's training with respect to release orders in particular, and he did not connect any differences between his preferred training program and DOC's to what took place in this case.").

In support of his failure to act argument, Hurd argues that "[h]ad D.C. made the promised changes [resulting from the *Barnes* and *Bynum* cases] by 2011, it is likely Mr. Hurd would *never* have been over-detained and reimprisoned."  (*See* Reply at 22–23.)  This is plainly incorrect.  For example, in *Barnes*, Judge Lamberth criticized the District for its number of overdetentions by suggesting that "many, if not most, of the administrative tasks incident to an inmate's release can be undertaken prior to the expiration of a sentence or before a jail's receipt of a paper court order authorizing release—unlike in the probable cause context, where all of the administrative tasks must necessarily follow the detainee's arrest."  793 F. Supp. 2d at 276.  Looking at Hurd's file sooner, on the other hand, would not have accelerated his release; instead, the DOC would

have unearthed the evidence of his unserved time earlier. Hurd was simply not on the same footing as the inmates described by Judge Lamberth—those "who [are] entitled, at that very moment, to release, and whom the DOC has *absolutely no reason to suspect* is the subject of some other basis for continued detention." *Id.* at 276 n.13 (emphasis added). The same faulty logic can be found in Hurd's criticism of the District's changes to its release policies, which he says "ha[ve] only complicated the policies and procedures making it more likely that over-detentions occur." (Pl.'s Opp. at 6.) There is no evidence that the need for additional supervisory signatures had anything to do with Hurd's re-incarceration, or that a different reform would have avoided his injury. *See Dave v. D.C. Metro. Police Dep't*, 905 F. Supp. 2d 1, 13 (D.D.C. 2012) ("[S]uch generalized claims without reference to specific facts are insufficient at the summary judgment stage.").

Furthermore, if one accepts Hurd's argument that the Court should look to *Barnes*, Judge Lamberth's findings cut against him. The Court in *Barnes* determined that after February 25, 2008, the District demonstrated a sharp decrease in the number of over-detentions. *See* 793 F. Supp. 2d at 281. As a result, it concluded that this reduction, "alongside the District's implementation in 2008 of measures that even plaintiffs concede have 'solved' much of the overdetention problem, leads this Court to the conclusion that the DOC, from February 2008 forward [to the end of May 2011], could not reasonably be found to have been deliberately indifferent to the due process rights of overdetention class members during this period." *Id.* So even accepting Hurd's argument that his situation is sufficiently similar to the *Barnes* scenario, the Court cannot both accept Hurd's argument that *Barnes* evidences a problem about which the District was aware *and* ignore the explicit finding that the District had undertaken substantial reforms starting in 2008 that had substantially reduced the number of overdetentions. *See id.*

The same goes for the use of evidence that the District has changed its release procedures. While Hurd attempts to turn the District's evidence of policy changes against it (*see* Reply at 22 ("[The] fact that it says it made changes to its release processes *demonstrates that D.C. knew of the problem at a policymaking level . . . .*" (emphasis in original))), the Court cannot accept such arguments. *See Byrd v. District of Columbia*, 297 F. Supp. 2d 136, 141 (D.D.C. 2003) ("[I[f one were to adopt plaintiff's approach, a municipality would be ill-advised to evaluate its operational practices or to institute reforms lest its efforts be labeled as a policy or custom of deliberate indifference.").

## CONCLUSION

For the foregoing reasons, the Court concludes Hurd has failed to prove that the District is liable for any constitutional violations under 42 U.S.C. § 1983. As a result, the Court will grant the District's motion for summary judgment (ECF 38) and deny Hurd's motion for summary judgment (ECF 41). A separate Order accompanies this Memorandum Opinion.



ELLEN S. HUVELLE
United States District Judge

Date: December 11, 2019