## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHAEL D. HURD, JR.,

     Plaintiff,

       v.

DISTRICT OF COLUMBIA,

     Defendant.

Civil Action No. 15-666 (JDB)

## MEMORANDUM OPINION

Before the Court is a renewed motion for summary judgment filed by defendant the District of Columbia (the "District"), a motion for leave to file a sur-reply to the motion for summary judgment filed by plaintiff Michael D. Hurd, Jr., and a motion to preclude expert evidence filed by the District. Hurd brought this lawsuit in 2015 pursuant to 42 U.S.C. § 1983 alleging that the District violated his Fifth Amendment due process rights when it reincarcerated him without a hearing in 2011 for unserved misdemeanor sentences. Four years prior to his reincarceration, Hurd had completed his sentence of imprisonment on a felony conviction stemming from the same incident. He still had a period of incarceration left to serve on the misdemeanors, but upon completion of incarceration based on the felony conviction, he was erroneously released from prison and began serving the supervised release portion of his sentence. This case has been pending for eight years, went up on appeal to the D.C. Circuit twice, has gone through unsuccessful mediation, and is now on its third round of dispositive motions briefing, although the first before this judge, to whom the case has been reassigned. For the reasons explained below, the Court will grant Hurd's motion for leave to file a sur-reply; deny summary judgment as to Hurd's procedural due process claim; grant summary judgment as to Hurd's substantive due process claim; and deny as moot the District's motion to preclude expert evidence.

1

**Background**[1]

## I.   Factual Background

On January 13, 2006, Hurd was sentenced in D.C. Superior Court before Judge Holeman

on five convictions (one felony and four misdemeanors): carrying a pistol without a license (Count

B), possession of a prohibited weapon (Count C), two counts of possession of an unregistered

firearm (Counts D and E), and possession of cocaine (Count F).  Statement of Undisputed Material

Facts in Supp. of Def.'s Renewed Mot. for Summ. J. ("Mot. for Summ. J.") [ECF No. 65-1]

("SUF") ¶ 1; Pl.'s Combined Resp. to SUF & Fact Statement [ECF No. 66-30] ("Resp. SUF") ¶ 1;

see also Ex. 1 to Mot. for Summ. J. [ECF No. 65-3] ("Dist. Ex. 1") (criminal judgment and sentence

dated January 13, 2006).[2]  By the date of sentencing, Hurd had already spent 95 days in jail, as he

had been arrested on August 3, 2005 and was detained without bond until he was released

following his guilty plea on November 5, 2005.  Hurd SOF ¶ 2; see also Ex. 7 to Mot. for Summ.

J. [ECF No. 65-9] ("Dist. Ex. 7") at 2 (sentence computation data showing that Hurd was in

custody from "08-03-2005" to "11-05-2005"); Ex. 2 to Pl.'s Opp'n to Def.'s Mot. for Summ. J.

("Opp'n to Mot. for Summ. J.") [ECF No. 66-3] ("Hurd Ex. 2") (order denying bond); Ex. 3 to

Opp'n to Mot. for Summ. J. [ECF No. 66-4] ("Hurd Ex. 3") (case docket); Ex. 4 to Opp'n to Mot.

for Summ. J. [ECF No. 66-5] ("Hurd Ex. 4") (release order); Ex. 5 to Opp'n to Mot. for Summ. J.

---

[1] For a more fulsome factual exposition, see the background sections in Hurd v. District of Columbia ("Hurd I"), 146 F. Supp. 3d 57 (D.D.C. 2015), vacated and remanded, 864 F.3d 671 (D.C. Cir. 2017); Hurd v. District of Columbia ("Hurd II"), 864 F.3d 671 (D.C. Cir. 2017); Hurd v. District of Columbia ("Hurd III"), 427 F. Supp. 3d 21 (D.D.C. 2019), aff'd in part, vacated in part, remanded, 997 F.3d 332 (D.C. Cir. 2021); and Hurd v. District of Columbia ("Hurd IV"), 997 F.3d 332 (D.C. Cir. 2021).

[2] The document containing Hurd's responses to the District's statement of facts also includes his own statement of facts interspersed throughout.  The Court will refer to Hurd's responses to the District's facts by the paragraph number of the District fact to which he is responding, i.e., Resp. SUF ¶ [#], and will refer to Hurd's affirmative factual statements by reference to the number assigned in his filing, i.e., Hurd SOF ¶ [#].

[ECF No 66-6] ("Hurd Ex. 5") (order to appear for sentencing).[3]  Judge Holeman sentenced Hurd to 42 months' imprisonment with the execution of all but 45 days suspended, and one year of probation.  SUF ¶ 2; Resp. SUF ¶ 2; see also Dist. Ex. 1.[4]

Immediately after sentencing, Hurd was committed to the custody of the Attorney General to serve his sentence of 45 days' incarceration in D.C. Jail (with the remainder of the 42-month sentence of incarceration suspended).  Hurd SOF ¶ 4; see also Dist. Ex. 1.  After having spent two days in custody, he was released upon the application of his time-served credit, beginning his one-year term of probation.  Hurd SOF ¶ 4; see also Ex. 7 to Opp'n to Mot. for Summ. J. [ECF No. 66-9] ("Hurd Ex. 7") (release form dated January 14, 2006).  At this point, Hurd had spent a total of 97 days in custody.  Hurd SOF ¶ 5; see also Dist. Ex. 7 at 2 (reflecting 97 days of "jail credit").

In August 2006, the Court Services and Offender Supervision Agency for the District of Columbia ("CSOSA") filed a report in Superior Court alleging that Hurd had violated the terms of his probation through several positive drug tests from May to July 2006.  SUF ¶ 3; see also Ex. 2 to Mot. for Summ. J. [ECF No. 65-4] ("Dist. Ex. 2") (alleged violations report).  Following a show cause hearing, on September 21, 2006 Judge Holeman revoked Hurd's probation and ordered him to serve his full 42-month sentence of incarceration followed by three years of supervised release.

---

[3] Hurd's sentencing was initially scheduled for January 6, 2006 but was continued until January 13, 2006.  See Hurd Ex. 3 at 1–2.

[4] The judge sentenced Hurd as follows: on Count B (the felony) "15 months in prison with credit for time served E.S.S. as to all but 30 days to run consecutive to any other sentence"; on Count C (a misdemeanor) "1 year in prison with credit for time served E.S.S. to run consecutive to any other sentence"; on Count D (a misdemeanor) "180 days in jail with credit for time served E.S.S. to run consecutive to any other sentence"; on Count E (a misdemeanor), to the same as Count D; and on Count F (a misdemeanor) "180 days in jail with credit for time served E.S.S. as to all but 15 days to run consecutive to any other sentence."  Dist. Ex. 1.  The parties seem to agree that the aggregate sentence of incarceration was 42 months, but the Court counts 45 months, not accounting for any application of time-served credit.  If Hurd's 95 days of time-served credit applied to the aggregate sentence instead of as to each count, as the judgment seems to indicate, then the aggregate sentence of imprisonment would be 45 months less 95 days, totaling approximately 42 months.  It is not clear to the Court on this record how the time-served credits were applied to the sentence.  But the Court will accept the parties' mutual understanding that Hurd was sentenced to 42 months' imprisonment.  Despite the 42-month sentence, Hurd only had to serve 45 days total in prison on Counts B and F because the sentences of incarceration on the other three misdemeanors (Counts C, D, and E) were fully suspended.

SUF ¶ 4; Resp. SUF ¶ 4; <u>see also</u> Ex. 3 to Mot. for Summ. J. [ECF No. 65-5] ("Dist. Ex. 3")

(criminal judgment and sentence dated September 21, 2006).[5]  The judgment specified that Hurd

would be awarded "credit for time served" on each count, Hurd SOF ¶ 9; <u>see also</u> Dist. Ex. 3, and

that the 42-month sentence of incarceration was a single-term, aggregate sentence "comprised of

consecutive time periods for one felony count and four misdemeanor counts."  Hurd SOF ¶¶ 6–7;

<u>see also</u> Dist. Ex. 3.

On December 4, 2006, Hurd was designated to the Federal Correctional Institution in

Beckley, West Virginia ("FCI Beckley") to serve his sentence.  SUF ¶ 5; Resp. SUF ¶ 5; <u>see also</u>

Ex. 4 to Mot. for Summ. J. [ECF No. 65-6] ("Dist. Ex. 4") at 2 ("Inmate Hurd was initially

designated to FCI Beckley . . . on 12/04/2006[] for the service[s] of his sentence.").  On December

20, 2006, Judge Holeman denied Hurd's motion to reduce his sentence or for his sentences to run

concurrently, reiterating that Hurd shall receive time served credit on each of the five counts—that

is, for each of his five sentences, he should actually serve the term of imprisonment that he was

sentenced to, less 97 days.  Hurd SOF ¶¶ 12–13; <u>see also</u> Ex. 9 to Opp'n to Mot. for Summ. J.

[ECF No. 66-11] ("Hurd Ex. 9") (order denying Hurd's motion).  The order was mailed to Hurd

at the address of the D.C. Jail, but Hurd had already been transferred to FCI Beckley, so he never

received the order.  Hurd SOF ¶ 14; <u>see also</u> Hurd Ex. 9 at 4 (showing that the order was mailed

to Hurd at "1901 D. Street, S.E., Washington, D.C. 20004," the address of the D.C. Jail).

Hurd remained at FCI Beckley until June 11, 2007.  SUF ¶ 5; Resp. SUF ¶ 5.  He was

released to a halfway house in D.C. and began his three-year term of supervised release on July

---

[5] The September 2006 judgment differs from the January 2006 judgment in that Hurd was sentenced in September to five months' imprisonment, respectively, on Counts 4, 5, and 6, rather than 180 days on those same counts in the January judgment (those counts were also referred to as Counts D, E, and F in the January judgment, while they are Counts 4, 5, and 6 in the September judgment).  <u>Compare</u> Dist. Ex. 1 (January 2006 judgment), <u>with</u> Dist. Ex. 3 (September 2006 judgment).

18, 2007.  SUF ¶ 6; Resp. SUF ¶ 6; Hurd SOF ¶ 15; see also Ex. 5 to Mot. for Summ. J. [ECF No. 65-7] ("Dist. Ex. 5") (authorization for transfer to halfway house); Ex. 6 to Mot. for Summ. J. [ECF No. 65-8] ("Dist. Ex. 6") (certificate of supervised release).  At the time of his entry into the supervised release program, he had satisfied the sentence on his felony conviction (15 months less 97 days' credit for time served).  SUF ¶ 7; Resp. SUF ¶ 7 (not disputing that Hurd had completed his felony sentence); see also Ex. 7 to Mot. for Summ. J. [ECF No. 65-9] ("Dist. Ex. 7") at 1 (sentencing monitoring computation data dated December 12, 2006 showing that the "projected satisfaction date" of Hurd's felony sentence was "07-18-2007," the date he was released from the halfway house).  But he still had time to serve on his four misdemeanor sentences—27 months total less the 97 days' jail credit on each count (388 days), meaning he should not have been finished serving his consecutive misdemeanor sentences until September 25, 2008.[6]  Hurd SOF ¶ 21; see also Dist. Ex. 3; Hurd SOF ¶ 10.  However, Hurd believed that his term of incarceration had been served in full because he never received the order denying his motion to reduce his sentence or for his sentences to run concurrently.  Hurd SOF ¶ 15; see also Ex. 10 to Opp'n to Mot. for Summ. J. [ECF No. 66-12] ("Hurd Ex. 10") 24:3–25:13 (Hurd deposition).

While on supervised released, Hurd had several brushes with the law.  On September 12, 2007, he was charged with simple assault.  SUF ¶ 9; Resp. SUF ¶ 9.  He pled not guilty to that charge and was acquitted following a trial.  SUF ¶ 9; Resp. SUF ¶ 9; Hurd SOF ¶ 23; see also Ex.

---

[6] The parties claim to dispute how much time Hurd still had to serve on the misdemeanor sentences at the time he entered his supervised release term, with the District claiming Hurd had 27 months left to serve and Hurd claiming he had 27 months less his time-served credit of 97 days for each of the four counts.  See SUF ¶ 7; Resp. SUF ¶ 7; see also Reply ISO Mot. for Summ. J. [ECF No. 68] at 17–18.  But the Court does not think there is a genuine dispute as to this fact.  The September 2006 judgment and other accompanying documentation is clear that Judge Holeman ordered that Hurd be credited for the 97 days he spent in jail on each of his five counts.  See Dist. Ex. 3.  And he was credited that time as to his felony conviction.  See Dist. Ex. 7.  The District, for its part, does not present any counterevidence in the record that would suggest Hurd was not owed the 97 days' credit on each of the four misdemeanor counts.  Instead, it urges that the Court should "not entertain" that "argument" for a variety of reasons.  Reply ISO Mot. for Summ. J. at 17–18.  But it is not an argument—it is a fact.  Because all the evidence in the record supports Hurd's view, the Court concludes that there is no genuine dispute and will accordingly credit Hurd's version.

11 to Opp'n to Mot. for Summ. J. [ECF No. 66-13] ("Hurd Ex. 11") (case docket). On December 3, 2008, Hurd was charged with possession with intent to distribute cocaine while armed, possession of drug paraphernalia, possession of an unregistered firearm, and possession of unregistered ammunition. SUF ¶ 10; Resp. SUF ¶ 10. The arrest report indicates that 108.7 grams of crack cocaine in false-bottomed containers, $8,426 in cash, a Ruger firearm, and nineteen rounds of ammunition were found in Hurd's girlfriend's apartment. SUF ¶ 10; Resp. SUF ¶ 10; see also Ex. 13 to Mot. for Summ. J. [ECF No. 65-15] ("Dist. Ex. 13") (arrest report) at 2–3. Hurd pled not guilty, and all of the charges were ultimately dismissed. Hurd SOF ¶ 24; see also Ex. 12 to Opp'n to Mot. for Summ. J. [ECF No. 66-14] ("Hurd Ex. 12") (case docket). On August 15, 2009, Hurd was charged with simple assault, pled not guilty, and the charge was ultimately dismissed. SUF ¶ 11; Resp. SUF ¶ 11; Hurd SOF ¶ 25; see also Ex. 13 to Opp'n to Mot. for Summ. J. [ECF No. 66-15] ("Hurd Ex. 13") (case docket). Hurd also tested positive for marijuana and cocaine on more than 50 separate occasions from November 2008 to July 2009. SUF ¶ 13; Resp. SUF ¶ 13; see also Ex. 9 to Mot. for Summ. J. [ECF No. 65-11] ("Dist. Ex. 9") at 3 (alleged violation report); Ex. 10 to Mot. for Summ. J. [ECF No. 65-12] ("Dist. Ex. 10") at 1 (report of drug use).[7] Federal authorities issued Hurd letters of reprimand for his positive drug tests and increased the frequency of his drug testing but did not seek to revoke his supervised release. SUF ¶ 15; Resp. SUF ¶ 15;

---

[7] Hurd claims to dispute this fact, but the Court does not consider this purported dispute to be material. Hurd does not dispute that he tested positive for the presence of drugs on more than 50 separate occasions. See Hurd SOF ¶ 27. What Hurd disputes is the inference that he actually used drugs on each of those occasions. Id. ¶ 28 ("[I]t is also true that marijuana can be detected in urine for weeks after use, and the tests all occurred within days of other tests, so the number of positive results is not at all indicative of the extent of use."). As will be discussed later in this Opinion, Hurd offers an expert opinion to support that proposition. See Ex. 14 to Opp'n to Mot. for Summ. J. [ECF No. 66-16] ("Hurd Ex. 14") (expert report of Dr. Howard Robin). He also points out that he "work[ed] diligently to discontinue his use of drugs," Hurd SOF ¶ 29, that he complied with his supervised release conditions "by reporting to CSOSA officers regularly for three years, submitting urine samples for drug testing, and training for and obtaining a well-paid job," id. ¶ 30, and that the Parole Commission never expressed interest in revoking his supervised release as a result of these positive drug tests, id. ¶ 31. While helpful context, none of these facts negate that Hurd tested positive for drugs on over 50 separate occasions between November 2008 and July 2009. Thus, the Court will accept that fact as established based on the record.

see also Ex. 14 to Mot. for Summ. J. [ECF No. 65-16] ("Dist. Ex. 14") (letters of reprimand). Hurd's term of supervised release ended on July 18, 2010.  Hurd SOF ¶ 35.

On September 20, 2011, Hurd pled guilty to possession of a controlled substance in D.C. Superior Court and was sentenced to nine days' incarceration to be served over the course of three consecutive weekends at D.C. Jail.  SUF ¶ 16; Resp. SUF ¶ 16; see also Ex. 15 to Mot. for Summ. J. [ECF No. 65-17] ("Dist. Ex. 15") (judgment).  A then-existing D.C. Department of Corrections ("DOC") policy regarding the release of inmates from D.C. Jail required that a Records Office Legal Instrument Examiner ("LEI") had to complete "release clearance" before a "release authorization form" could be prepared.  SUF ¶ 21; Resp. SUF ¶ 21; see also Ex. 19 to Mot. for Summ. J. [ECF No. 65-21] ("Dist. Ex. 19") at 9 (DOC program statement).  The release clearance procedure mandated that LEIs "shall obtain and review printouts from [various agencies] . . . to determine if there are any outstanding charges preventing release[] prior to an inmate's release from the custody of DOC."  Dist. Ex. 19 at 9.  On October 2, the last day of Hurd's second weekend at the D.C. Jail, Mark Sibert, the LEI responsible for preparing Hurd's release authorization form, realized while performing the release clearance process that Hurd was never returned to D.C. Jail to serve the remainder of his 2006 misdemeanor sentences after he served the 15-month felony sentence at FCI Beckley.  SUF ¶¶ 22–23; Resp. SUF ¶¶ 22–23; Hurd SOF ¶¶ 41–42; see also Ex. 21 to Mot. for Summ. J. [ECF No. 65-23] ("Dist. Ex. 23") 26:21–31:2, 50:22–52:1 (Sibert deposition).  The "normal practice" at the time was "for felony time to be served in the federal prison" and "misdemeanor time to be served in the []D.C. Jail."  Hurd SOF ¶¶ 41–42; see also Dist. Ex. 23 26:21–31:2 (Sibert deposition).  Sibert contacted a supervisor for advice about how to proceed given that Hurd seemingly still had time left to serve on the 2006 sentence and ultimately denied Hurd's release.  SUF ¶ 23; Resp. SUF ¶ 23; Dist. Ex. 23 52:11–54:19.

DOC staff accordingly informed Hurd shortly after 7:00 p.m. on Sunday, October 2, 2011, while he was waiting to be released, that he had 27 months' incarceration remaining on his 2006 sentence and thus would not be released, SUF ¶ 17; Resp. SUF ¶ 17, despite the 2011 judgment's specification that Hurd shall be released on October 2, 2011 at 7:00 p.m. after serving his second weekend sentence, Hurd SOF ¶ 37; Ex. 16 to Mot. for Summ. J. [ECF No. 65-18] ("Dist. Ex. 16") at 9 (interrogatory answers); see also Dist. Ex. 15. Hurd responded that his 2006 sentence had "already been served in full" and asked for a hearing, and the DOC staff responded that "since he was already in custody[,] he was not entitled to a hearing." Dist. Ex. 16 at 13–14. There were no outstanding warrants or detainers against Hurd at that time. Hurd SOF ¶ 41.

Two days later, on October 4, Hurd submitted an inmate complaint expressing confusion about why he was still being held when there were "[n]o open cases" or "warrants" against him, he was "not on parole or probation," and there had been no court date or hearing. Hurd SOF ¶ 53; see also Ex. 18 to Opp'n to Mot. to Dismiss [ECF No. 66-20] ("Hurd Ex. 18") at 2 (inmate complaint).

A week later, on October 11, 2011, Sibert contacted the Federal Bureau of Prisons ("BOP") and inquired about why Hurd was not released to the D.C. Jail to serve the remaining time on his misdemeanor sentences because Sibert understood the possibility that "they could have sent him to a different [facility]" to serve the remainder of his time and thus that "his time could have already been served elsewhere." SUF ¶ 24; Resp. SUF ¶ 24; Hurd SOF ¶¶ 44, 48; see also Dist. Ex. 23 58:3–15. BOP responded two weeks later stating: "You need to contact the institution that released the inmates as they are responsible for the detainer[]. Not sure if you placed a detainer on the inmate as the info we have here shows on the Custody and detention Form that [there] is no consecutive misdemeanor term." Hurd SOF ¶ 48; see also Ex. 22 to Mot. for Summ. J. [ECF No.

65-24] ("Dist. Ex. 22") (email from BOP to Sibert with the Custody and Detention Form attached that indicates no "consecutive misdemeanor information"); SUF ¶ 24 (describing Sibert's efforts to ascertain how Hurd could have been released before completing his sentence on the misdemeanor convictions as "unsuccessful").   On October 26, 2011, DOC wrote a memo addressed to Hurd responding to his inmate complaint asking why he had not been released from custody on October 2.  SUF ¶ 18; Resp. SUF ¶ 18.  The memo states:

> It was discovered that you were erroneously release[d] from Bureau of Prisons on 07/18/2007, from the felony charge, when you also had a consecutive misdemeanor to serve.  Please see the attached Judgment & Commitment.  We have also included the computation to the felony charge as evidence to show that you only served 15 months.

Ex. 19 to Opp'n to Mot. for Summ. J. [ECF No. 66-21] ("Hurd Ex. 19") at 1 (letter from DOC to Hurd).  The parties dispute whether Hurd ever received the notice.  See SUF ¶ 18; Hurd SOF ¶ 52 ("The District has not shown when, if ever, this document was provided to Mr. Hurd.").  The forwarding memorandum on Hurd's complaint stated that "the Informal Resolution process is that the inmate must be interviewed and sign the document acknowledging your actions taken and returned."  Hurd SOF ¶ 55; Hurd Ex. 18 at 1.  There is no statement of acknowledgment by Hurd in the record and no indication that the interview took place.

Hurd filed in Superior Court a petition for a writ of habeas corpus or, in the alternative, for reconsideration of the denial of his pro se motion to reduce his sentence on November 16, 2011. SUF ¶ 19; Resp. SUF ¶ 19; see also Ex. 18 to Mot. for Summ. J. [ECF No. 65-20] ("Dist. Ex. 18") (Hurd's petition for writ of habeas corpus).  Hurd alleged that his "re-incarceration more than four years after his sentence was deemed satisfied and he was successfully reintegrated into society violate[d] due process."  SUF ¶ 19; Dist. Ex. 18 at 3.  The District opposed the motion and asked the court to discharge its order for the District to show cause why the writ of habeas corpus should

not issue.  Hurd SOF ¶ 58; see also Ex. 20 to Opp'n to Mot. for Summ. J. [ECF No. 66-22] ("Hurd Ex. 20") at 1–4 (District's opposition).  Following a hearing on the motion on July 27, 2012—10 months after the District declined to release Hurd—Judge Holeman denied Hurd's motion.  SUF ¶ 20; Resp. ¶ 20; see also Ex. 12 to Mot. for Summ. J. [ECF No. 65-14] ("Dist. Ex. 12") (hearing transcript).  General Counsel for the U.S. Parole Commission ("USPC") Rockne Chickinell issued a memo to file on July 31, 2012  directing staff to "[p]lease consult with the legal office before issuing another supervised release certificate" in Hurd's case and noted that he has "[r]emaining sentences" for "misdemeanor crimes" and that he "will be serving the remaining 27 months with the D.C. Dept. of Corrections."  SUF ¶ 25; Resp. SUF ¶ 25; see also Ex. 23 to Mot. for Summ. J. [ECF No. 65-25] ("Dist. Ex. 23") (memo to file).  Hurd was released from DOC custody on September 30, 2013 after having served 729 additional days in custody.  SUF ¶ 26; Resp. SUF ¶ 26.

## II.  Procedural Background

In May 2015, Hurd filed this lawsuit seeking money damages against the District under 42 U.S.C. § 1983 for violating his procedural and substantive Fifth Amendment due process rights by not providing him with notice and a hearing before refusing to release him at the conclusion of his sentence on his September 2011 conviction and for not providing him with a hearing promptly after the decision to keep him detained.  See First Am. Compl. [ECF No. 7] ("Compl.") ¶¶ 55–67.[8]

The District moved to dismiss the complaint, and Judge Huvelle granted the motion.  Hurd I, 146 F. Supp. 3d 57.  The court applied the test articulated in United States v. Merritt, 478 F. Supp. 804 (D.D.C. 1979), to assess Hurd's substantive due process claim, ultimately concluding that Hurd had not "successfully turned his life around" during his time at liberty such that his "re-

---

[8] Hurd also alleged a negligent supervision and training claim in the alternative.  See Compl. ¶¶ 68–74.

incarceration [wa]s so unfair as to implicate due process concerns."  See Hurd I, 146 F. Supp. 3d at 64–71.  As for Hurd's procedural due process claim, the Court dismissed that claim because he did not have "a protected liberty interest in his continued freedom."  Id. at 71–72.  The D.C. Circuit reversed the dismissal of Hurd's claims.  Hurd II, 864 F.3d at 688.  On the procedural due process claim, the court held that "[a] prisoner who is released from prison early does in certain circumstances have a protected liberty interest entitling him to some form of process before re-incarceration, and the facts as plausibly pleaded here show such an interest."  Id. at 682.  And on the substantive due process claim, the court reversed because the district court "relied on material beyond the pleadings to grant the motion to dismiss without permitting discovery and summary judgment briefing on the substantive due process claim and, in particular, on the element the district court deemed determinative and on which Hurd's own evidence would necessarily be highly relevant: whether he had 'turned his life around.'"  Id. at 686.  The panel accordingly remanded to the district court for further proceedings.  Id. at 688.

On remand, after discovery and summary judgment briefing, Judge Huvelle granted the District's motion for summary judgment, concluding that even if a constitutional violation had occurred, Hurd failed to show that the violation was caused by a policy or custom of the District.  See Hurd III, 427 F. Supp. 3d at 28–37.  On appeal, the D.C. Circuit affirmed in part and reversed in part.  See Hurd IV, 997 F.3d 332.  The panel "affirm[ed] the district court's judgment that Hurd failed to establish a pattern of constitutional violations or to demonstrate deliberate indifference" but "vacate[d] the entry of summary judgment for the District on the claim of an unconstitutional policy," finding there were genuine disputes of material fact on that issue, and again remanded the case to the district court for further proceedings.  Id. at 342.

At that point, the case was reassigned to this Court upon Judge Huvelle's retirement.  Feb. 4, 2022 Min. Entry.  The case was then referred to mediation, Feb. 18, 2022 Order [ECF No. 57], which was ultimately unsuccessful.  With summary judgment having been denied as to the second prong of Hurd's § 1983 claim (that the District's custom or policy caused his alleged constitutional violations), the Court then set a briefing schedule to address whether either party is entitled to summary judgment as to the first prong of Hurd's § 1983 claim—that the District violated his Fifth Amendment due process rights.  See Scheduling Order [ECF No. 63].  The District filed a motion for summary judgment on September 19, 2022, see Mot. for Summ. J. [ECF No. 65], Hurd responded in opposition, see Opp'n to Mot. for Summ. J. [ECF No. 66], and the District replied in support of its motion, see Reply ISO Mot. for Summ. J.  Hurd filed a motion for leave to file a sur-reply, see Mot. for Leave to File a Surreply in Opp'n to Mot. for Summ. J. [ECF No. 71]; Pl.'s Proposed Surreply in Opp'n to Mot. for Summ. J. [ECF No. 71-1] ("Sur-Reply"), and the District filed an opposition, see Def.'s Opp'n to Mot. for Sur-Reply [ECF No. 74] ("Sur-Reply Opp'n").  On November 1, 2022, the District filed a motion to preclude Hurd from relying on certain expert evidence in his opposition to the District's motion for summary judgment, see Def.'s Mot. to Preclude Expert Evidence [ECF No. 69] ("Mot. to Preclude Evid."), Hurd filed an opposition, see Pl.'s Opp'n to Mot. to Preclude Evid. [ECF No. 70] ("Opp'n to Mot. to Preclude Evid."), and the District filed a reply in support of its motion, see Reply in Further Supp. of Mot. to Preclude Evid. [ECF No. 73] ("Reply ISO Mot. to Preclude Evid.").  All three motions are now ripe for decision.

## Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[D]isputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). But summary judgment may not "be avoided based on just any disagreement as to the relevant facts; the dispute must be 'genuine,' meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant." Etokie v. Duncan, 202 F. Supp. 3d 139, 146 (D.D.C. 2016) (quoting Anderson, 477 U.S. at 248). Thus, a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251–52.

To support its factual positions, a party must "cit[e] . . . particular parts of materials in the record" or "show[] that the materials cited" by the opposing party "do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "Courts must avoid making 'credibility determinations or weigh[ing] the evidence'" and should accept the non-movant's evidence as true and make all justifiable inferences in its favor. Perry-Anderson, 192 F. Supp. 3d at 143 (alteration in original) (quoting Reeves, 530 U.S. at 150). This is so because "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,' and are thus inappropriate at summary judgment." United States v. $17,900.00 in U.S. Currency, 859 F.3d 1085, 1092 (D.C. Cir. 2017) (alteration in original) (quoting Anderson, 477 U.S. at 255). Hence, "[i]f material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences," a court should not grant summary judgment. Hagan v. United States, 275 F. Supp. 3d 252, 257 (D.D.C. 2017).

## Analysis

Hurd brings his Fifth Amendment due process claims under 42 U.S.C. § 1983, which provides a cause of action for individuals whose federal constitutional rights have been violated.

To succeed on a § 1983 claim against a municipality, such as the District, Hurd must prove (1) "a violation of [his] rights under the Constitution or federal law," and (2) "that the municipality's custom or policy caused the violation." Warren v. Dist. of Columbia, 353 F.3d 36, 38 (D.C. Cir. 2004). After summary judgment briefing, a D.C. Circuit panel previously held that there are genuine disputes of material fact about whether a District policy caused the alleged constitutional violations in this case. See Hurd IV, 997 F.3d 342. The issue now before the Court is whether Hurd's claims of Fifth Amendment constitutional violations survive the District's motion for summary judgment.

## I.    Procedural Due Process Claim

Hurd alleges that the District's failure to provide him with notice and a hearing before "refus[ing] to release [him] when required" at the conclusion of his three-weekend sentence for his 2011 conviction, and its failure to provide him with a hearing at any point before the conclusion of his incarceration, constituted a violation of his Fifth Amendment procedural due process rights. Compl. ¶¶ 56–65.   The District argues that on the facts in the record, Hurd received "constitutionally adequate process," and thus it is entitled to summary judgment on this claim. Mot. for Summ. J. at 18. Hurd disagrees, arguing that he had "a constitutionally protected liberty interest in being released" after the completion of his 2011 sentence and also "had a protected liberty interest in his continued liberty following his release from prison in 2007, and in particular following his successful completion of his three-year term of supervised release in 2010." Opp'n to Mot. for Summ. J. at 7. Accordingly, he contends that the District deprived him of that interest without notice or a hearing, either before or after it decided to keep him incarcerated, violating his Fifth Amendment rights. See id. at 7–30.

14

The Fifth Amendment provides, in relevant part, that "[n]o person shall be . . . deprived of . . . liberty . . . without due process of law."  U.S. Const. amend. V.  Prior to deprivation of a protected liberty interest, due process guarantees "the opportunity to be heard . . . at a meaningful time and in a meaningful manner."  Goldberg v. Kelly, 397 U.S. 254, 267 (1970) (internal quotation marks and citations omitted).  Courts "engage in a . . . 'two-part inquiry' to determine whether [a plaintiff's] due process rights were violated": (1) whether the plaintiff "was deprived of a protected interest," and, if so, (2) "whether he received the process to which he was entitled." Thompson v. Dist. of Columbia, 832 F.3d 339, 344 (D.C. Cir. 2016) (citations omitted).

## A.  Liberty Interest

The first step in the procedural due process analysis is to determine whether Hurd had a protected liberty interest in being released at the conclusion of his 2011 sentence.  In Hurd II, the D.C. Circuit held that "[a] prisoner who is released from prison early does in certain circumstances have a protected liberty interest entitling him to some form of process before re-incarceration, and the facts as plausibly pleaded here show such an interest."  864 F.3d at 682.  The court reasoned that "[t]he Due Process Clause protects liberty, and 'freedom from bodily restraint' is at the very core of that protected interest."  Id. at 683 (first citing U.S. Const. amend. V, XIV; then quoting Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 572 (1972); and then citing Washington v. Glucksberg, 521 U.S. 702, 719 (1997)).  The court further explained that

> [t]he freedom of a person to conduct his life physically unconfined by the government is among the most fundamental of constitutional liberty interests.  The Supreme Court has repeatedly held that in at least some circumstances, a person who is in fact free of physical confinement—even if that freedom is lawfully revocable—has a liberty interest that entitles him to constitutional due process before he is re-incarcerated.

Id. (first citing Young v. Harper, 520 U.S. 143, 152 (1997) (pre-parole conditional supervision); then citing Gagnon v. Scarpelli, 411 U.S. 778, 782 (1973) (probation); and then citing Morrissey

v. Brewer, 408 U.S. 471, 482 (1972) (parole)).  The court found that, in this case, "the character of supervised release as a follow-on to a sentence of imprisonment, together with Hurd's fulfillment of his entire term of supervised release, reinforces the reasonableness of his expectation that he had completed his sentence, and strengthens his liberty interest."  Id.

Although the D.C. Circuit was evaluating whether Hurd had sufficiently alleged a liberty interest at the motion to dismiss stage, which carries a lower standard than the summary judgment standard applicable here, the allegations the court highlighted as "support[ing] a liberty interest," Hurd II, 864 F.3d at 684, have since been borne out.  The D.C. Circuit reasoned that the liberty interest was "crystallized" here because Hurd was aware that "his original sentence did not impose a mandatory minimum," and thus when he was released early from BOP he "reasonably thought the release was deliberate and lawful" "[a]s shown by his submission to and successful completion of three years of supervised release."  Id. at 683–84.  Moreover, "if he had believed it was an error that might be discovered and corrected, it is hard to see why he would have remained in the District of Columbia, successfully . . . serving out his prescribed term of supervised release."  Id. at 684. Hurd "complied [with his conditions of supervised release] by reporting to CSOSA officers regularly for three years, submitting urine samples for drug testing, and training for and obtaining a well-paid job."  Id.  "[A]ll parties treated [this period] as his post-incarceration period of supervised release"  and  "Hurd's many communications and interactions with the government reinforced his reasonable understanding that he was continuing to serve his sentence and that he was making progress toward unconditional release from criminal justice supervision."  Id.

Nothing in the record developed since Hurd II makes the D.C. Circuit's reasoning any less applicable at the summary judgment stage.  It is undisputed that Hurd's 2006 sentence did not have a mandatory minimum, Hurd SOF ¶ 18, that Hurd did not leave the D.C. metropolitan area during

his three-year term of supervised release, SUF ¶ 8; Hurd SOF ¶ 8, and that he complied with the mandatory conditions to submit to drug testing and make an effort to work regularly, SUF ¶ 8; Hurd SOF ¶ 8.  And the District does not seem to argue that Hurd did not have a protected liberty interest that entitled him to some form of process before re-incarceration; rather, it argues that despite this interest, there were "extraordinary circumstances" that justified bypassing any pre-deprivation process here.  See Mot. for Summ. J. at 18–21.  Hence, the Court finds that the undisputed facts show that Hurd had a protected liberty interest in his continued freedom after he completed his term of supervised release such that some form of process was required before depriving him of that liberty.

### B.  Notice and Hearing

"'[T]he root requirement' of the Due Process Clause [is] 'that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.'"  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985) (quoting Boddie v. Connecticut, 401 U.S. 371, 379 (1971)).  "This principle requires 'some kind of a hearing' prior to" the deprivation.  Id. (quoting Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 569–70 (1972)); see Thompson, 832 F.3d at 345.  It is undisputed that the District did not provide Hurd a hearing before re-incarcerating him at the conclusion of his 2011 weekends-only sentence to serve out the remainder of his 2006 misdemeanor sentence.  See SUF ¶ 17; Hurd SOF ¶ 39.

Despite the general rule that a pre-deprivation hearing is required, in rare circumstances a post-deprivation hearing following closely after the deprivation may satisfy the requirements of due process.  "Although due process normally requires pre-termination proceedings of some kind prior to the [deprivation of the] constitutionally protected interest[] . . . , post-deprivation hearings suffice in 'extraordinary situations where some valid governmental interest is at stake that justifies

postponing the hearing until after the event.'" Wash. Teachers' Union Loc. No. 6, Am. Fed'n of

Tchrs., AFL-CIO v. Bd. of Educ. of the D.C., 109 F.3d 774, 780 (D.C. Cir. 1997) (quoting United

States v. James Daniel Good Real Prop., 510 U.S. 43, 53 (1993)).

> To determine whether post-deprivation hearings satisfy "minimal requirements of
> due process," [courts] balance the three factors . . . : the private interest affected by
> the government's action; the risk of erroneous deprivation of that interest and the
> likely value of additional safeguards; and the government's interest, including the
> administrative burdens that additional procedural requirements would impose.

Id. (quoting UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trustees of Univ. of

D.C., 56 F.3d 1469, 1473 (D.C. Cir. 1995)).  The only disputed issues here are whether post-

deprivation notice and hearing was permissible under these circumstances and, if so, whether Hurd

in fact received adequate post-deprivation process.

The District first argues that it was justified in foregoing a pre-deprivation hearing because

it "had a strong interest in enforcing a lawful sentence and avoiding the high risk that Plaintiff, if

released, would evade returning to court or custody."  Mot. for Summ. J. at 19.  As an initial matter,

Hurd correctly observes that "[a]ll governments with the power to punish persons convicted of a

crime share that same interest . . . .  Thus, the general interest in 'enforcing a lawful sentence' is

not enough to dispense with notice and a hearing before reincarceration occurs."  Opp'n to Mot.

for Summ J. at 11–12.  The Court agrees.  The District must prove that the specific and unique

circumstances of this situation warranted holding Hurd without a hearing:  "[t]he governmental

interest we consider here is not some general interest in forfeiting property but the specific interest

in seizing real property before the forfeiture hearing.  The question . . . is whether ex parte seizure

[wa]s justified by a pressing need for prompt action."  James Daniel Good Real Prop., 510 U.S. at

56 (emphases added).

Hurd responds to the District's argument with a series of reasons why there was no exigency justifying the District holding him past his release date.  See Opp'n to Mot. for Summ J. at 11–21.  The most compelling of these arguments is that Hurd was obligated to return to the D.C. jail the following weekend to serve the last stint of his weekends-only sentence, and thus "the District could have taken the time to research the issue" in the intervening week.  Id. at 20.  Moreover, while the District obliquely notes in passing that Hurd "would evade returning to court or custody," Mot. for Summ. J. at 19, it has "cited absolutely no evidence in support of this proposition, and the evidence that does exist shows that there was no risk of flight if the District provided Mr. Hurd with prior notice and a hearing," Opp'n to Mot. for Summ. J. at 20.  It is undisputed that Hurd had one more weekend of incarceration to serve when he was held on his outstanding 2006 sentence.  See SUF ¶¶ 16–17; Resp. SUF ¶¶ 16–17.  It is also undisputed that Hurd did not flee the Washington, D.C. area at any time during his three years on supervised release, see SUF ¶ 8; Hurd SOF ¶ 22—indeed, the District has not pointed to any facts in the record to indicate that Hurd was a flight risk at all, let alone a "high" risk of flight.

In addition to the identified interest in "enforcing a lawful sentence and avoiding the high risk that Plaintiff, if released, would evade returning to court or custody," the District also identifies an interest in avoiding the administrative burdens of providing a pre-deprivation hearing in this context.  The District contends that

> [t]he addition of an extra-judicial hearing mechanism—where a judicial remedy (habeas) already exists—would not only be costly (because it would apply to anyone scheduled for release with any possible obstacle complicating that release, such as a warrant, detainer, court order or other unserved sentence), but also duplicative and inefficient.

Mot. for Summ. J. at 12.  While courts may consider "administrative burdens that additional procedural requirements would impose" when assessing the government's interest in bypassing

pre-deprivation process, see Wash. Teachers' Union Loc. No. 6, 109 F.3d at 780, the District's cited administrative concerns in this context are unconvincing. First, a pre-deprivation hearing mechanism is not "duplicative" of the habeas process. The foundation of the Fifth Amendment's due process right is to guarantee notice and hearing before the deprivation. Litigation via habeas corpus, by its very nature, cannot serve that function and can only be initiated once the deprivation has occurred—here, once Hurd has been incarcerated. The government's argument that affording a pre-deprivation hearing in this context would be "inefficient" or "costly" is similarly unpersuasive. Process of any kind necessarily entails costs, but the District has not carried its burden of showing any unique or undue inefficiencies or costs in this particular context. Put simply: the District cannot evade the strictures of the Fifth Amendment merely because adherence to those principles involves the expenditure of resources. Hence, the facts in the record do not support the District's contention that it had a strong interest in holding Hurd past his release date without prior notice and a hearing in this particular circumstance.

On the other side of the balance is "the private interest affected by the government's action." Wash. Teachers' Union Loc. No. 6, 109 F.3d at 780. The District claims that "Plaintiff's interest in liberty and avoiding reincarceration is not particularly strong because he was subject to a judgment that he should be incarcerated." Mot. for Summ. J. at 19. But that reasoning misses the point entirely. As discussed above, Hurd's interest in not being incarcerated without warning took effect and crystallized over the several-year span of his supervised release and the period after its completion during which Hurd could reasonably believe he had completed the incarcerative portion of his 2006 sentence. That, unbeknownst to him, he "was subject to a judgment that he should be incarcerated," id., does not undermine this interest. As Hurd notes, "[r]eincarceration without any advance notice would necessarily affect his job, his family, his living arrangements,

his property, his relations with his creditors and other aspects of his personal life, all of which would be suddenly and without warning utterly disrupted." Opp'n to Mot. for Summ. J. at 28. It is undisputed that "[j]ust days before the District decided to lock Mr. Hurd away for another two years, Mr. Hurd had completed his apprenticeship and was about to commence working as a Journeyman—which would have entitled him to a higher rate of pay," Hurd SOF ¶ 70, and "[w]hen he could not return to his job because the District had jailed him, Mr. Hurd lost his job[] and . . . his income," id. ¶ 71. Indeed, just such considerations warranted the "weekends" sentence Hurd was about to complete. Thus, there is strong record support that Hurd had a private interest in notice and a hearing before re-incarceration, and the strength of that interest is a genuine issue of material fact.

The final factor to consider in assessing whether a post-deprivation hearing is appropriate is "the risk of erroneous deprivation of that interest and the likely value of additional safeguards." Wash. Teachers' Union Loc. No. 6, 109 F.3d at 780. The District contends that "because Plaintiff has never disputed the validity of [the 2006] judgment, he cannot articulate what protection additional procedures would have provided. That is, notice and a hearing before his reincarceration would not have presented him an opportunity to correct any error in the judgment—because there was no error." Mot. for Summ. J. at 19. Thus, it contends, the "additional safeguard[]" of a pre-deprivation hearing would likely not have been valuable, which supports the propriety of a post-deprivation hearing. Id. But that is not correct.

First, the record shows that there was "a risk of erroneous deprivation," Wash. Teachers' Union Loc. No. 6, 109 F.3d at 780, at the time the decision was made to detain him beyond his authorized 2011 sentence. The parties do not dispute that when Sibert discovered the discrepancy, he was unsure whether the previous sentence actually remained unserved because it was possible

that the authorities at the federal facility "could have sent him to a different [facility] . . . [to] serve[] the time" and thus that his time could have already been served "elsewhere."  Hurd SOF ¶¶ 43, 65; see SUF ¶ 24; Resp. SUF ¶ 24.  Further, Hurd has "articulate[d] what protection additional procedures would have provided," Mot. for Summ. J. at 19.  As the District itself acknowledges, because DOC "unilaterally re-incarcerated Hurd without a warrant or a detainer despite the fact that the authority to detain him was statutorily committed to [BOP], . . . [i]f Hurd had received notice and a hearing before his re-incarceration, he might have raised an ultra vires challenge to the District's authority to detain him."  Hurd II, 864 F.3d at 684; accord Mot. for Summ. J. at 19 (citing this portion of Hurd II).  "A timely hearing could also have allowed Hurd to present his substantive claims against re-incarceration."  Hurd II, 864 F.3d at 684.

Thus, taking all the factors together, under these circumstances, the District has not met its burden of showing—based on the undisputed facts—that the District was justified in foregoing a pre-deprivation hearing before re-incarcerating Hurd.[9]

### C.  Prejudice

"Once a plaintiff establishes that he was [deprived of a protected liberty interest] without due process and demonstrates damages arising from that [deprivation], the defendant is responsible for those damages unless the defendant shows they would have occurred regardless."  Thompson, 832 F.3d at 346.  "Thus, the burden is upon the District to show that Mr. Hurd would have served the same amount of time if he had been given due process."  Opp'n to Mot. for Summ. J. at 30–31.  As Hurd frames it,

---

[9] Even assuming that a post-deprivation hearing was justified here, and assuming that a habeas proceeding is an adequate substitute, the process Hurd eventually received was likely inadequate because he did not receive a habeas hearing until he had already been incarcerated for nearly 10 months.  SUF ¶ 20; Resp. SUF ¶ 20.  Any exigency that may have justified the government's decision to detain him before holding a hearing certainly did not justify waiting 10 months to hold such a hearing.

the issue of whether the result would have been different boils down to a determination of whether there was any time left for Mr. Hurd to serve on the 2006 sentence, either as a result of the action of the Parole Commission, the expiration of the sentence through the passage of time, or through the application of credits, including the credit for time served contained in the 2006 judgment itself and the credit available under the law for time spent at liberty following an erroneous release.

Id. at 31.[10]

    i.   Timeliness

As an initial matter, the District urges the Court to "not entertain" Hurd's argument that he was over-incarcerated because his time-served credits were not applied to each sentence of conviction as specified in the judgment and order, claiming that it "is a new claim that has not been pleaded or, at least, a new theory that has never been pursued." Reply ISO Mot. for Summ. J. at 17. Hurd responds that the factual allegations underlying this theory are pleaded in the complaint, Sur-Reply at 4 (citing Compl. ¶¶ 11, 40, 60),[11] and that he has repeatedly lodged general claims of overincarceration despite not specifically articulating this particular theory of overincarceration until his opposition to the summary judgment motion, giving the District plenty of time to digest and respond to those arguments, see id. at 5–6. Moreover, Hurd notes that the District "itself raised the issue of its compliance with the [2006] order," so it "can hardly object to evidence that bears

---

[10] Although Hurd centers his prejudice argument on overincarceration, it is also possible that he could have experienced prejudice from his inability to get his affairs in order before being reincarcerated. He notes in his brief that upon being reincarcerated without warning, "[h]e could not return home at the end of the weekend and secure his personal property. His business and personal relationships were all at once halted and disrupted and he could do little if anything to mitigate the damages. He had to cash in his retirement plan to pay bills, and when he was finally released, he had to start over as an apprentice in a different union, where it took him years to work back up to journeyman status." Opp'n to Mot. for Summ. J. at 29–30. The Court will not assess that theory of prejudice at this time, as the parties did not give it sufficient attention in their briefing and the Court ultimately concludes that Hurd's time-served theory of prejudice survives summary judgment. But such an alternate theory of prejudice could be viable at a later stage in this litigation.

[11] The Court will exercise its discretion to grant Hurd's motion for leave to file a sur-reply and will consider it, along with the District's opposition and the reply in support, in deciding the instant motion.

on the issue and can hardly ask the Court to ignore the plain terms of the 2006 order that the District says governs here." Id. at 6.

The Court agrees with Hurd and will consider his theory of overincarceration based on the failure to apply time-served credits to the sentence for each conviction.

> Unless a defendant is prejudiced on the merits by a change in legal theory, a plaintiff is not bound by the legal theory on which he or she originally relied. A court may deny a motion to dismiss or for summary judgment on the basis of a legal theory never embraced by the plaintiff, as long as that theory is supported by the facts alleged and as long as the defendant is not prejudiced on the merits.

Hanson v. Hoffmann, 628 F.2d 42, 53 n.11 (D.C. Cir. 1980) (citations omitted). First, Hurd's time-served theory of overincarceration is certainly within the contours of his complaint, and the Court accordingly does not consider it to be an entirely new theory that he has "never [previously] embraced." But more importantly, even if the Court were to treat it as a new argument, the District has not demonstrated the requisite prejudice to foreclose consideration of it. The District contends that "it would be unfair and prejudicial . . . to allow Plaintiff now to create an issue about the validity of the sentence the District enforced when that issue has long been foregone and was not explored in discovery." Opp'n to Sur-Reply at 8. But as the District itself recognizes, Hurd raised a theory of overincarceration as early as two years ago in a previous round of summary judgment briefing. See id. at 2–3. Moreover, the District does not even attempt to explain what further materials it would have sought in discovery had it focused on this theory earlier. And based on the Court's understanding of the issue, additional discovery would have little value here: the record already contains the judgment and order stating in clear language that time served should be applied to the sentence for each conviction. The Court struggles to see what additional discovery would alter the calculus, as the issue is rather straightforward: whether Hurd was held longer than

what those consecutive sentences as imposed total up to.  And it is undisputed that he was.  As Hurd notes,

> [t]he briefing in the last appeal occurred more than two years ago, so the District has had ample time to consider the issue, and the District asked for an additional two weeks to file its Reply Brief. . . .  [and it] has [not] identified any witness or any discovery that could have changed the analysis.

Sur-Reply at 5–6.

Further, the District's statement that Hurd's "claim has always been, as this Court and the D.C. Circuit recognized, that reincarcerating him was the constitutional violation he allegedly suffered—not that he was reincarcerated for an incorrect amount of time," Opp'n to Sur-Reply at 5—misses the point.  In order for Hurd to make out a viable due process claim, he must show that he was prejudiced by the denial of due process.  Thus, while it is true that he argues that the constitutional violation here was the failure to provide either a pre-deprivation hearing or a timely post-deprivation hearing relating to his reincarceration, he also needs to establish that he could have served less time incarcerated if he had received due process.  One of his theories for why he was over-incarcerated is that his time-served credits were not properly applied, and a deprivation hearing would have revealed that.  Hence, the Court will consider Hurd's theory of incarceration based on the alleged failure to properly apply time-served credits.

      ii.   <u>Merits</u>

The District contends that even if there was a due process violation, Hurd did not experience any prejudice "because Judge Holeman considered and rejected each of Plaintiff's arguments on the merits" during the habeas proceeding that Hurd received 10 months later, "so a prompter hearing would not have changed the result."  Mot. for Summ. J. at 20–21.  That is, "[a]t bottom, there was a valid sentence, and there was no challenge Plaintiff could raise—at any time— that would have changed that."  Reply ISO Mot. for Summ. J. at 16.  But the District does not

explain or point to any facts in the record as to why that must necessarily be the case.  Any number of factors could have influenced the outcome of the habeas proceeding, and hence changing any of those factors could have yielded a different result had Hurd received a pre-deprivation hearing. Importantly, at the habeas proceeding, the burden was on Hurd to demonstrate why he should be released or have his sentence reduced, whereas at a pre-deprivation hearing, the burden would have been on the District to prove why it had the legal authority to detain Hurd past his release date.  That difference in burden alone could have altered the outcome.

Indeed, there are facts in the record that call into question whether Hurd's 27-month additional sentence was in fact "valid."  At the habeas hearing, Hurd's counsel mainly focused on the argument that he was over-incarcerated because he should have received credit toward any unserved sentence for his time spent at liberty.  See Dist. Ex. 12.  But his counsel failed to raise the distinct, and seemingly persuasive, argument that Hurd's credit for time served should have been applied against each of his four outstanding misdemeanor sentences, meaning that his outstanding 27-month sentence should have been reduced by 97 days' of time-served credit on each of the four convictions, totaling 388 days.  See Hurd Ex. 9 at 2.  Had this argument been raised and accepted at a pre-deprivation hearing, Hurd would have spent over a year less time incarcerated than he did.  It is possible that—at a different hearing, at a different time, in a different setting, in front of a different judge, with different counsel, and with a different party having the burden—the outcome of the hearing would have been different as well, yielding a shorter term of incarceration.  And as the Court reviews the relevant documents today, it seems apparent that Hurd should have received the 97 days' time-served credit on each of the four misdemeanor convictions.[12]

---

[12] While it is illogical in this Court's view to impose consecutive sentences for which time served is applied to each sentence rather than to the aggregate sentence, both the January 2006 and September 2006 judgments are clear

The District has not met its burden on this record to show that if an adjudicator in a pre-deprivation hearing had been presented with the evidence before the Court now and had decided the issues based on whether the government had carried its burden, that adjudicator would not have seen what seems apparent to the Court now based on this record: that Hurd was over-detained by 388 days based on the failure to apply the plain language of both the January 13, 2006 and September 21, 2006 judgments requiring credit for time served as to each of the four misdemeanor convictions.  The facts in the record support Hurd's theory of prejudice,[13] and the District offers nothing to undermine that theory.  At best for the District, there is a genuine dispute of material fact on this issue; at worst for the District, Hurd has established this element of his claim.   Either way, summary judgment for the District is inappropriate.

Hence, the Court will deny the District's motion for summary judgment on Hurd's procedural due process claim.

## II.   Substantive Due Process Claim

Hurd alleges that the same conduct also violated his Fifth Amendment substantive due process rights: "[b]ecause the actions of the District officials were egregious, and because the treatment of Mr. Hurd shocks the conscience, Mr. Hurd was also deprived of substantive due process."  Compl. ¶ 66.

---

that Judge Holeman ordered time served credits to be applied to each sentence.  See Dist. Ex. 1; Dist. Ex. 3.  Any opinion about the prudence of that decision accordingly has no place in this Court's analysis.  This Court must accept the sentences as rendered by Judge Holeman in the clear language of his 2006 judgments.

[13] Hurd presents two additional theories of prejudice in the form of overincarceration.  First, he argues that he "was released as a result of a deliberate decision by the Parole Commission within its discretion," meaning that he "would have no time left to serve at all."  Opp'n to Mot. for Summ. J. at 31–32.  Second, "even if [he] had been released from the federal prison by mistake, then he was entitled to credit for the time he spent at liberty," "[a]nd here, the time at liberty exceeded the time remaining on his sentence, so the credit results in service of the sentence in full."  Id. at 33–37.  Because the Court finds that the facts support the theory of prejudice discussed above—that "the 2006 criminal judgment required [him] to be given credit for time served on . . . all four of the misdemeanor cou[nts], and, prior to sentencing, [he] had been in jail for 97 days," id. at 32–33—which precludes summary judgment for the District on this claim, the Court will not address the other theories at this time.

### A.  The Appropriate Standard

The D.C. Circuit "has not yet had occasion to set forth a framework for analyzing a prematurely released prisoner's re-incarceration" as a violation of his substantive due process rights, and on appeal in this case the panel "merely assume[d] without deciding" that the standard articulated in United States v. Merritt, 478 F. Supp. 804 (D.D.C. 1979), governed Hurd's claim. Hurd II, 864 F.3d at 687.  As explained by the D.C. Circuit,

> Merritt held that it violated "fundamental principles of liberty and justice" to re-incarcerate an individual who had been discharged from state prison and lived openly for three years before the government realized that it should have moved him to federal prison rather than discharging him upon completion of his state sentence.

Hurd II, 864 F.3d at 684 (quoting Merritt, 478 F. Supp. at 808).  The Merritt court further explained that

> [i]t is well settled that when a prisoner is released prior to service or expiration of his sentence through no fault or connivance of his own, and the authorities make no attempt over a prolonged period of time to reacquire custody over him, he may be given credit for the time involved, and he will not be required at some later time to serve the remainder of his sentence.

Merritt, 478 F. Supp. at 806 (footnote omitted).  But the Merritt court "started from the premise that '[a] convicted person will not be excused from serving his sentence merely because someone in a ministerial capacity makes a mistake' by releasing him early," Hurd II, 864 F.3d at 684–85 (alteration in original) (quoting Merritt, 478 F. Supp. at 807), and accordingly indicated that

> "[s]everal additional factors must be present" to make out a violation of substantive due process: "the result must not be attributable to the defendant himself; the action of the authorities must amount to more than simple neglect; and the situation brought about by defendant's release and his re-incarceration must be unequivocally inconsistent with fundamental principles of liberty and justice,"

id. at 684 (quoting Merritt, 478 F. Supp. at 807).  The Merritt court considered the plaintiff's "long-term adjustment to society" in deciding that enforcement of his sentence "would be inconsistent with fundamental principles of liberty and justice."  478 F. Supp. at 808.

Although the D.C. Circuit elected to use the Merritt framework, it acknowledged the use of a slightly different standard set by the Supreme Court in County of Sacramento v. Lewis, 523 U.S. 833 (1998): "since Merritt was decided, the Supreme Court has emphasized that 'only the most egregious official conduct'—that which 'shocks the conscience'—'can be said to be arbitrary in the constitutional sense.'"  Hurd II, 684 F.3d at 687–68 (quoting Lewis, 523 U.S. at 846).  Lewis held that "the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."  523 U.S. at 849.  Rather, "behavior at the other end of the culpability spectrum . . . would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  Id.

The parties disagree about which standard applies here.  The District contends that Lewis controls the analysis.  See Reply ISO Mot. for Summ. J. at 1–5.  It first notes that the D.C. Circuit regularly applies Lewis to substantive due process claims based on executive action and that while the D.C. Circuit has not decided whether Lewis applies in the context of spontaneous reincarceration following erroneous release specifically, five other circuits have applied Lewis in those types of cases.  See id. at 2 (collecting cases).  The District further contends that Merritt's multi-factor test is inappropriate because it "obscure[s] the critical inquiry under Lewis of whether governmental action is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," id. (cleaned up), and it "proceeds from non-constitutional premises"

because it "relied on common-law concepts of installment sentences, waiver of jurisdiction, and credit for time at liberty," id. at 3.

For his part, Hurd contends that the "shock the conscience" test in Lewis is not the correct test in this context because Lewis "involved a high-speed automobile chase, not a wrongful incarceration," see Opp'n to Mot. for Summ. J. at 42, and there is a "well-developed body of law" governing substantive due process violations when "prisoners [are] released before the end of their imposed sentences," id. at 43.[14]

The Court sees no reason why Merritt—a district court case from more than 40 years ago— would apply rather than Lewis, a Supreme Court case decided two decades later. To begin, Supreme Court precedent is binding on this Court while district court cases are not. Moreover, Merritt is in tension with Lewis. Under Merritt, the relevant government actor[15] arguably need

---

[14] Hurd also argues more broadly that the test articulated in Lewis is inappropriate because it "add[s] an additional layer of proof for conduct prohibited to the government by the Bill of Rights." Opp'n to Mot. for Summ. J. at 42. He cites a portion of Lewis that states that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing a claim." Id. at 42 (quoting Lewis, 523 U.S. at 842). He infers from that passage that

> [u]nder the Fifth Amendment, the government may not deprive a person of his liberty without due process of law. That means it is always wrong for the government to deprive a person of his liberty without due process of law. It does not mean that it is wrong for the government to deprive a person of his liberty without due process of law only when it "shocks the conscience." . . . The express commandment of the Fifth Amendment prohibits the government from depriving a person of liberty without due process of law, period. As a result, when notice and a hearing are required, and notice and a hearing are not provided, the government has acted to deprive[] the plaintiff of liberty without due process of law.

Id. at 43. While this summary of the function of the Fifth Amendment is generally accurate (albeit oversimplified to the point of verging on being a truism), Hurd's suggestion that these general notions displace Lewis's "shock the conscience" test in the context of assessing a Fifth Amendment substantive due process claim is incorrect. First, Hurd seems to be referring to procedural due process rather than substantive due process in the quoted passage, as he identifies notice and hearing as the relevant core rights. Second, it is quite common for courts to effectuate the mandates of the Constitution using analytical frameworks that have no direct textual basis in the relevant constitutional amendment. Lewis and other circuit court cases have endorsed a test for lower courts to use when assessing a Fifth Amendment substantive due process claim. The Court will accordingly disregard Hurd's attack on the Lewis standard based on these overbroad notions.

[15] It is not immediately clear whose actions are relevant in this prong of the Merritt test. Merritt was sentenced to imprisonment on a federal charge to run concurrently with the Maryland state sentences he was already serving. 478 F. Supp. at 805. "The federal sentence was lodged as a detainer with the Maryland authorities . . . ." Id. The U.S. Marshal's office failed to execute the detainer, and Merritt "was paroled by the Maryland authorities to a halfway

only have a level of culpability rising above simple neglect to trigger liability for a constitutional violation under the Fifth Amendment.  478 F. Supp. at 807 ("[T]he action of the authorities must amount to more than simple neglect . . . .").  This is at odds with <u>Lewis</u>'s command that "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'"  523 U.S. at 846.  One could imagine a situation in which conduct that rises above simple negligence (gross negligence, perhaps) could satisfy the <u>Merritt</u> test but fail under the <u>Lewis</u> standard.  As the District puts it, "<u>Merritt</u> is too lenient a standard."  Reply ISO Mot. for Summ. J. at 3.  And critically, the <u>Merritt</u> decision is not grounded in principles of constitutional due process.  Rather, the court based its reasoning on principles of equity, such as the "waiver of jurisdiction theory."  478 F. Supp. at 806.  Accordingly, <u>Lewis</u> is the controlling standard for a substantive due process violation.

The Court is also not convinced that <u>Lewis</u> does not apply in settings like this one, in which a prisoner was spontaneously reincarcerated to serve out the remainder of a valid sentence after having been erroneously released.  First, the D.C. Circuit has not carved out from <u>Lewis</u> a different test for this specific scenario.  Second, and importantly, five other circuit courts have applied <u>Lewis</u> in similar circumstances.  <u>See</u> <u>Hawkins v. Freeman</u>, 195 F.3d 732, 741–45 (4th Cir. 1999) (en banc); <u>Bonebrake v. Norris</u>, 417 F.3d 938, 942–44 (8th Cir. 2005); <u>Vega v. United States</u>, 493 F.3d 310, 316 (3d Cir. 2007); <u>Gonzalez-Fuentes v. Molina</u>, 607 F.3d 864, 880–81 (1st Cir. 2010); <u>Hughes v. Oliver</u>, 596 F. App'x 597, 599 (10th Cir. 2014).

---

house" at the conclusion of his state sentences.  <u>Id.</u> at 806.  Three years later, he was arrested by the U.S. Marshals for the outstanding detainer.  <u>Id.</u>  <u>Merritt</u> analyzes the actions of both the state and federal authorities, referring to them as "the joint and several wrongful actions of the federal and Maryland governmental authorities" and noting that "[i]n one way or another, the wrongful actions of the agents of these two governmental bodies were inextricably intertwined."  <u>Id.</u> at 808.  In the present case, it is not clear if the relevant actions are those of the authorities who errantly released Hurd, those who decided to reincarcerate him, or both, further demonstrating the limitations of this test.

The Court hence concludes that <u>Lewis</u>, not <u>Merritt</u>, is the correct standard under which to assess whether the District's executive action violated Hurd's substantive due process rights.[16]

### B.  Application of the <u>Lewis</u> Standard

In a substantive due process challenge to executive action under <u>Lewis</u>, a plaintiff can challenge "only the most egregious official conduct" that "shocks the conscience."  523 U.S. at 846.  The <u>Lewis</u> Court recognized that deliberate indifference may be sufficient to shock the conscience in some circumstances, but that "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking."  <u>Id.</u> at 850.  The D.C. Circuit has "described the doctrine as preventing only 'grave unfairness,'" <u>George Wash. Univ. v. Dist. of Columbia</u>, 318 F.3d 203, 209 (D.C. Cir. 2003) (quoting <u>Silverman v. Barry</u>, 845 F.2d 1072, 1080 (D.C. Cir. 1988), <u>as amended</u> (Feb. 11, 2003)),

> which requires demonstrating either "a substantial infringement of state law prompted by personal or group animus, or a deliberate flouting of the law that trammels significant personal or property rights."  By contrast, "[i]nadvertent errors, honest mistakes, agency confusion, even negligence in the performance of official duties, do not warrant redress,"

<u>Elkins v. Dist. of Columbia</u>, 690 F.3d 554, 562 (D.C. Cir. 2012) (quoting <u>Silverman</u>, 845 F.2d at 1080).  On appeal in this case, the D.C. Circuit acknowledged that "<u>Lewis</u> recognized that when officials have 'the luxury' of 'time to make unhurried judgments,' and 'such extended

---

[16] The District also moved to "preclude Plaintiff from relying on any evidence or testimony derived from his proffered drug-testing expert, Howard S. Robin, MD, . . . for purposes of the District's pending motion for summary judgment or otherwise."  Mot. to Preclude Evid. at 1.  Because Dr. Robin's expert report is primarily relevant for assessing whether Hurd adequately reintegrated into society upon release under the <u>Merritt</u> framework, the Court will deny that motion as moot.  If the admissibility of Dr. Robin's expert testimony becomes an issue at a later stage of litigation, the parties may raise the issue then.

opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking.'" Hurd II, 864 F.3d at 688 (quoting Lewis, 523 U.S. at 854).

> i.   Failure to Provide Hearing

Hurd's argument that the District's conduct "shocked the conscience" is primarily premised on the District's failure to provide him with a deprivation hearing for 10 months, until the habeas hearing in front of Judge Holeman: "[d]espite its affirmative obligation to provide Mr. Hurd with a prompt hearing, the District here has never made any attempt to do so, ever.  This conduct shocks the conscience."  Opp'n to Mot. for Summ. J. at 44.  Hurd then cites several cases from other jurisdictions in which courts found that holding a defendant for a long period of time without a hearing "shock[ed] the conscience."  See id. (collecting cases).  Hurd concludes by contending that whether the District's conduct here shocked the conscience is an inherently fact-sensitive inquiry that should be decided by a jury, not on summary judgment.  Id. at 45.

There are several problems with this argument.  First, as the District notes, the majority of the cases Hurd cites are of limited value because "[a]lmost all [of them] involved detention following an arrest without a court appearance for a prolonged period."  Reply ISO Summ. J. at 6–7 (emphasis added); see, e.g., Hayes v. Faulkner County, 388 F.3d 669, 673 (8th Cir. 2004) ("The issue is a pretrial detainee's right to a prompt appearance in court, after arrest by warrant."); Martz v. Simmons, Civil No. 4:18-cv-04040, 2019 WL 2110576, at *2 (W.D. Ark. May 14, 2019) (concerning an arrestee who was "detained fifteen days before his first appearance"); Cancino Castellar v. McAleenan, 388 F. Supp. 3d 1218, 1223 (S.D. Cal. 2019) ("This case presents the question whether the Fifth Amendment Due Process Clause requires certain protections for noncitizens detained by the Government pending removal proceedings.").[17]  That context is

---

[17] Although Johnson v. Herman, 132 F. Supp. 2d 1130, 1132 (N.D. Ind. 2001), did concern a detainee incarcerated beyond the release date specified in his sentence, that case differs because, there, the plaintiff's grievance

distinguishable from what occurred here, since—unlike the plaintiffs in those cases—Hurd was afforded numerous hearings during his underlying prosecution on the 2006 charges, which resulted in conviction and sentencing.  Hurd's rights were thus much different than if he had been detained after arrest pending trial, at which point he would have still enjoyed the presumption of innocence. What conduct will shock the conscience in the arrestee/pretrial context is necessarily a lower bar than what conduct will shock the conscience in a setting where the detainee has already been convicted.

But the more fundamental problem with Hurd's argument is that he is essentially complaining of the lack of process he received, which is duplicative of his procedural due process claim.  A substantive due process claim is not the proper vehicle for such a grievance because substantive due process "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'"  Zinermon v. Burch, 494 U.S. 113, 125 (1990) (emphasis added) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)).  To make out a colorable substantive due process claim, then, Hurd must allege that some element of this episode beyond the lack of process "shocked the conscience" and accordingly violated his constitutional rights.  Accord Gonzalez-Fuentes, 607 F.3d at 880 ("The substantive component of due process protects against certain government actions regardless of the fairness of the procedures used to implement them.  Thus, unlike a procedural due process claim, this challenge requires us to assess the constitutionality of the deprivation itself." (emphases added) (internal quotation marks and citation omitted)).  Accordingly, the District's failure to provide a pre- or post-deprivation hearing cannot serve as an independent basis for a substantive due process violation.

---

was focused on the unlawfulness of his incarceration rather than the lack of notice and a hearing post-deprivation, see id. at 1137–39.  Unlike in this case, in Johnson there was no facially valid sentence that justified holding the detainee past his release date.  Id.

ii.   <u>Reincarceration</u>

While Hurd seems to rely primarily on the District's failure to provide him a hearing for 10 months as the relevant conscience-shocking behavior, he also suggests that the initial decision to reincarcerate him after several years at liberty also shocks the conscience: "[t]he very idea that the District can refuse to release a prisoner serving a weekend sentence for two additional years without ever giving the prisoner a hearing to challenge the basis [of] his confinement is by itself an outrage, particularly when the District had prior to that taken no action to enforce the sentence over a period of years, despite multiple opportunities to do so." Opp'n to Mot. for Summ. J. at 43 (emphasis omitted) (internal quotation marks omitted).

Courts have held that reincarcerating a prematurely released prisoner to serve the remainder of his unserved, valid sentence does not shock the conscience due to how commonly that occurs, and, accordingly, "mindless abuse of power, or a deliberate exercise of power as an instrument of oppression, or power exercised without any reasonable justification in the service of a legitimate governmental objective" would be required before delayed incarceration would shock the conscience.  <u>Hawkins</u>, 195 F.3d at 746 (cleaned up).  In <u>Hawkins</u>, the court noted that "erroneous release . . . was not so unique an occurrence in general penal administration as to suggest arbitrariness in the challenged conduct by that fact alone" and that "[n]either . . . was the decision to reincarcerate . . . so much at odds with customary executive practice as to suggest arbitrariness on that account alone."  <u>Id.</u> at 743; <u>see</u> <u>Bonebrake</u>, 417 F.3d at 943 ("The sort of administrative error that leads to delayed incarceration is too frequently made in penal systems administration to raise any presumption of arbitrariness in the constitutional sense, whenever it occurs, and the routine executive practice has been to remedy the error by incarcerating or reincarcerating the offender." (internal quotation marks and citation omitted)).

The <u>Hawkins</u> court further noted that to find the decision to reincarcerate on a facially valid judgment violative of due process, one "would have to believe that [the decision] was infected or driven by something much worse—more blameworthy—than mere negligence, or lack of proper compassion, or sense of fairness, or than might invoke common law principles of estoppel or fair criminal procedure to hold the state to its error." 195 F.3d at 746.  It ultimately concluded that the decision to reincarcerate did not shock the conscience because "[n]othing about [the decision] suggest[ed] any element of vindictiveness or of power exercised simply to oppress."  <u>Id.</u>; <u>cf.</u> <u>Bonebrake</u>, 417 F.3d at 944  (denying a substantive due process violation because "[l]acking from the record . . . is a showing of mindlessly arbitrary or deliberately oppressive action by the State that might meet the rigorous standard of <u>Lewis</u> and the doctrine of substantive due process").[18]

---

[18] The <u>Hawkins</u> court suggested that reincarcerating an erroneously released prisoner without applying credit for the prisoner's time served while on parole could be conscience-shocking behavior if state law provides that parolees must be credited with the time they serve on parole against their sentences of incarceration.  <u>See</u> 195 F.3d at 746 (noting, in deciding that the government's decision to reincarcerate was not a violation of substantive due process, that "in compliance with state law, [authorities] properly credited Hawkins with the time spent on erroneous release," which North Carolina law "require[d] where parole [was] revoked").  Hurd thus argues that <u>Hawkins</u> supports that he was entitled to credit for time spent at liberty after he was erroneously released, which would have resulted in "no time left to serve" on his 2006 sentence.  <u>See</u> Opp'n to Mot. for Summ. J. at 36.

But the D.C. Court of Appeals has "reject[ed] any broad 'doctrine of credit for time at liberty.'"  <u>Wells v. United States</u>, 802 A.2d 352, 354 (D.C. 2002) (quoting <u>United States v. Martinez</u>, 837 F.2d 861, 865 (9th Cir. 1988)).  <u>Wells</u> explained that a "convicted person will not be excused from serving his sentence merely because someone in a ministerial capacity makes a mistake with respect to its execution," <u>id.</u> at 354 (internal quotation marks omitted), except in "'extreme' circumstances [where] a belated correction of a sentence might be 'so unfair that it must be deemed inconsistent with fundamental notions of fairness embodied in the Due Process Clause,'" <u>id.</u> at 355 (quoting <u>Davis v. Moore</u>, 772 A.2d 204, 220 (D.C. 2001)).  The court then proceeded to apply the <u>Merritt</u> test to determine whether the facts presented in that case constituted such an "extreme circumstance."  Hurd argues that <u>Wells</u> does not control because it

> was decided before adoption of Equitable Street Time Credit Amendment Act of 2008, which provides that "in the interests of administering a fair and proportionate system of parole, a parolee shall receive credit toward the completion of the sentence for all time served on parole unless the United States Parole Commission orders [that] the parolee not receive such credit under the circumstances set forth in this act."

Sur-Reply at 2 (alteration in original) (quoting D.C. Law 17-389).

First, the Equitable Street Time Credit Amendment Act of 2008 is of little relevance here as Hurd was never on parole.  Second, to the extent <u>Wells</u> applies beyond the parole context (and thus survives the enactment of the Equitable Street Time Credit Act), its holding is clear that D.C. does not recognize a broad common law right to credit for time spent at liberty after erroneous release except in "extreme circumstances," as set forth in the <u>Merritt</u> test.  But this Court has already decided that <u>Merritt</u> is not the appropriate yardstick against which to measure a substantive due process violation; rather, <u>Lewis</u>'s more stringent conscience-shocking inquiry governs.  Thus, any argument that Hurd

The undisputed facts in this record do not support that the DOC (through Sibert) acted with deliberate indifference or any level of culpability above mere negligence—if it acted with any fault at all—in the decision to hold Hurd beyond the completion of his weekends-only sentence.  It is not genuinely disputed that Sibert, the DOC employee responsible for preparing Hurd's release authorization form, discovered a facially valid judgment showing that Hurd seemingly never served the remainder of his 2006 sentence after serving the 15-month felony sentence at FCI Beckley despite the "normal practice" at the time, which was "for felony time to be served in the federal prison" and "misdemeanor time to be served in the []D.C. Jail."  Hurd SOF ¶¶ 41–42; see SUF ¶¶ 22–23; Resp. SUF ¶¶ 22–23; see also Dist. Ex. 21 26:21–31:2, 50:22–52:1.[19]  Sibert contacted a supervisor for advice on how to proceed given that Hurd seemed to still have time left to serve on the 2006 sentence, before ultimately denying Hurd's release.  SUF ¶ 23; Resp. SUF ¶ 23; Dist. Ex. 23 52:11–54:19.  Sibert then took the additional step of contacting BOP to inquire about the circumstances of Hurd's release because he understood the possibility that "they could have sent him to a different [facility]" to serve the remainder of his time and thus that his time

---

was constitutionally entitled to credit for time spent at liberty seems to have little place in Lewis's substantive due process rubric.  Accord Vega, 493 F.3d at 317 ("Because we do not find a constitutional basis upon which to anchor the rule of credit for time spent erroneously at liberty, the roots of the rule must be located elsewhere.  In this respect, we look to the common law.").

Moreover, whether Hurd served too long a sentence after the initial decision to reincarcerate him is a separate (though related) question.  The next section will address the viability of such an overincarceration theory.

[19] Hurd claims to dispute the facts surrounding Sibert's discovery of Hurd's unserved sentence—namely, he disputes "that Mr. Sibert 'discovered that [Hurd] had outstanding charges.'"  Resp. SUF ¶ 23. It is not immediately clear whether he disputes the fact that Sibert "discovered" the "outstanding charges" or that there were, in fact, "outstanding charges."  The Court finds that either dispute is not material (at least in this context) because what matters here is whether Sibert had a reasonable belief that there was—not that there certainly was—outstanding time to be served on other sentences.  Hurd provides contextual facts seemingly in an effort to dispute this fact, including evidence that Sibert "did not begin his actual investigation" into Hurd's unserved sentence "until after the District decided to keep him in jail," Hurd SOF ¶ 64, that "Sibert had no way of knowing whether Mr. Hurd in fact had [] time left to serve," id. ¶ 65, and that "[w]hen the District decided not to release Mr. Hurd, it did not actually know whether [he] had time left to serve or not," id. ¶ 66.  Although these facts may be important in other respects, nothing Hurd cites creates a genuine or material dispute as to the circumstances of Sibert discovering that there was a 2006 sentence indicating that Hurd had been sentenced to a term of incarceration on misdemeanor convictions that he had, according to the records, never served.

could have already been served elsewhere."  Dist. Ex. 23 58:3–15; see SUF ¶ 24; Resp. SUF ¶ 24;

Hurd SOF ¶¶ 44, 48.  Moreover, Sibert did not personally know Hurd prior to preparing his release

authorization form, foreclosing the possibility that the decision to hold Hurd was motivated by any

personal animus toward him or other impermissible personal dynamics.  Dist. Ex. 21 at 50:3–14.

This record of Sibert's conduct simply does not support the inference that his decision to

hold Hurd "was infected or driven by something much worse—more blameworthy—than mere

negligence, or lack of proper compassion, or sense of fairness," Hawkins, 195 F.3d at 746.  In fact,

a reasonable fact finder could conclude that Sibert's conduct was not even negligent, as Sibert

conducted due diligence, conferred with his supervisor before taking action, and later inquired of

BOP to ensure his action was justified.  Hurd has not pointed to any facts in the record that support

a contrary inference.

And Sibert's inquiry into Hurd's sentences dispels any notion of even the lesser standard

of "deliberate indifference"—the facts show that he was not indifferent at all but rather took the

issue seriously and investigated it.  Put simply: Sibert's initial decision to hold Hurd past his

weekends-only sentence and reincarcerate him pursuant to the facially valid judgment and order

indicating that he had remaining time to serve on other misdemeanor sentences was reasonable;

hence no reasonable juror could find that initial decision to be conscience-shocking.

      iii.    Overincarceration

Hurd also contends that he was overincarcerated, either because the decision by parole to

release him was deliberate and had the effect of revoking the outstanding balance of his sentences

of incarceration, because he should have been credited for his time at liberty after supervised

release, or because his time-served credits were not properly applied to his misdemeanor

sentences.[20]   He seems to obliquely suggest that his overincarceration, following the initial decision to reincarcerate him, "can be viewed . . . as an independent violation of substantive due process," separate and apart from the decision to reincarcerate him in the first instance.  Opp'n to Mot. for Summ. J. at 31.  This theory is distinct from the theory that the reincarceration itself was the violation, because this theory concerns whether the length of time Hurd was detained (beyond the initial decision to detain) was outrageous or conscience-shocking.

"Overdetentions potentially violate the substantive component of the Due Process Clause by infringing upon an individual's basic liberty interest in being free from incarceration absent a criminal conviction."  Barnes v. Dist. of Columbia, 793 F. Supp. 2d 260, 274–75 (D.D.C. 2011) (footnote omitted).  "Courts have declined to adopt a bright-line rule for the maximum permissible delay in the overdetention context."  Id. at 275.  "Given that plaintiff['s] overdetention claim[] [is] brought under the substantive component of the Due Process Clause, to show a violation of [his] constitutional rights, [he] must demonstrate that the DOC's conduct either interfere[d] with rights 'implicit in the concept of ordered liberty,' or was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  Id. at 276–77 (first quoting United States v. Salerno, 481 U.S. 739, 746 (1987); and then quoting Lewis, 523 U.S. at 847).  "In the prison setting, . . . 'deliberate indifference can rise to a constitutionally shocking level . . . .'  The central question is whether the DOC's conduct manifested deliberate indifference to plaintiff['s] . . . constitutional rights."  Id. at 277 (quoting Lewis, 523 U.S. at 852).  "Courts evaluating due process claims involving overdetentions have found various factors relevant to the

---

[20] Given that Judge Holeman denied Hurd's motion for a reduction of sentence based on the first two of these three theories during the July 2012 habeas corpus hearing, see Dist. Ex. 12, it is hard for the Court to see how the District's continued incarceration of Hurd after that denial could constitute the basis for conscience-shocking behavior. The Court will therefore focus mainly on the theory of overincarceration based on the failure to properly apply time-served credits.

analysis, including the delays associated with necessary administrative procedures, the total number of persons overdetained during the period, the rate of overdetentions given the total number of releases processed, and the duration of individual overdetentions." Id.

The District argues that this is a new theory: "[t]he only issue has been whether Plaintiff could be reincarcerated—not for how long.  Indeed, Plaintiff has not previously disputed the amount of time left on his sentence."  Opp'n to Sur-Reply at 7.  As discussed above, the Court rejects that argument, at least insofar as it would bar consideration of overincarceration as the basis of Hurd's prejudice resulting from the alleged procedural due process violation.  But it is less clear that Hurd has pursued the theory that overdetention is the relevant harm for his <u>substantive</u> due process claim.

Perhaps partially as a result of Hurd not pursuing this substantive due process theory over the eight-year span of this litigation, the record is sparse as to the circumstances surrounding the execution and length of Hurd's sentence after DOC's decision not to release him at the conclusion of his weekends-only sentence in October 2011.  The only evidence relevant to this issue in the record is (1) Judge Holeman's 2006 judgments specifying clearly that Hurd would be awarded "credit for time served" on each count of conviction and, <u>see</u> Dist. Ex. 1; Dist. Ex. 3; (2) that Hurd had a total of 97 days of time-served credit, Dist. Ex. 7 at 2 (reflecting 97 days of "jail credit"); (3) that Hurd was incarcerated for an additional 729 days on the outstanding charges, <u>see</u> SUF ¶ 26; Resp. SUF ¶ 26, even though he should have been incarcerated for 388 fewer days per the terms of the 2006 judgments; (4) that in July 2012, 10 months after Hurd was held over to serve the balance of his time on his 2006 sentences, Judge Holeman denied his petition for a writ of habeas corpus, which did not include consideration of the time-served-credits issue but rather focused on Hurd's right to credit for time spent erroneously at liberty, <u>see</u> Dist. Ex. 12; and (5) that the General

Counsel for the USPC issued a memo to file on July 31, 2012, four days after Judge Holeman denied the habeas petition, noting that Hurd had "[r]emaining sentences" for "misdemeanor crimes" and that he "will be serving the remaining 27 months with the D.C. Dept. of Corrections," see Dist. Ex. 23 (memo to file).

Setting aside the merits of such a theory,[21] the Court is unwilling at this juncture to entertain it.  Hurd has had several years to tee-up a substantive due process claim based on serving too much time after the initial decision to reincarcerate him.  He has argued (persuasively) that some amount of overincarceration occurred.   But that argument was made primarily in the context of the prejudice he experienced as a result of the District's procedural due process violation—Hurd's pleading and briefs have never clearly articulated that the relevant harm for his <u>substantive</u> due process claim was overincarceration.[22]  And it is too late to do so now (although it is still not clear to the Court based on the briefing before it that he is even trying to).  "[I]t is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, like the plaintiff here."  <u>Raines v. U.S. Dep't of Just.</u>, 424 F. Supp. 2d 60, 66 n.3 (D.D.C. 2006) (internal quotation marks omitted); <u>see also</u> <u>Johnson v. Panetta</u>, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived.").

---

[21] The Court is doubtful that, based on this cursory record, there is sufficient evidence to support an inference that relevant DOC staff were deliberately indifferent to ensuring that the length of Hurd's sentence was correct in a manner that shocks the conscience.  It is not even clear from the record who the relevant decision-maker is in deciding the length of a prisoner's sentence, let alone who that decision-maker was in this case and how that decision was made.  There is simply not enough meat on the bones of this argument for the Court to properly consider it.

[22] As discussed in the procedural due process section, Hurd articulates overincarceration as a theory of harm/prejudice resulting from his failure to receive a pre-deprivation hearing, which is the basis for his procedural due process claim, <u>see, e.g.</u>, Opp'n to Mot. for Summ. J. at 30–35, but he has not adequately framed or briefed his overincarceration as an independent theory of <u>substantive</u> harm beyond a cursory mention in a footnote.

Accordingly, the Court will grant the District's request for summary judgment in its favor on Hurd's substantive due process claim.

## **Conclusion**

For the foregoing reasons, the Court will grant Hurd's motion for leave to file a sur-reply; deny the District's motion for summary judgment on Hurd's procedural due process claim; grant the District's motion for summary judgment on Hurd's substantive due process claim; and deny the motion to preclude expert evidence as moot at this time.  The parties shall meet and confer to discuss the next steps in this litigation and file a joint status report outlining a proposed schedule for further proceedings by not later than August 15, 2023.  The parties shall also appear for a status conference on August 17, 2023 to discuss the status of the litigation and the proposed schedule. An accompanying Order will issue on this date.

_____/s/_____

JOHN D. BATES
United States District Judge

Dated: July 25, 2023